**Gatewood Walden**
Attorney at Law  WAL 043
# 8 Marlborough Street
Montgomery, Alabama 36109
Phone: 334-277-3790
Fax: 334-274-9157
gatewoodwalden@msn.com
Attorney for Crooked Creek
Properties, Inc., a Nevada Corporation

RECEIVED

2008 DEC 18  P 4: 10

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA

CROOKED CREEK PROPERTIES, INC.,
a Nevada corporation, whose principal
place of business is located in Bakersfield,
California,

      Plaintiff,

Case No.: 2:08 CV 1002 - WKW

vs.

**JURY TRIAL DEMANDED \***

RICHARD ENSLEY, PATRICIA ENSLEY,
ANITA LILES, CHARLES EDMONDSON, ES CAPITAL,
LLC, VENTURE SERVICES D/B/A DANYA APARTMENTS
MANAGEMENT GROUP, AN ASSOCIATION-
IN-FACT, XYZ, INC., A CORPORATION WHOSE
NAME IS UNKNOWN, BUT WHICH WILL BE ADDED BY
AMENDMENT WHEN ASCERTAINED, ABC, LLC, AN
ALABAMA LIMITED LIABILITY COMPANY, WHOSE NAME IS
UNKNOWN, BUT WHICH WILL BE ADDED BY AMENDMENT
WHEN ASCERTAINED, JOHN DOE, JANE DOE, RICHARD
ROE, INDIVIDUALS WHOSE TRUE AND CORRECT
NAMES ARE UNKNOWN, BUT WHICH WILL BE ADDED
WHEN ASCERTAINED.

      Defendants.

# TABLE OF CONTENTS

DEMAND FOR JURY TRIAL ...................................................................4

I.      RICO ........................................................................................4

II.     SUBJECT MATTER JURISDICTION ..................................7

III.    SUPPLEMENTAL JURISDICTION ......................................8

IV.     PERSONAL JURISDICTION ................................................8

V.      DIVERSITY JURISDICTION ................................................9

VI.     FEDERAL QUESTION JURISDICTION................................9

VII.    PROGRAMS INVOLVING FEDERAL FUNDS.....................9

VIII.   VENUE ..................................................................................11

IX.     PERSONS OR ENTITIES INVOLVED IN THE CASE ...................... 13

   A.   PLAINTIFF ................................................................. 13

     1. CROOKED CREEK PROPERTIES, INC. .................. 13

     2. WILLADEAN WALDEN .......................................... 13

   B.   DEFENDANTS ............................................................. 14

     1. RICHARD ENSLEY .............................................. 14

     2. PATRICIA ENSLEY.............................................. 14

     3. ANITA LILES ...................................................... 15

     4. CHARLES EDMONDSON ...................................... 15

     5. ES CAPITAL, LLC .............................................. 17

     6. VENTURE SERVICES d/b/a DANYA APARTMENTS
       MANAGEMENTGROUP ........................................ 18

     7. WAYNE SANDLIN ............................................... 18

X.      BACKGROUND ........................................................................ 19

   A.   THE MONTGOMERY CIRCUIT COURT CASE ......................... 22

   B.   THE AUTAUGA CIRCUIT COURT CASE.............................. 32

   C.   THE APPELLATE COURT CASE ..................................... 36

   D.   THE CONVEYANCE TO CROOKED CREEK PROPERTIES, INC. ....... 38

XI.     ALLEGATIONS COMMON TO ALL CLAIMS ................................. 40

   A.   GENERAL ALLEGATIONS............................................... 40

B.  THE ENGRAFTING OF THE "MORTGAGE" AND "MANAGEMENT AGREEMENT".............................................................................. 44

C.  THE OPEN ENDED "MORTGAGE AGREEMENT"................................. 45

D.  CANCELLATION OF THE PURPORTED MANAGEMENT AGREEMENT.................................................................................... 46

XII.  GENERAL RICO ALLEGATIONS ....................................................... 51

A.  INFILTRATION AND EXPLOITATION OF DANYA APARTMENTS.. 51

B.  RICO PERSONS ............................................................................... 52

C.  THE ASSOCIATION-IN-FACT ENTERPRISE.................................... 53

    1.  STANDING ................................................................................ 57

    2.  PROXIMATE CAUSE .................................................................. 58

D.  RICO ENTERPRISE ........................................................................ 59

E.  THE PATTERN OF RACKETEERING ACTIVITIES ........................... 64

    1.  SEPERATENESS AND CONTINUITY........................................... 67

    2.  RELATEDNESS .......................................................................... 68

F.  SCIENTER ...................................................................................... 70

G.  RICO INJURIES.............................................................................. 73

H.  FORESEEABILITY OF DAMAGES .................................................... 74

XIII.  PREDICATE RICO OFFENCES ......................................................... 76

A.  BANK FRAUD ................................................................................. 76

B.  THE INTERSTATE TRANSPORTATION OF STOLEN SECURITIES.. 79

C.  MAIL FRAUD AND WIRE FRAUD ................................................... 88

D.  THE NATIONAL STOLEN PROPERTY ACT ...................................... 99

E.  EXTORTION ................................................................................... 101

F.  MONEY LAUNDERING ................................................................... 106

G.  PROGRAMS RECEIVING FEDERAL FUNDS .................................... 108

XIV.  RICO CLAIMS FOR RELIEF ............................................................ 109

FIRST CLAIM FOR RELIEF CIVIL RICO 18 U.S.C. § 1962 (a) ................... 109

SECOND CLAIM FOR RELIEF CIVIL RICO 18 U.S.C. § 1962 (b).............. 115

THIRD CLAIM FOR RELIEF CIVIL RICO 18 U.S.C. § 1962 (c).................. 118

FOURTH CLAIM FOR RELIEF CIVIL RICO 18 U.S.C. § 1962 (d) ............. 135

FIFTH CLAIM FOR RELIEF AIDING AND ABETTING............................. 147

SIXTH CLAIM FOR RELIEF MONEY LAUNDERING ................................ 149

SEVENTH CLAIM FOR RELIEF EXTORTION – HOBBS ACT .................. 151

EIGHTH CLAIM FOR RELIEF PROGRAMS RECEIVING FEDERAL
FUNDS........................................................................................ 157

NINTH CLAIM FOR RELIEF RECEIPT OF STOLEN PROPERTY .......... 158

XV.   STATE LAW CLAIMS FOR RELIEF ...................................... 161

A.   TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS............ 161

B.   CRIMINAL TRESPASS ...................................................... 165

C.   CONVERSION – PROGRAMS INVOLVING FEDERAL FUNDS ......... 167

D.   FELONY AS BASIS FOR TORT ACTION................................... 170

1.   STATE LAW CLAIM AGAINST RICHARD ENSLEY.................... 170

2.   STATE LAW CLAIM AGAINST CHARLES EDMONDSON ........ 171

3.   STATE LAW CLAIMS AGAINST PATRICIA ENSLEY ............... 176

4.   STATE LAW CLAIMS AGAINST ANITA LILES ...................... 177

5.   STATE LAW CLAIM FOR CONSPIRACY .............................. 178

E.   AN ACTION IN THE NATURE OF EJECTMENT .................... 181

F.   AN ACTION FOR BREACH OF FIDUCIARY DUTY.............. 184

G.   AN ACTION FOR RECISSION FOR BREACH OF CONTRACT ......... 185

H.   AN ACTION TO QUIET TITLE ......................................... 186

I.   AN ACTION TO DECLARE MORTGAGE VOID ..................... 189

XVI.   SUPPLEMENTAL REQUEST FOR RELIEF UNDER 18 U.S.C.
§ 1964 (a)............................................................................ 199

A.   TEMPORARY RESTRAINING ORDER.................................. 199

B.   APPOINTMENT OF A RECIEVER ...................................... 200

C.   AN ACCOUNTING ........................................................ 201

D.   MOTION TO PRODUCE .................................................. 201

E.   REQUESTS FOR AN APPOINTMENT OF A RECEIVER...................... 201

REMEDIES............................................................................ 202

CONCLUSION........................................................................ 202

ATTORNEY VERIFICATION ................................................... 203

CERTIFICATE OF SERVICE.................................................... 205

## COMPLAINT FOR VIOLATION OF THE RACKETEERING INFLUENCED & CORRUPT ORGANIZATIONS ACT AND FOR SUPPLEMENTAL STATE CAUSES OF ACTION AND OTHER RELIEF

**COMES NOW**, the plaintiff, CROOKED CREEK PROPERTIES, INC., a Nevada Corporation, whose principal place of business is located in Bakersfield, California, by and through its attorney, GATEWOOD WALDEN, a duly licensed and practicing Alabama attorney, and commences this action against defendants, RICHARD ENSLEY, PATRICIA ENSLEY, ANITA LILES, CHARLES EDMONDSON, ES CAPITAL, LLC., and VENTURE SERVICES d/b/a DANYA APARTMENTS MANAGEMENTGROUP, an association-in-fact enterprise within the meaning of RICO, XYZ, INC., a corporation whose name is unknown, but which will be added by amendment when ascertained, ABC, LLC, an Alabama Limited liability company, whose name is unknown but which will be added by amendment when ascertained, JOHN DOE, JANE DOE, RICHARD ROE, individuals whose true and correct names are unknown, but which will be added by amendment when ascertained, and bring the following causes of action to wit:

## DEMAND FOR JURY TRIAL

CROOKED CREEK PROPERTIES, INC. brings this action and respectfully demands *trial by jury* on all counts.

## I.    RICO

1.    This action is brought pursuant to the Racketeering and Corrupt Organizations Act (RICO), 18 U.S.C.A. § 1961 and § 1964, and supplemental state causes of action.

2.    Congress passed RICO for the *express purpose* of protecting legitimate businesses from infiltration and exploitation by corrupt organizations. Moreover, the Racketeering and Corrupt Organizations Act *specifically targets* the racketeering

4

businessman who by devious means attempts to cause or causes the honest victim to surrender his business to the racketeer businessman.[1]

3.      While RICO's primary target may have been organized crime syndicates, nevertheless, this action is a prototypical civil RICO action because it does indeed involve racketeers and a corrupt organization, which has infiltrated and has exploited, and continues to exploit a legitimate business. And it involves racketeering businessmen who by devious means are even now attempting to cause plaintiff to surrender its business to them.

4.      The racketeering statute, Title 18 U.S.C. § 1962 (a-d), makes it unlawful (1) to invest income derived from a pattern of racketeering activity in any enterprise, (2) to acquire or maintain any interest in any enterprise through a pattern of racketeering activity, (3) to conduct any enterprise or participate in the conduct of the affairs of any enterprise through a pattern of racketeering activity, and (4) to conspire to violate the substantive provisions of § 1962. Of particular importance in this action is 18 U.S.C. § 1952, which prohibits interstate transportation in aid of racketeering. [2]

5.      A corrupt organization is defined under RICO as any group that has an organized structure of bosses, advisors, and committed working members whose *key goal* is to obtain money and property through illegal or unlawful activities. In this action the corrupt organization, or organized crime group that has infiltrated and is exploiting a legitimate business is referred to as VENTURE SERVICES d/b/a

---

[1] "As the Supreme Court recently noted, Congress in enacting RICO intended to "encourag[e] civil litigation to supplement Government efforts to deter and penalize the . . . prohibited practices. The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity." Rotella v. Wood, 528 U.S. 549, 557 (2000). Recognizing that the statute gives private citizens the ability to seek injunctive relief as well as damages is fully consistent with this role for civil RICO litigation."
[2] Bunker Ramo Corp. v. United Business, 713 F.2d 1272 (7th Cir. 1983).

DANYA APARTMENTS MANAGEMENT GROUP (hereinafter "DANYA GROUP").

6.    For the record, DANYA GROUP is an association-in-fact enterprise, or corrupt organization as defined by 18 U.S.C. § 1961 (4), which has engaged in a pattern of racketeering activity that has affected interstate commerce by committing a variety of racketeering acts such as bank fraud, mail fraud, wire fraud, theft of government funds, receiving stolen property, interstate transportation of stolen securities, extortion, and conspiracy to violate RICO.[3]

7.    The *participants* in DANYA GROUP are eerily analogous to the traditional Mafia family. RICHARD ENSLEY is Godfather; PATRICIA ENSLEY is capo and confidant; ANITA LILES is soldier and enforcer; CHARLES EDMONDSON is consigliore and shyster; and ES CAPITAL, LLC serves as conduit through which the criminally derived funds are laundered. [4] To be sure, these RICO "persons" associate together, and function similarly to an archetypal crime syndicate.

8.    The legitimate business that the corrupt organization has infiltrated and is exploiting is DANYA PARK APARTMENTS (hereinafter "DANYA APARTMENTS"), a federally subsidized Section 8 housing-project for low-income families located in Prattville, Alabama. Parenthetically speaking, DANYA APARTMENTS is owned by plaintiff. But plaintiff has been prevented by the association-in-fact enterprise, DANYA GROUP, from having any access to or control over its property.

9.    Under federal caselaw, the association-in-fact enterprise may also include a blameless victim such as DANYA APARTMENTS.[5] Thus, it would seem that the

---

[3]  Bunker Ramo Corp. v. U.S., 713 F.2d 1272 (7th Cir.1983).
[4]  "Participate" is defined as "to take part in." Webster's Third New *International Dictionary, 1646 (1976)*.
[5]  *Aetna Cas. v. P&G Auto Body*, 43 F.3d 1546, 1547 *(1st Cir. 1994); Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir. 1989).

Section 8 housing-project, although a victim of racketeering activity, nevertheless participates in and is an integral part of the association-in-fact enterprise, within the meaning of RICO. It goes without saying, that although DANYA APARTMENTS is an integral part of the association-in-fact enterprise, it is *not* a party-defendant.

10. Similarly to the *modus operandi* of a classic organized crime syndicate, DANYA GROUP, has taken-over a legitimate business by force, and is systematically looting the business of every dollar it brings in. In addition, the mob boss, RICHARD ENSLEY, has implicitly made plaintiff an "offer" that it cannot refuse. Give up DANYA APARTMENTS or else! (Such an injury has been termed in federal caselaw an infiltration and exploitation injury.)

## II.    SUBJECT MATTER JURISDICTION

11. The District Court for the Middle District of Alabama has jurisdiction over the subject matter, and the defendants in this action pursuant to the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961-1968 (1994 and Supp. III), specifically, 18 U.S.C. § 1964 (a-d), § 27 and 28 U.S.C. § 1331, et al.

12. Subject matter jurisdiction of a claim under the Racketeering Influenced and Corrupt Organizations statute is founded on 18 U.S.C.A. § 1964 (c), which provides that any person *injured in his or her business or property* by reason of a violation of 18 U.S.C.A. § 1962 (a-d) may sue therefore in any appropriate United States District Court, and shall recover treble the damages sustained, and the cost of the suit, including a reasonable attorneys' fee.

13. Moreover, this District Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a), because the matter in controversy exceeds the sum of $100, 000 exclusive of interest and costs, and because there is complete diversity of citizenship between the plaintiff and the defendants. Specifically, plaintiff alleges that the parties in this case are citizens of different states, the

plaintiff, CROOKED CREEK, being a corporation organized and existing in the state of Nevada, and having its principal place of business in Bakersfield, California, and the defendants, each of them, being residents of the state of Alabama.

## III.  SUPPLEMENTAL JURISDICTION

14. This court has supplemental jurisdiction under 28 U.S.C. § 1367 over the claims asserted here that arise under the laws of the State of Alabama.

15. Moreover, supplemental jurisdiction applies in this action pursuant to 28 U.S.C. § 1367 (c) because plaintiff's state law claims are so factually related to its RICO claims that they form a part of the same case or controversy under Article III of the U.S. Constitution.

16. Furthermore, CROOKED CREEK avers that this District Court may exercise pendente jurisdiction over state law claims as provided for in 18 U.S.C. § 1964 (c), § 28.

17. Lastly, CROOKED CREEK believes and therefore alleges that there is a justiciable controversy between the parties hereto under RICO and also under state civil law, and that this court has jurisdiction over this matter.

## IV.  PERSONAL JURISDICTION

18. Plaintiff alleges that personal jurisdiction is founded on 18 U.S.C.A. § 1965 (b) and (d). Personal jurisdiction exists as to each of the defendants in this action because not only is each one of them a resident of the State of Alabama, they were at all times relevant to this action doing business in the state of Alabama.

19.    Also, this District Court has jurisdiction over certain claims herein pursuant to 18
       U.S.C. § 1964, and U.S.C. § 1331 because the claims arise under the laws of the
       United States of America.

## V.    DIVERSITY JURISDICTION

20.    Moreover, this court has jurisdiction in this action because the parties are
       completely diverse, and the amount in controversy exceeds $100,000 and this court
       has jurisdiction under 28 U.S.C. § 1332.

## VI.    FEDERAL QUESTION JURISDICTION

21.    CROOKED CREEK alleges that there is federal question jurisdiction in this action
       because the case involves both (1) the necessity for plaintiff to prove as an essential
       element of their state law causes of action, the existence of federal mail fraud, wire
       fraud, and bank fraud crimes, interstate transportation of stolen property, theft of
       federal funds, receiving stolen property, aiding and abetting the commission of
       federal criminal offenses, extortion, forgery of U.S. Government securities, and
       conspiracy to commit federal criminal offenses, which indictable offenses would
       be enforceable in a federal civil RICO cause of action as predicate acts; and (2) the
       fact that proof of the alleged federal mail fraud, wire fraud, bank fraud, and
       interstate transportation of stolen property, theft of federal funds, extortion, forgery
       of U.S. Government securities, and conspiracy to commit federal criminal offenses,
       involves very substantial federal questions as explicated in *Ayers v. General
       Motors Corp., U.S.* 11th Circuit Court of Appeals, No. 98-8696, (11th Cir. 2000).

## VII.  PROGRAMS INVOLVING FEDERAL FUNDS

22.    As well, this Court has jurisdiction over this case because plaintiff is an
       organization that receives federal funds within the meaning of 18 U.S.C. § 666 (a)
       (1) (A).

9

23. Under federal statutory law whoever, without authority, knowingly converts to the use of any person other than the rightful owner, property that is valued at $5000 or more, and is owned by, or is under the care, custody, or control of an organization that receives federal funds, violates 18 U.S.C. § 666 (a) (1) (A).

24. Plaintiff, CROOKED CREEK, owns DANYA APARTMENTS, a Section 8 housing-project for low-income families that receives federal funds, which subsidizes the rent of the tenants who occupy the apartment units located in the housing-project. Section 8 housing was created by the Housing and Community Development Act of 1974, Pub .L. No. 93-383, Sec. 201 (a), 88 Stat. 633, 662. Section 8 housing is owned by private parties who enter into contracts with government authorities. The Secretary of Housing and Urban Development oversees the program. See 24 C.F.R. Secs. 811-899 (section 8 housing).Occupancy in federally assisted housing is limited to "lower income families," defined as "families whose incomes do not exceed 80 per centum of the median income for the area." 42 U.S.C. Sec. 1437a (b) (2) (Supp. III 1985). The class of lower income families is divided into two subclasses; low income families, whose incomes are from 80 percent to 50 percent of the median and very low income families, whose incomes are below 50 percent of the median.

25. Defendants RICHARD ENSLEY, ANITA LILES, and their associates have *knowingly converted* to their own use, during the preceding three years, without plausible justification or legal excuse, property valued at in excess of $100,000 that was owned by, or was under the care, custody, or control of plaintiff's predecessor-in-interest or plaintiff, an organization that receives federal funds within the meaning of 18 U.S.C. § 666 (a) (1) (A). Violations of 18 U.S.C. § 666 (a) (1) (A), are federal crimes involving moral turpitude.[6]

---

[6] Cancellation of the "Management Agreement" removed any plausible justification or legal excuse.

26.   CROOKED CREEK believes and therefore alleges that ENSLEY and LILES continually forge endorsements on U.S. Government subsidy checks that belong to CROOKED CREEK in violation of 18 U.S.C. §§ 495, 641.

27.   CROOKED CREEK further alleges that ENSLEY and LILES are aided and abetted in the theft of property concerning programs receiving federal funds by PATRICIA ENSLEY and CHARLES EDMONDSON.

28.   Upon information and belief, plaintiff avers that PATRICIA ENSLEY encourages, induces, and counsels with ENSLEY and LILES in the commission of the aforementioned federal criminal offenses, and, consequently, knowingly and willingly receives a portion of the criminally derived funds for her services.

29.   And, upon information and belief, ENSLEY and LILES consult with and are counseled by CHARLES EDMONDSON who devises the unlawful strategy that is required for them to continue violating 18 U.S.C. § 666 (a) (1) (A), and that for this illicit service EDMONDSON knowingly and willingly receives a portion of the proceeds of the criminally derived funds.

30.   A violation of 18 U.S.C. § 666 (a) (1) (A) is a federal criminal offense, as is also aiding and abetting in the violation of 18 U.S.C. § 666 (a) (1) (A), as well as a variety of other indictable federal offenses mentioned in detail hereinafter, and therefore this court has jurisdiction of this case.

## VIII. VENUE

31.   To be sure, CROOKED CREEK alleges that this civil action arises under the laws of the United States of America.

32.   Venue is proper in the Middle District of Alabama under 18 U.S.C. § 1965 (a) and (b), and 18 U.S.C. § 30, because the defendants are found, have agents, and

transact business, or all of the above, within the meaning of 18 U.S.C. § 1965 (a), in this District.

33. Venue is also proper in this District under 28 U.S.C. § 1391 (b) because a substantial part of the events or omissions giving rise to plaintiff's claims, such as the fraudulent conversion, theft, or misappropriation of U. S. federal funds payable only to the owner of the Section 8 housing-project, receipt of fraudulently converted or stolen public funds, criminal trespass on a federally subsidized housing-project, tortious intentional interference with business relations affecting interstate commerce, interstate transportation of stolen or wrongfully converted U.S. Government funds, mail fraud, wire fraud, and bank fraud, conspiracy to violate RICO, aiding and abetting RICO violations, extortion, and unlawfully receiving stolen or converted federal funds....all occurred in this District.

34. Moreover, venue is proper in the Middle District of Alabama under 28 U.S.C. § 139 (a) because a substantial portion of the real and personal property that is the subject of this action is situated within this judicial district, and because under the common-law doctrine of local actions, actions involving disputes over title to or possession of real property must be brought in the judicial district where the real property is located.

35. In addition, the general venue provision over actions based on federal questions jurisdiction, 18 U.S.C.A. § 1391 (b), is supplemental to RICO venue provision 18 U.S.C.A. § 1965 (a) and (b), § 30.

36. Furthermore, venue is proper in the District Court for the Middle District of Alabama pursuant to the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961-1968 (1994 and Supp. III), specifically, 18 U.S.C. § 1964 (a-d), § 27 and 28 U.S.C. § 1331.

37.   Lastly, venue is proper in the Middle District of Alabama because DANYA
      APARTMENTS is a HUD, Section 8 low-income housing-project located in the
      Middle District of Alabama that receives federal funds, which defendants have
      stolen and continue to steal each month in violation of 18 U.S.C. § 666 (a) (1) (A)
      and other federal statutes.

## IX.   PERSONS OR ENTITIES INVOLVED IN THE CASE

### A. PLAINTIFF

#### 1.   CROOKED CREEK PROPERTIES, INC.

38.   CROOKED CREEK PROPERTIES, INC, the plaintiff in this action, is a foreign
      corporation organized and existing under the laws of the state of Nevada, with its
      principal place of business located in Bakersfield, California. It is duly registered to
      do business in the state of Alabama.

39.   CROOKED CREEK is the successor-in-interest to DANYA PARK
      APARTMENTS, LLC, a limited liability company organized in the state of
      Alabama.

40.   CROOKED CREEK claims legal title to DANYA APARTMENTS, Prattville,
      Alabama. Plaintiff's record of title is recorded in the Office of the Judge of
      Probate, Autauga County, Alabama, and it is by virtue of the record of title that
      plaintiff also claims color of title.[7] In so far as is known, no other person or entity
      claims legal title or color of title to DANYA APARTMENTS but plaintiff.

#### 2.   WILLADEAN WALDEN

41.   WILLADEAN WALDEN is not a party in this case at this time, but she is a
      resident citizen of the City of Montgomery, State of Alabama, and she is the former
      owner of all of the common stock in DANYA PARK APARTMENTS, LLC,

---

[7]   *Roe v. Doe ex dem. Tennessee Coal, Iron & Ry. Co.,* 50 So. 230 (Ala. 1909)

which owned DANYA APARTMENTS. She is mentioned here because she was prominently involved in the events leading to this litigation.

### B. DEFENDANTS

42.   CROOKED CREEK alleges that the following individuals are the defendants in this case, and they are "persons" within the meaning of 18 U.S.C. § 1962 (a-d).

#### 1. RICHARD ENSLEY

43.   RICHARD ENSLEY resides in the state of Alabama. He is purportedly a Certified Public Accountant, and at all times relevant hereto, has wrongly and deceitfully held himself out to be the "manager" of DANYA APARTMENTS. Regarding the management and operation of the association-in-fact enterprise, he purportedly has been and continues to be the final authority. Indeed, he is the <u>ringleader</u> of the RICO association-in-fact enterprise whose members are identified with particularity hereinafter.

#### 2. PATRICIA ENSLEY

44.   PATRICIA ENSLEY resides in the state of Alabama. She counsels, induces, encourages, and aids and abets RICHARD ENSLEY in the commission of the federal criminal offenses he commits and which are described in detail hereinafter. And, she knowingly and willfully participates in the association-in-fact enterprise. Moreover, she participates in the operation and management of the association-in-fact-enterprise in that she has the power to approve or disapprove of the major decisions affecting the conduct of the enterprises. She possesses this power because, upon information and belief, she is the major financial backer of the association-in-fact enterprise; therefore she has veto authority over any major decision that affects the continued vitality of the enterprise. Furthermore, upon information and belief, she personally capitalized ES CAPITAL, LLC. ES CAPITAL, LLC is the entity through which the criminally derived funds are channeled, or laundered.

14

### 3. ANITA LILES

45.   ANITA LILES resides in the City of Prattville, State of Alabama. At all times
      relevant hereto, LILES has been employed by ENSLEY as DANYA
      APARTMENTS' on-site manager. And as on-site manager she has had and
      continues to have a role in the Management and operation of the association-in-
      fact-enterprise. That is to say she participates in the operation and management of
      the association-in-fact-enterprise. Upon information and belief, she knowingly and
      willfully participates in the association-in-fact enterprise, and receives part of the
      criminally derived proceeds resulting from the plundering of the Section 8
      business. It is believed that she knowingly and willfully forges endorsements on
      the low-income families' checks, and on the U.S. Government's subsidy checks,
      and deposits them into a checking account in a federally insured Alabama bank for
      collection from an out-of-state bank or other out-of-state financial institution.

### 4. CHARLES EDMONDSON

46.   CHARLES EDMONDSON resides in the state of Alabama. Upon information and
      belief, he is a lawyer, and at all relevant times to this action he knowingly and
      willfully participates in the unlawful conduct and illegal operations of the
      association-in-fact enterprise by counseling and advising ENSLEY and LILES on
      ways and means of continuing to dominate and exploit the Section 8 business.
      Moreover, he has a role in the management and operation of the association-in-fact
      enterprise in that his counsel and advice are sought and followed on major
      management and operational matters, especially those decisions relative to the
      relationship between the enterprise and the plaintiff. Upon information and belief,
      EDMONDSON has been instrumental in the enterprise's practice of withholding
      financial information and data from plaintiff. To be sure, CROOKED CREEK
      believes and therefore alleges that EDMONDSON knowingly and willingly
      facilitates ENSLEY, LILES and their associates in their racketeering activities by

15

his tacit approval of the enterprise's illicit conduct in furtherance of the enterprise's scheme to systematically loot the Section 8 business, and eventually forcibly take it over. Indeed, EDMONDSON has been instrumental in the RICO defendants' attempts to cause plaintiff to surrender its Section 8 business to them.

47.    Astonishingly, EDMONDSON knows, should know, or has reason to believe that ENSLEY, LILES, and their associates never submit monthly financial reports to plaintiff as required under the terms and conditions of the purported Management Agreement, just as the enterprise did not submit such monthly financial reports to plaintiff's predecessor-in-interest, and yet he continues to participate in the enterprises, and to do all he can do to see that it succeeds. He has refused and continues to refuse to withdraw from participation in the RICO enterprise even though he knows or has reason to believe that the failure to submit monthly financial reports to plaintiff is alone a material breach of the purported Management Agreement. And is a clear indicator that defendants intend to take over the business and that plaintiff should give up any aspirations it might harbor of ever getting its business back.

48.    In addition, EDMONDSON knows, should know, or has reason to believe that ENSLEY, LILES, and their associates falsely endorse and deposit to their own business account the periodic U.S. Government subsidy checks that belong to plaintiff. And, EDMONDSON knows as a matter of fact that ENSLEY, LILES, and their associates have been barred by plaintiff from entering onto the housing-project's property, and he also knows as a matter of fact that they have been ordered by plaintiff to discontinue all further involvement in the conduct of the affairs of the Section 8 business. But he also knows that plaintiff's demands have been ignored and that defendants have ignored those just demands so that they can continue to plunder the business.

49.  More than that, for his services as consigliore EDMONDSON has received a
     substantial portion of the criminally derived funds resulting from the infiltration,
     domination, and exploitation of the Section 8 business in violation of 18 U.S.C.A.
     § 2315. Not to be misunderstood, CROOKED CREEK alleges that some or all of
     the money EDMONDSON has received for the services he has rendered to the
     criminal enterprise have come directly from the enterprise's criminally derived
     funds, and EDMONDSON knows this to be a fact. To explicate, CROOKED
     CREEK alleges that a taking by fraud falls within the scope of 18 U.S.C.A. § 2315,
     the statute making it an indictable offense to receive goods, moving in, or as, or
     part of interstate commerce, knowing the same to have been stolen, unlawfully
     converted, or taken within the meaning of said statute. [8] EDMONDSON has
     feloniously received, and, it is believed, continues to feloniously receive funds
     taken by fraud within the meaning of 18 U.S.C.A. § 2315. It is factual to say and
     CROOKED CREEK therefore alleges that at all times relevant to this action
     EDMONDSON has committed numerous indictable federal offenses in violation of
     RICO over the preceding three years.

     **5.  ES CAPITAL, LLC**

50.  At all relevant times to this action, ES CAPITAL, LLC has been and is, upon
     information and belief, a duly organized and existing Alabama limited liability
     company. Upon information and belief, RICHARD ENSLEY and PATRICIA
     ENSLEY are the sole stockholders in ES CAPITAL. The company purports to hold
     a "mortgage" on DANYA APARTMENTS. But in actuality the company is merely
     a conduit through which criminally derived funds are laundered within the meaning
     of 18 U.S.C. § 1957, and as exposited in federal case law. ES CAPITAL participates
     in the enterprise as a vehicle through which criminally derived funds are channeled.

---

[8]  U.S. v. McClintic, 570 F.2d 685. ". . . we have not found any cases dealing with the value problem in 18
U.S.C.A. § 2315 (Sale or receipt of stolen goods, etc.) as distinguished from 18 U.S.C.A. § 2314 (Transportation of
stolen goods, etc.).

### 6. VENTURE SERVICES d/b/a DANYA APARTMENTS MANAGEMENTGROUP

51.   CROOKED CREEK avers that VENTURE SERVICES d/b/a DANYA
      APARTMENTS MANAGEMENT GROUP ("DANYA GROUP") is an
      association-in-fact enterprise as that term is understood and used in the RICO
      context, and within the meaning of 18 U.S.C. § 1961 (4), and 18 U.S.C.A. § 1962
      (a-d). DANYA GROUP's members consists of, upon information and belief, the
      following RICO "persons:" RICHARD ENSLEY, PATRICIA ENSLEY, ANITA
      LILES, CHARLES EDMONDSON, VENTURE SERVICES, and ES CAPITAL,
      LLC. DANYA GROUP is a corrupt organization or criminal "enterprise" in this
      matter within the meaning of 18 U.S.C.A. § 1962 (c) and 18 U.S.C.A. § 1964, and
      its infiltration, domination, and exploitation of DANYA APARTMENTS is a
      violation of the RICO statute.

### 7. WAYNE SANDLIN

52.   WAYNE SANDLIN is not a defendant in this case at this time, but he is one of the
      original conspirators in the fraudulent scheme. His wholly owned company, PARK
      PLACE CENTER, LTD., was an original party to the purported Management
      Agreement to manage DANYA APARTMENTS. And he and ENSLEY together
      bribed HUGH SMITH and formed ES CAPITAL to take an unlawful "mortgage"
      on the Section 8 housing-project. He is not a party to this RICO litigation at this
      time, although he may be added by amendment after discovery, because he
      assigned PARK PLACE CENTER's purported interest in the "Management
      Agreement" to ENSLEY, and he also conveyed his interest in ES CAPITAL to
      ENSLEY. Having cashed-out, he then withdrew from the conspiracy. However, he
      is mentioned here because he was prominently involved in formulating and
      executing the fraudulent scheme, and he did, upon information and belief,
      unlawfully and feloniously receive a substantial portion of the criminally derived

and illegally obtained U.S. Government funds, an indictable federal crime within the meaning of 18 U.S.C. § 666(a) and other federal statutes.

## X.   BACKGROUND

53.   The Byzantine, underlying, procedural history and the salient facts leading up to this RICO litigation began in 1995 when the late HUGH SMITH filed a declaratory judgment action against then 78 year-old WILLADEAN WALDEN in the Montgomery Circuit Court. MRS. WALDEN counterclaimed, won the case, and in 2000 (after an enforcement of the judgment hearing) was awarded the common stock in a corporation that owned a Section 8 housing-project located in Prattville, Alabama.[9] Then, in 2002 the Montgomery court, having been deceived by HUGH SMITH and others, vacated the 2000 judgment, and awarded MRS. WALDEN a first lien on the Section 8 housing-project conditioned upon SMITH refinancing DANYA APARTMENTS and paying off MRS. WALDEN's money judgments. MRS. WALDEN filed notice of appeal.

54.   While the case was under appellate review (*lis pendens*), however, ENSLEY and SANDLIN offered SMITH a $35,000.00 bribe to allow them to take a mortgage on DANYA APARTMENTS to secure unsecured loans they had made to him. SMITH accepted the bribe and fraudulently *encumbered* the property with a purported "Management Agreement" and a purported "mortgage" even though he knew it was unlawful to mortgage DANYA APARTMENTS while MRS. WALDEN's appeal was pending and unresolved.

55.   Thereafter, the appellate court affirmed the 2002 judgment. However, when MRS. WALDEN learned of the existence of the purported "Management Agreement" and the purported "mortgage" --- which violated the terms of the Montgomery court's 2002 judgment --- she filed a Rule 60 (b) (6) motion to vacate the 2002 judgment

---

[9] Hugh V. Smith Enterprises, Inc. was the name of the corporation whose stock was awarded to Willadean Walden.

as having been procured by a fraud upon the court. The upshot was that in 2004 the Montgomery court, with the consent of the parties, granted the Rule 60 (b) motion and reinstated the 2000 *in rem* judgment. At that point, MRS. WALDEN became, as a matter of law, the undisputed equitable owner of the Section 8 housing-project. But the property had been encumbered with what she believed was an invalid "Management Agreement" (to WAYNE SANDLIN's Management company -- later assigned to ENSLEY), and an invalid "mortgage" to ES CAPITAL, LLC (ENSLEY's and SANDLIN's purported mortgage company).

56.    Thereafter, MRS. WALDEN demanded that the "Management Agreement" and the purported "mortgage" be dissolved or set-aside and that ENSLEY discontinue any further involvement in the business affairs of the Section 8 business. Remarkably, ENSLEY (SANLDIN had by that time sold out to ENSLEY) ignored MRS. WALDEN's demands. Instead, he hunkered down.

57.    Consequently, MRS. WALDEN filed suit in ejectment and to quiet title in the Autauga Circuit Court, Prattville, Alabama.

58.    During the course of the litigation, both parties filed cross-motions for summary judgment. MRS. WALDEN argued that the "Management Agreement" was invalid because, *inter alia,* HUGH SMITH was not an officer or director of the corporation that owned the Section 8 housing-project when he executed the agreement -- and unchallenged documentary evidence of record in the case proved the point.

59.    MRS. WALDEN also argued that the "purported mortgage" taken on the property by ES CAPITAL was *void as a matter of law* because both ENSLEY and SANDLIN had actual knowledge of the existence of the pending litigation between MRS. WALDEN and HUGH SMITH (involving DANYA APARTMENTS) when the mortgage was executed.[10] Thus, they were not bona fide mortgagees for value.

---

[10] *Wallace v. Frontier Bank, N.A.,* 903 So.2d 792 (Ala. 2004)

60. Defendants', on the other hand, contended that the Montgomery court lost jurisdiction of the case once it had been affirmed on appeal. They argued, disingenuously, that the Montgomery court's 2002 judgment was the law-of-the-case, and that the Montgomery court had no authority to grant MRS. WALDEN *postaffirmance* Rule 60 (b) (6) motion.

61. Having willingly suspended its belief in fundamental principals of law or precedent, the Autauga court, in an unprecedented *collateral attack* by one court of concurrent jurisdiction on a final judgment of another court of concurrent jurisdiction, held that the Montgomery court's 2004 postaffirmance judgments were <u>void</u>, and that consequentially ES CAPITAL's mortgage was valid. The Autauga court also stated, as an afterthought and not as a reasoned opinion (i.e. dicta), that the "Management Agreement" was valid. As one would expect, MRS. WALDEN filed notice of appeal.[11]

62. Astonishingly, the appellate court affirmed....<u>not</u> on law-of-the-case grounds, but on grounds that ENSLEY and SANDLIN had prevailed on appeal.... never mind that ENSLEY and SANDLIN were *not even parties* to the Montgomery litigation.[12] To be sure, neither ENSLEY nor SANDLIN was a party to the Montgomery case or the appellate court case. Hence, that appellate court case stands as a monument for the proposition that in Alabama a "non-party" to an appeal can "win" the case!

63. Not surprisingly, the appellate court, following the lead of the Autauga court, did not discuss the reasons for its decision, or explain its logic. Nor did the appellate court, again following the lead of the Autauga court, <u>cite</u> any precedential case. It

---

[11] *G.T. Wofford Oil Co. v. Burgin*, 66 So. 931, 11 Ala. App. 477 (Ala.App. 1914) "The decisions, and not the dicta, of our Supreme Court are binding on us . . . ."

[12] Appellate court's may not legally affirm a lower court's ruling on different grounds unless those grounds were raised in the lower court, which they were not

goes without saying, that no case was cited because none exists. The principal of *stare decisis* was simply ignored.[13]

64. Even more astonishingly, however, the appellate court did not address the post affirmance Rule 60 (b) procedural issue <u>at all</u>. That is to say, there was <u>no</u> discussion (no analysis; no explanation) whatsoever regarding the issue of the validity or invalidity of MRS. WALDEN's postaffirmance Rule 60 (b) motions. For aught that appears in the decision, a Rule 60 (b) postaffirmance motion is not proper procedure in Alabama, but, of course, it is proper procedure. Still, the issue was never considered or discussed. One thing is for certain, though, the minds of the court were not brought to bear upon the issue, and it was not solemnly and finally adjudicated. In other words, that issue was <u>not</u> decided on the merits.

65. At that point, MRS. WALDEN having reached the age of 91 years, and weary of eccentric court decisions conveyed her interest in the Section 8 housing-project to CROOKED CREEK PROPERTIES, INC., a Nevada corporation.

66. CROOKED CREEK now brings this action alleging, *inter alia,* violations of the Racketeering and Corrupt Organizations Act.

### A. THE MONTGOMERY CIRCUIT COURT CASE

67. CROOKED CREEK alleges and avers the following relevant facts in support of its RICO and state law claims set forth hereinafter with particularity.

68. MRS. WALDEN prevailed in the Montgomery case, winning the declaratory judgment action against HUGH SMITH outright, and obtaining money judgments against him on her counter-claims, including a $70,000.00 jury verdict for <u>fraud</u>.

---

[13] Devotion to stare decisis is considered a mark of judicial restraint.

69. MRS. WALDEN executed on her money-judgments, but the Sheriff's return stated "No Assets Found." SMITH had denied owning any assets or real property. Distrustful of SMITH's impecunious claims, she began judgment enforcement proceedings. Finding at the evidentiary hearing that SMITH was indeed concealing assets (i.e. stock in HUGH V. SMITH ENTERPRISES, INC.), and finding also that the corporate stock's value was approximately equivalent to MRS. WALDEN's money judgments, the Montgomery court, pursuant to Rule 70, A.R.Civ.P., and a Circuit court's inherent authority to enforce its own judgments, in August 2000, vested MRS. WALDEN with <u>all</u> of the common stock in HUGH V. SMITH ENTERPRISES, INC., an Alabama corporation that owned DANYA PARK APARTMENTS, a Section 8 housing-project for low-income families located in Prattville, Alabama.

70. MRS. WALDEN recorded the Montgomery court's 2000 *in rem* judgment in the Probate Court of Autauga County, Alabama, in December 2000, at RLPY Bk 578 PG 544. And SMITH did <u>not</u> appeal.

71. Two years later, in June 2002, the Montgomery court, relying on false representations that if allowed he, SMITH, would refinance DANYA APARTMENTS and would pay MRS. WALDEN's money judgments, vacated the 2000 *in rem* judgment, and in its place awarded MRS. WALDEN a first lien on the Section 8 property.

72. At that point, believing that the Montgomery court had failed to follow proper procedure, MRS. WALDEN filed notice of appeal. On appeal she argued that the 2000 in rem judgment was still valid and in force.

73. While the case was under appellate review, however, RICHARD ENSLEY and WAYNE SANDLIN confronted SMITH about unsecured, past-due loans they had made to him. ENSLEY and SANDLIN at the time correctly believed they were

squarely faced with the prospect of sizeable financial losses if SMITH defaulted, a likely prospect. So they, along with their lawyer, JESSIE WILLIAMS, met with SMITH, and his lawyers, GEORGE THOMAS, ALVIN PRESTWOOD and LINDA WELLMAN to discuss their financial dilemma. At the meeting, refinancing of DANYA APARTMENTS was discussed at length. THOMAS, a real estate specialist, opined that refinancing through an institutional-lender was problematic because MRS. WALDEN's *in rem* judgment was of record in the Autauga Probate Court. He pointed out in that meeting in PRESTWOOD's office that the Montgomery court's *in rem* judgment was a cloud on DANYA APARTMENTS' title. And, he also opined, correctly, that MRS. WALDEN's pending *appeal (lis pendens)*[14] was another legal impediment to institutional-refinancing. Simply put, real-estate-lawyer THOMAS told ENSLEY and SANDLIN that it was unrealistic to believe that they could obtain refinancing of the Section 8 housing-project through a conventional institutional lender such as a bank or mortgage company under the circumstances.

74.    Because obtaining institutional-investor financing was doubtful, if not impossible, ENSLEY and SANDLIN --- *instead of simply taking a second mortgage* on DANYA APARTMENTS ---- concocted an imaginative, albeit unlawful and fraudulent, scheme not only to avoid what they no-doubt perceived to be an almost certain financial loss, but a possible way to reap a windfall profit.

75.    Their extraordinary scheme, however, involved perpetrating a <u>fraud</u> on the Montgomery court, and cheating MRS. WALDEN. Put another way, SMITH, ENSLEY, and SANDLIN, enabled by their compliant, if not corrupt lawyers, concocted and carried out a multifaceted conspiracy to defraud the Montgomery court, and swindle MRS. WALDEN. At the heart of the conspiracy was the breach

---

[14] Under the common-law doctrine of lis pendens, the filing of an action respecting the right, title, interest in or claim to property placed the property *in custodia legis,* or in the custody of the court in which the action was commenced. *Thompson v. Johnson,* 201 Ala. 315, 78 So. 91 (1918).

of the Montgomery court's 2002 order, which had <u>mandated</u> that MRS. WALDEN's judgments be paid first from any refinancing of DANYA APARTMENTS. Rather than refinancing DANYA APARTMENTS and paying MRS. WALDEN's judgments, however, SMIITH, having been promised a $35,000 bribe, permitted ENSLEY and SANDLIN to take a first mortgage on DANYA APARTMENTS. The ulterior purpose of the combination of the "Management Agreement" and "mortgage" was to engraft their claims onto MRS. WALDEN's Section 8 property (here the term engrafting is meant to suggest permanent attachment). The objective being to gain total control over the property and access to its income … in perpetuity. The plan worked. The results being that MRS. WALDEN was stymied, and her successor-in-interest, the plaintiff herein, continues to be stymied.

76. Disdainful of MRS. WALDEN's recorded *in rem* judgment, unwelcome by institutional investors, and dismissive of black-letter property-law (*bona fide* mortgagee status is *precluded* a mortgagee who has notice as to another party's equity, either *at the time of the mortgage, or at or before, the time the mortgagee parts with the consideration*) ENSLEY and SANDLIN formed ES CAPITAL, LLC to take a mortgage on DANYA APARTMENTS.[15] This stratagem allowed them to convert their unpaid, unsecured, loans to SMITH, *individually*, into secured loans due and payable by what they believed was SMITH's corporation (secured because HUGH V. SMITH ENTERPRISES, INC owned DANYA APARTMENTS).[16] The upshot was, SMITH, ENSLEY and SANDLIN defrauded the Montgomery court and cheated MRS. WALDEN.[17]

---

[15] "A bona fide purchaser ... is one who buys property in good faith for valuable consideration and without knowledge (actual or imputed) of outstanding claims in a third party or parties." <u>Carter v. Converse, 550 S.W.2d 322, 329</u> (Tex.Civ.App.1977, writ ref'd n. r. e.). (This rule is universal). The issue of notice is factual, and should not be resolved by the court as a question of law unless "there is no room for ordinary minds to differ as to the proper conclusions to be drawn from the evidence." <u>Crystal City Independent School District v. Crawford, 612 S.W.2d 73, 75</u> (Tex.Civ.App.1980-writ ref'd n. r. e.). (Obviously, Alabama courts erred in granting summary judgment on this issue).
[16] Unbeknownst to Ensley and Sandlin, Smith purportedly had no interest in Hugh V. Smith Enterprises, Inc. and thus had no authority to encumber the corporation's property at the time he executed the "Management Agreement."
[17] First National Bank of Birmingham v. Culberson, 342 So. 2d 347 (1977).

77. Therefore, legally speaking, ENSLEY and SANDLIN fraudulently conspired to hinder, delay, or defraud MRS. WALDEN, a judgment creditor. And linguistically speaking, they acted in concert with each other with malevolent forethought, intending to burden MRS. WALDEN with a long delay in the enjoyment of her property rights in hopes that she, an elderly, widow-woman, would surrender her property rights to them . . . or expire.

78. ES CAPITAL ("E" for ENSLEY; "S" for SANDLIN) although ostensibly a single-transaction mortgage company was and continues to be, in reality, a mere procedural device for transmuting ENSLEY's and SANDLIN's unsecured loans into secured mortgage loans to HUGH V. SMITH ENTERPRISES, INC. In other words, ENSLEY and SANDLIN, in forming ES CAPITAL to take a mortgage on DANYA APARTMENTS, were able to convert their individual, unsecured, loans to SMITH into secured loans to HUGH V. SMITH ENTERPRISES, INC. --- or so they believed --- due and payable to their company, ES CAPITAL, albeit at MRS. WALDEN's expense. As a bonus, ES CAPITAL would serve as a conduit through which criminally derived funds would flow . . . by-passing the owner of DANYA APARTMENTS. By these means, the illicitly obtained funds would be laundered and untraceable within the meaning of 18 U.S.C. § 1957.

79. Not unimportantly, ENSLEY's and SANDLIN's lawyer-prepared, mortgage-loan documentation lent the transaction the appearance of legitimacy, and served concomitantly to discourage or confuse future challengers of the legality of the transaction.

80. For his abasement, SMITH was paid a $35, 000 bribe at closing, an aberrant occurrence implicative of the transaction's underlying malevolence. The cash-to-SMITH-at-closing was, of course, merely a pay-off for his complicity in the unlawful scheme to defraud the Montgomery court, and to swindle MRS.

WALDEN. And, of course, it was money he would <u>not</u> have otherwise received had he not joined in the ENSLEY/SANDLIN conspiracy.

81.   The linchpin of SMITH's, ENSLEY's and SANDLIN's elegant, albeit corrupt, two-part scheme was a purported Management Agreement between HUGH V. SMITH ENTERPRISES, INC. and PARK PLACE CENTER, LTD. The purported Management Agreement provided that SANDLIN's company would manage the Section 8 housing-project until such time as ES CAPITAL's mortgage was paid in full. It might be said with accuracy that the "Management Agreement" was open-ended because there was no time period expressed in it. The "Management Agreement" provided that it would continue in force and effect until ES CAPITAL was paid in full, which of course could be indefinitely.

82.   In this way, ENSLEY and SANDLIN were able to infiltrate the Section 8 housing-project, and began their exploitation of the business. It goes without saying that this allowed them immediate, unfettered access to the Section 8 housing-project's cash-flow, a circumstance they intended to utilize to their maximum advantage. Meaning to say, they kept and continue to keep every penny of profit the business brings in.

83.   Notwithstanding the Autauga court's dicta that the "Management Agreement" was valid (no explanation or rationale was given for the statement), the "Management Agreement" was as a matter of law and fact void *ab initio*. The purported Management Agreement was void *ab initio* because SMITH was not an agent, officer, or director of HUGH V. SMITH ENTERPRISES, INC. in 2003, when he affixed his signature to the document. That is to say, SMITH, who was neither an officer nor director of the corporation, had no authority to bind HUGH V. SMITH ENTERPRISES, INC. to any contract or agreement at that point in time. This critical fact is undisputable because documentary evidence is of record in the Montgomery court case that proves the truth of the assertion. To explain, MARK WHITE, a lawyer representing ANNEE CASPARI (SMITH's sister) and

27

purportedly the trustee of a trust to whom SMITH had allegedly conveyed his HUGH V. SMITH ENTERPRISES, INC. stock, was instructed to write a letter to SMITH's attorney, ALVIN PRESTWOOD, which WHITE dutifully did in 2001 putting PRESTWOOD on notice that CASPARI had terminated SMITH as an officer and director of HUGH V. SMITH ENTERPRISES, INC. Hence, SMITH had no authority in 2003 to bind the corporation to the purported "Management Agreement" Thus ENSLEY's insistence that he is the "manager" of DANYA APARTMENTS is unsubstantiated by irrefutable evidence in the Montgomery court record, and is therefore false.

84.   Not only did SMITH lack corporate authority according to conclusive documentary evidence, he did not even claim to possess such authority according to ENSLEY himself. That is to say, ENSLEY <u>testified</u> by affidavit filed in the Montgomery case that he had prepared SMITH's federal and state income tax returns from 1990 through 1999, and that during that period of time, SMITH never claimed (on his tax returns under penalty of perjury) to have any ownership interest in HUGH V. SMITH ENTERPRISES, INC. ENSLEY has never refuted his affidavit testimony.

85.   This documentary evidence coupled with the notices of cancellation of the purported Management Agreement (all of which is a part of the official Autauga court record) obviously created a <u>factual issue</u> precluding summary judgment on the issue of the validity of the purported Management Agreement notwithstanding the Autauga court's order granting summary judgment in ENSLEY's favor. Moreover, the existence of this evidence also explains the omission of any discussion, or analysis by the court for its decision that the "Management Agreement" was valid. Indeed, what this evidence demonstrates and proves conclusively is that the issue of *the validity of the purported Management Agreement was not decided on the merits*. Hence, the Autauga court's statement

(absent explanation or analysis) that the "Management Agreement" was valid was nothing more than dicta.[18]

86.   Be that as it may, SANDLIN says he conveyed his stock in ES CAPITAL to ENSLEY. And he also claims he "assigned" PARK PLACE CENTER's dubious interest in the "Management Agreement" to ENSLEY as well.

87.   Meanwhile in March 2004, the appellate court affirmed the Montgomery court's June 2002, order, without opinion. Thereafter plaintiff's predecessor-in-interest, MRS. WALDEN, filed a Rule 60 (b) (6) motion seeking relief from the June 2002, order asserting as grounds that SMITH (together with SANDLIN and ENSLEY) had perpetrated a fraud upon the court.

88.   The Montgomery court held an evidentiary hearing on the motion, and with the consent of the parties in the case (which ENSLEY and SANDLIN were not) the Montgomery court entered a judgment vacating the 2002 order, and reinstating the 2000 *in rem* judgment.

89.   Parenthetically speaking, judgments are to be construed like other written instruments.[19] Moreover, a *consent judgment* is in the *"nature of a contract or a binding obligation between parties . . . ."*[20]

---

[18] G. T. Wofford Oil Co. v. Burgin, 66 So. 931, 11 Ala. App. 477 (Ala. App. 1914) "The decisions, and not the dicta, of our Supreme Court are binding on us . . . ". "Dictum, of course, is merely persuasive and has no precedential value." Knight v. State, 273 Ala. 480, 486, 142 So.2d 899, 905 (1962); Roquemore v. Sovereign Camp W.O.W., 226 Ala. 279, 282, 146 So. 619, 622 (1933). 585 So.2d 133, Hooper v. State, (Ala.Crim.App. 1990); "An opinion based on facts not shown by the record in the case is dicta and such opinion is not binding in subsequent cases." Wilkinson v. Rowe, 98 So. 2d 435, 266 Ala. 675 (Ala. 1957).

[19] Schwab v. Schwab, 255 Ala. 218, 50 So.2d 435 (1951).
[20] Price v. American National Bank of Gadsden, 350 So.2d 328 (Ala.1977). A consent decree has elements of difference from one representing judicial determination by the court. For it then 'must be 'regarded as in the nature of a contract or binding obligation between the parties thereto." Garrett v. Davis, 216 Ala. 74, 112 So. 342, 343; Cowley v. Farrow, 193 Ala. 381, 69 So. 114; Nixon v. Nixon, 245 Ala. 43, 15 So.2d 561; Adler v. Van Kirk Land & Construction Co., 114 Ala. 551, 21 So. 490, 62 Am.St.Rep. 133; Carr v. Ill. Cent. R. R. Co., 180 Ala. 159, 60 So. 277, 43 L.R.A.,N.S., 634; 30 C.J.S., Equity, § 678, p. 1126. It is controlled by certain principles which govern the effect of a contract, Cowley v. Farrow, supra, 193 Ala. at page 384, 69 S.W. 114, though it is a judgment and has the force of one as long as it so remains. Mudd v. Lanier, 24 So.2d 550, 247 Ala. 363 (Ala. 1945).

*Historically, the overwhelming weight of authority is that consent judgments are construed as being contracts of the litigants, and not as judicial acts of the court, and as contracts they <u>cannot be modified</u> without consent of the parties.*

*In entering consent judgment a court does not inquire into the wisdom of the bargain, nor of the facts at issue. The only question to be determined is whether the parties are capable of binding themselves [41 Ala. App. 632] by consent, and have done so. Once these questions are decided, the court's function is ministerial. See 08 Univ. of Penn. Law Review, p. 178.[21] (emphasis added).*

90.   Indeed, the act of entering a consent judgment in a matter *lawfully agreed upon between the parties and within the authority of the court is ministerial.*[22] Rules applicable to the construction and interpretation of contracts are applicable to the construction and interpretation of judgments.[23] Thus, in construing a consent judgment, the *intention of the parties* derived from the judgment itself controls if its language is plain and unambiguous. [24]

91.   The United States Supreme Court has interpreted consent decrees as follows: "A consent decree no doubt embodies an agreement of the parties and thus in some aspects is *contractual in nature*. But it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees."[25] Consequently,

---

[21]   The rule that consent judgments are to be regarded as contracts. . . ." Justice Cardozo in the 'Packers Consent Decree' case, United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 462, 76 L.Ed. 999.

[22]   Ex parte Lawley, 636 So.2d 474 (Ala.Civ.App. 1994); Jones, 252 Ala. at 482, 41 So.2d at 282.

[23]   Southern Housing Partnerships, Inc. v. Stowers ManagementCo., 494 So.2d 44 (Ala.1986).

[24]   Shores v. Sklar, 885 F.2d 760 (11th Cir.1989), cert. denied, 493 U.S. 1045, 110 S.Ct. 843, 107 L.Ed.2d 838 (1990); Walding v. Blue Cross and Blue Shield of Alabama, Inc., 577 So.2d 853, (Ala. 1991); Hanson v.   Hearn, 521 So.2d 953, (Ala. 1988)

[25]   Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378, 112 S. Ct. 748, 757, 116 L. Ed. 2d 867 (1992). "It is the clear doctrine of our cases that a consent judgment is in the nature of a contract between the parties, to which the court gives its formal approval administratively. A consent judgment waives all prior irregularities, and releases error, and cannot be set aside without the consent of the parties in the absence of fraud, mutual mistakes, or actual absence of consent. See Charles v. Miller, 36 Ala. 141; Davis v. McCampbell, 37 Ala. 609; McNeil v. State of Alabama, 71 Ala. 71; Ex parte Gresham, 82 Ala. 359, 2 So. 486; Curry v. Peebles, 83 Ala. 225, 3 So. 622; Senn v. Joseph, supra; Adler v. Van Kirk Land & Construction Co., 114 Ala. 551, 21 So. 490; Gunter v. Hinson, 161 Ala.

plaintiff's predecessor-in-interest was the undisputed owner of the common stock in the corporation that owed DANYA APARTMENTS, which plaintiff's predecessor-in-interest later conveyed to plaintiff.[26] Hence, under Alabama law plaintiff is the present undisputed equitable owner of DANYA APARTMENTS by virtue of both judgment and *contract*, and the Autauga court had no power to vacate or modify the contract between the parties. It should be added that plaintiff's claim of title is unchallenged by any other party claiming superior title. Nor is there any suit pending to enforce or test the validity of plaintiff's title.

92.     The following month the Montgomery court entered a *nunc pro tunc* judgment clarifying both the 2000 *in rem* judgment, and the 2004 consent judgment.   These two 2004 judgments were duly recorded in the Probate Court of Autauga County, Alabama. And since the two 2004 judgments are unappealed and unreversed, they are unassailable, unalterable, final judgments, *immune* from collateral attack.[27]

93.     Accordingly, by authority of the Montgomery court, plaintiff's predecessor-in-interest became, as a matter of law, the undisputed owner of all of the common stock of HUGH V. SMITH ENTERPRISES, INC., and under Alabama law the equitable owner of its assets, DANYA APARTMENTS. Thereafter, plaintiff's predecessor-in-interest formed a limited liability company, DANYA PARK

---

536, 50 So. 86; Cowley v. Farrow, 193 Ala. 381, 69 So. 114; Garrett v. Davis, 216 Ala. 74, 112 So. 342; National Bread Co. v. Bird, supra; Brasher v. First National Bank of Birmingham, 232 Ala. 340, 168 So. 42; Nixon v. Nixon, 245 Ala. 43, 15 So.2d 561; Mudd v. Lanier, 247 Ala. 363, 24 So.2d 550; A.B.C. Truck Lines v. Kenemer, 247 Ala. 543, 25 So.2d 511; Gossett v. Pratt, 250 Ala. 300, 34 So.2d 145; Louisville & N. R. Co. v. Bridgeforth, supra; Health v. Hall, 39 Ala.App. 623, 106 So.2d 38; Annotation, Power to Open or Modify Consent Judgment, 139 A.L.R. 421; 49 C.J.S. Judgments §§ 173-178; Black on Judgments (2d Ed.), Sec. 319, Consent Judgments, p. [41 Ala.App. 633] 484; Freeman on Judgments, 5th Ed., Sec. 1344-1352. Grigsby v. Liles, 147 So.2d 836, 41 Ala.App. 627 (Ala. 1961).

[26] "Speaking of the nature and effect of consent judgments and decrees, Freeman on Judgments (5th Ed., Vol. 3, page 2779, § 1352) says: 'Since a consent judgment or decree is in the nature of a contract, if it is vacated in part it must be vacated in toto. The court has no more power to modify or vacate in part a judgment by consent than it would have to modify a contract between the same parties.'"
Brasher v. First Nat. Bank, 168 So. 42, 232 Ala. 340 (Ala. 1936)

[27] The Autauga court lacked jurisdiction to vacate the 2004 final judgments of the Montgomery court. Therefore, the Autauga court's judgment is void.

APARTMENTS, LLC, and conveyed her common stock in HUGH SMITH
ENTERPRISE, INC. to the new company.

## B. THE AUTAUGA CIRCUIT COURT CASE

94.  Then, in 2004, believing her title in DANYA APARTMENTS firmly and legally
established, MRS. WALDEN demanded that ENSLEY, LILES, and their
associates discontinue further involvement in the conduct of the affairs of her
Section 8 business. And she also *barred* ENSLEY, LILES, and their associates
from coming onto the property.

95.  However, ENSLEY audaciously dismissed demands that he step aside as
"manager" and not come back onto her property. Instead, he hunkered down,
continued to dominate the business, and continued *misappropriating* all the money
the business brought in.

96.  Exasperated, MRS. WALDEN sought relief in the Autauga Circuit Court. She filed
a civil lawsuit alleging, *inter alia,* ejectment and quiet title.

97.  ENSLEY, SANDLIN, *et al,* answered and soon after filed summary judgment
motions contending that the appellate court's affirmance of the Montgomery
court's 2002 order was the law of the case and valid, and that the Montgomery
court's 2004 consent judgment and its *nunc pro tunc* judgment were null and void.
They reasoned, therefore, that their mortgage and their "Management Agreement"
were valid.

98.  In response, MRS. WALDEN argued that the law-of-the-case doctrine did not
apply for two reasons: one, because defendants' summary judgment motions
amounted to an *impermissible collateral attack* on the Montgomery court's

unappealed, unreversed, final judgments,[28] and, two, because the Montgomery court had jurisdiction under Rule 60 (b) (6) to grant her <u>postaffirmance</u> motion to vacate a judgment procured by the perpetration of a fraud upon the court. MRS. WALDEN also argued that the mortgage was invalid because ENSLEY and SANDLIN were <u>not</u> bona fide purchasers/mortgagees since they had actual notice of MRS. WALDEN's prior claim of title when they took their mortgage.

99.   It is worthy of note that ENSLEY and SANDLIN *did not plead the affirmative defense of bona fide purchaser.*[29] And, of course, the failure to plead an affirmative defense is a waiver of that defense.

100.   MRS. WALDEN also argued that the purported Management Agreement was void because, according to undisputed documentary evidence, HUGH SMITH was *not authorized* to enter into any agreement on behalf of the corporation. Indeed, he was not an officer, director, or agent of the corporation on the date he signed the purported Management Agreement. At the least it was a question of fact for the jury precluding summary judgment.

101.   A hundred years of Alabama appellate court decisions forbidding collateral attacks by one court on the final judgments of another court of concurrent jurisdiction did not impress the Autauga court, however. Dismissive of rock-solid precedential caselaw, the Autauga court instead divined that the Montgomery court was in error in granting MRS. WALDEN's Rule 60 (b) (6) <u>postaffirmance</u> motion for fraud upon the court, and erred in entering a consent judgment in accordance with the wishes and approval of the parties in the case.

---

[28] *Otto v. Guthrie,* 475 So.2d 856 (Ala. 1985). The court ruled that a motion for summary judgment in a different proceeding in a different court is a collateral attack on a judgment, and that. an attempt, by a summary judgment motion made in a different proceeding in a different court could not succeed. This rule of law was also explicated in Cowley v. Farrow, 193 Ala. 381 at page 384, 69 So. 114, 115; 34 C.J. 516, § 817. The court held that judgments and decrees by consent are open to direct attack only.
[29]   *Hoffman v. Truck Driving Academy* 777 So.2d 151 (Ala.Civ.App.2000).

33

102. Therefore, the Autauga court held that the Montgomery court's 2004 judgments were <u>null</u> and <u>void</u>. Whereupon, the Autauga court <u>reinstated</u> the Montgomery court's vacated 2002 judgment.

103. The Autauga court was similarly unimpressed not only by Alabama appellate court policy, but also by the reasoning of the United States Supreme Court in the case of *Standard Oil v. United States*,[30] as well as the wisdom of the Alabama Rules Committee on Civil Procedure. Rather, the Autauga court chose to disregard Alabama appellate court policy, which plainly and sensibly states that decisions of federal courts on matters of procedure are controlling in Alabama since Alabama Rules of Civil Procedure are modeled after the Federal Rules of Civil Procedure. Instead, the Autauga Court chose to disregard the rule set forth in *Standard Oil,* which is that a trial court may entertain a Rule 60 (b) *postaffirmance* motion without first obtaining leave of the appellate court. Lastly, the Autauga Court pooh-poohed the Committee Comments to Rule 60 (b), which states that leave of the appellate court is *not a prerequisite* to the filing of a Rule 60 (b) motion to vacate a judgment *that has been affirmed on appeal*. (Not surprisingly, the Autauga court omitted explaining why it had disregarded Alabama appellate court policy, why it had failed to apply the rule in *Standard Oil*, and why it refused to be guided by the plain language of the Rules' Committee.

104. Besides disregarding the rock-solid and long-settled doctrine that a judgment of a court of concurrent jurisdiction is *immune* from collateral attack by another court of concurrent jurisdiction, and discounting the little-known and rarely utilized federal and state procedural rule that a *postaffirmance* Rule 60 (b) motion is proper and sometimes necessary procedure, the Autauga court also inexplicably refused to acknowledge or else refused to apply the staid, if not antediluvian, black-letter rule of real property law which states that "a mortgagee must have had <u>no</u> notice, and

---

[30] *Standard Oil Co. of California v. United States*, 429 U.S. 17, 50 L.Ed.2d 21, th; see also *Ramirez-Zayas v. Puerto Rico*, 225 F.R.D.396 (D.Puerto Rico 2005)(Fed.RulesCiv.Proc.Rule 60(b), 28 U.S.C.A.).

34

knew of no fact sufficient to put him on inquiry as to another party's equity, _either at the time of the taking of the mortgage, or at or before, parting with the mortgage funds or otherwise parting with such value_."[31]

105.   Put differently, the Autauga court unaccountably rejected (without explanation) the universally accepted rule of property law that actual knowledge of pending litigation involving the subject property, **at the time** the mortgagee takes the mortgage, precludes _bona fide_ mortgagee status and renders a mortgage invalid. What the rule (the rule rejected by the Autauga court) means is that real property which is the subject of litigation is _unmerchantable_ until the litigation is settled or concluded. And mortgaging property or taking a mortgage on property involved in litigation (_lis pendens_) is impermissible, unlawful, and ineffectual. In other words, SMITH, ENSLEY and SANDLIN _broke the law._ And regrettably the Autauga court put its official imprimatur on their unlawful conduct; and became complicit in it.

106.   Regarding ENSLEY's and SANDLIN's actual knowledge of MRS. WALDEN's prior claim of legal title to the Section 8 housing-project property when ES CAPITAL took a mortgage on it, that fact is not in dispute. Nor is it in dispute that both of them, ENSLEY and SANDLIN, had actual knowledge of the pending appellate court litigation when they, or technically speaking their company, took a mortgage on the property. The simple, unalterable, truth of the matter is those facts are of record in the state courts.

107.   Besides opting not to apply well-settled rules of property law, the Autauga court also opted not to explain or justify its reason(s) for declaring that the "Management Agreement" was valid. Nor did the Autauga court deal with the issue of plaintiff's and plaintiff's predecessor-in-interest's written termination notices. The upshot is this: a simple, declaratory statement by the Autauga court that "the Management

---

[31]   _Wallace v. Frontier Bank, supra._

Agreement is valid" does not rise to the level of a *decision on the merits* of the precise issue as to whether the purported Management Agreement had been cancelled. Plaintiff's predecessor-in-interest alleged in her pleadings that she had officially and in writing cancelled the purported Management Agreement. ENSLEY and SANDLIN neither admitted nor denied the allegation. So, the Autauga court ignored the allegation altogether with the exception of the bald-faced statement that "the Management Agreement is valid." Consequently, those simple words being merely <u>dicta</u> are non-binding on the issue of cancellation of the "Management Agreement" on this or any other court. Truth be told, the Autauga court simply ducked the issue. And some other issues as well.

108. For the record, the Autauga court's order granting summary judgment was merely declaratory in nature. That is to say, the Autauga court "declared" that ES CAPITAL's purported mortgage was valid, and that ENSLEY's Management Agreement was also valid. What the Autauga court failed to do was address MRS. WALDEN's ejectment claim, quitclaim claim, conversion claim, trespass claim, etc. Those claims were split-off by the Autauga court, and left unresolved through no fault of MRS. WALDEN.

109. Be that as it may, MRS. WALDEN appealed from the Autauga court's judgment granting defendants' motions for summary judgment.

### C. THE APPELLATE COURT CASE

110. Regarding the validity of ES CAPITAL's purported mortgage, the appellate court incorrectly affirmed the Autauga court's summary judgment order holding the mortgage valid, albeit on different grounds. The Autauga court had based its summary judgment order on the law-of-the-case doctrine, holding that the Montgomery court's 2004 judgments were void for want of jurisdiction.[32] The appellate court, on the other hand, affirmed the lower court on different grounds,

---

[32] *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425 (5th Cir. 2000). It is error for an appellate court to affirm a trial court's summary judgment on grounds not relied on, unless those grounds were asserted in the lower court.

grounds <u>not</u> asserted in the lower court. The appellate court affirmed on grounds that ENSLEY and SANDLIN had *"prevailed"* on appeal, and that because they had "prevailed" on appeal their mortgage was valid.[33] However, in as much as ENSLEY and SANDLIN were never parties to the Montgomery case, it begs the question; how could they have "prevailed" in the case? The answer, of course, is obvious. Not being parties to the litigation they could not have prevailed.

111. Furthermore, the appellate court, reminiscent of the Autauga court, completely, albeit inexplicably, disregarded the United States Supreme Court's decision in *Standard Oil, supra*, as well as the Committee Comments to Rule 60 (b), which plainly states that postaffirmance Rule 60 (b) motions are perfectly permissible and proper. Not only that, the appellate court failed to explain its logic in opining that "non-parties" had "won" on appeal. Not surprisingly, the appellate court cited <u>not a single appellate case</u> in support of its decision. Nor did it explain why *Wallace v. Frontier Bank, N.A.*, 903 So.2d 792 (Ala.2004), which sets forth the Alabama doctrine and is now *stare decisis*, was not controlling. (The Wallace court held that actual knowledge of pending litigation in which the subject property is in involved precludes *bona fide* mortgagee status, and renders a mortgage void.) Had the appellate court applied *Wallace*, the purported mortgage would have been deemed void because, as ENSLEY and SANDLIN both admitted they had actual knowledge of the state court litigation, and MRS. WALDEN's pending claim on DANYA APARTMENTS *when they parted with the consideration,* i.e. when they made the mortgage.

112. Yet what is truly profound is the failure of the state courts to address the defendants' failure to plead the affirmative defense of bona fide purchaser. Or the state courts failure to discuss or explain how a mortgage can be declared valid when plaintiff accuses defendants of being mala fide mortgagees and they fail to

---

[33] *Id.*

plead or prove that they are bona fide mortgagees. Through no fault of MRS. WALDEN that crucial issue was *never* decided.

113. For the record, the appellate court simply affirmed the Autauga court's order granting summary judgment, which was merely declaratory in nature. That is to say, the appellate court affirmed the Autauga court order "declaring" that ES CAPITAL's purported mortgage was valid, and that ENSLEY's Management Agreement was also valid. What the appellate court did <u>not</u> address was the merits of MRS. WALDEN's ejectment claim, quitclaim claim, conversion claim, trespass claim, etc. Those claims were <u>split-off</u> by the appellate court just as they had been split-off by the Autauga court. And through no fault of MRS. WALDEN those crucial issues were left unresolved as well.

### D. THE CONVEYANCE TO CROOKED CREEK PROPERTIES, INC.

114. At that point, exhausted by protracted litigation, and dispirited by quirky, state-court, decisions, MRS. WALDEN, then 91 years-of-age, conveyed all of her common stock in DANYA PARK APARTMENTS, LLC to CROOKED CREEK PROPERTIES, INC.

115. Firstly, MRS. WALDEN owned all of the common stock in HUGH V. SMTIH ENTERPRISES, INC. by virtue of an award of an *in rem* judgment by the Montgomery Circuit Court in 2000, which she duly recorded in the Autauga Probate Court. Moreover, in 2004, the Montgomery Circuit Court entered a consent judgment in MRS. WALDEN's favor, which she also recorded in the Autauga Probate Court. Both judgments, the 2000 *in rem* judgment and the 2004 consent judgment, are now of record.

116. MRS. WALDEN changed the name of HUGH V. SMITH ENTERPRIESES, INC. to DANYA PARK APARTMENTS, INC., and later she conveyed all of her stock

in the corporation to plaintiff. Consequently, under Alabama law plaintiff is presently the equitable owner of DANYA APARTMENTS.

117. CROOKED CREEK is currently the recorded title holder of the real property known as DANYA APARTMENTS. In addition to plaintiff's claim of title, plaintiff also has *color of title*. Under Alabama law "[a]ny instrument purporting to convey an interest in land may be color of title, however defective or imperfect it is, and no matter from what cause it is valid."[34]

118. After the conveyance, ENSLEY, LILES, and their associates were notified that CROOKED CREEK had acquired and was the title holder of DANYA APARTMENTS, and that once again the "Management Agreement" was being formally cancelled. In addition, they were yet again ordered not to come back onto the Section 8 property.

119. Nonetheless, equally disdainful of DANYA APARTMENTS' new owner, ENSLEY, LILES, and their associates ignored plaintiff's notice-of-cancellation, its demand that they not come back onto the Section 8 property, and its demand that they discontinue further involvement in its Section 8 business.

120. But, not only have ENSLEY, LILES, and their associates ignored plaintiff's notices of cancellation and justifiable demands that they not come back onto the Section 8 property, they have refused and continue to refuse to render any type of accounting to plaintiff. Indeed, they persist in refusing to furnish plaintiff any Section 8 business-related information, and they will continue to refuse to furnish plaintiff with that essential information unless constrained by this court.

121. Astonishingly, CROOKED CREEK has not been contacted by nor had any dealings with ENSLEY, LILES, and their associates. None whatsoever. Truth be

---

[34] *Green v. Dixon,* 727 So.2d 781 (Ala.1998) citing with approval *Edmondson v. Colwell,* 504 So.2d 235, 236 (Ala. 1987).

told, they have refused or failed to report lawsuits, refused or failed to account for expenses, refused or failed to relate damages to the property, or the cost of repairs and up-keep, or transmit any other such business-related information. Apparently ENSLEY considers himself to be the owner of DANYA APARTMENTS, accountable to no one.

122. To be sure, ENSLEY, LILES, and their associates continue to dominate, exploit, and loot the Section 8 business with impunity, and unless this court intervenes the RICO enterprise will continue unconstrained.

## XI.   ALLEGATIONS COMMON TO ALL CLAIMS

### A. GENERAL ALLEGATIONS

123. CROOKED CREEK alleges that after the Montgomery Circuit Court awarded plaintiff's predecessor-in-interest the common stock in HUGH V. SMITH ENTERPRISES, INC. in August 2000, she duly recorded the *in rem* judgment in the Probate Court of Autauga County, Alabama. Thereafter she conveyed her common stock in HUGH V. SMITH ENTERPRISES, INC. to her new company, DANYA PARK APARTMENTS, LLC. Subsequently, she conveyed her common stock in DANYA PARK APARTMENTS, LLC to CROOKED CREEK PROPERTIES, INC. Hence, CROOKED CREEK now owns DANYA APARTMENTS.

124. CROOKED CREEK alleges that at all relevant times to this action DANYA APARTMENTS was and continues to be a United States Housing and Urban Development (HUD), Section 8 housing-project for low-income families, and is located in Prattville, Alabama.

125. The Housing Act of 1937, which includes apartments, sought to provide an adequate supply of housing for low-income families by *subsidizing* their rent in the

40

private market within the meaning of 42 U.S.C. § 1437 f (a) (West 1994). HUD is the federal agency which administers the housing programs.

126.   CROOKED CREEK alleges that at the present time it is the recorded, fee simple owner of the property known as DANYA APARTMENTS. But, it is not now, nor has it ever been in possession of or in control of its property because a corrupt organization or criminal enterprise prevents it.

127.   CROOKED CREEK alleges that ENSLEY, LILES, and their associates are doing business as VENTURE SERVICES d/b/a DANYA APARTMENTS MANAGEMENT GROUP (hereinafter "DANYA GROUP"). At all relevant times to this action, DANYA GROUP was and continues to be a criminal enterprise, or "corrupt organization" within the meaning of 18 U.S.C.A. § 1961 (4) and § 1964.

128.   A criminal enterprises or corrupt organization is referred to under RICO as an "association-in-fact enterprise" within the meaning of 18 U.S.C.A. § 1961 (4) and § 1964.

129.   CROOKED CREEK alleges that at all relevant times to this action RICHARD ENSLEY, PATRICIA ENSLEY, ANITA LILES, CHARLES EDMONDSON, and ES CAPITAL, LLC comprise the members of DANYA GROUP, the association-in-fact enterprise within the meaning of 18 U.S.C.A. § 1961 (4) and § 1964. Moreover, because under federal caselaw the victim of a racketeering enterprise can also be considered a participant in the enterprise, plaintiff suggests that the Section 8 housing-project for low-income families is itself a participant in the RICO enterprise.

130.   As an aside, upon information and belief, WAYNE SANDLIN was a member of the association-in-fact enterprise in the beginning, but he sold his interest in the purported "Management Agreement" and ES CAPITAL for cash to ENSLEY and

withdrew from the conspiracy. Still, he connived with RICHAR ENSLEY, PATRICIA ENSLEY, HUGH SMITH and others to cheat plaintiff's predecessor-in-interest, and in furtherance of that goal he committed a variety of indictable federal offenses.

131. For the record, plaintiff alleges that at all times relevant to this action DANYA GROUP, an association-in-fact enterprise within the meaning of 18 U.S.C.A. § 1961 (4) and § 1964, now possesses, dominates, and exploits plaintiff's Section 8 business.

132. CROOKED CREEK further alleges that at all relevant times to this action PATRICIA ENSLEY, ANITA LILES, CHARLES EDMONDSON, and ES CAPITAL, LLC, are RICHARD ENSLEY's associates, and that they and each of them have agreed with ENSLEY and with each other, as evidenced by their words, actions, and conduct, to participate in the affairs of the association-in-fact enterprise within the meaning of 18 U.S.C.A. § 1961 (4) and § 1964.

133. At all times relevant to this action, DANYA GROUP, a corrupt organization or association-in-fact enterprise, is a *criminal* organization within the meaning of 18 U.S.C.A. § 1962 (a-d) and 18 U.S.C.A. § 1964. One essential characteristic of a RICO association-in-fact enterprise is that it have an organizational pattern or system of authority, which DANYA GROUP does indeed possess. RICHARD ENSLEY is boss; ANITA LILES is a soldier and enforcer who carries out the boss's instructions and orders; PATRICIA ENSLEY is ENSLEY's financier and consultant; CHARLES EDMONDSON is the corrupt organization's facilitator and consigliore who aids and abets the enterprise's criminal activities, and who assists and advises DANYA GROUP as its members persist in trespassing on plaintiff's federally funded property, and as they continue to misappropriate its U.S. Government subsidy funds, a portion of which are periodically paid over to each of them. And EDMONDSON aids the enterprise by throwing up legal roadblocks,

42

which prevents plaintiff from taking possession and control of the Section 8 business. Finally, ES CAPITAL is the vehicle through which criminally derived funds flow and are unlawfully laundered.

134. CROOKED CREEK alleges that at all relevant times in this action the association-in-fact enterprise and the RICO "persons" are <u>distinct</u> from the predicate acts alleged with particularity herein below. Moreover, the association-in-fact enterprise is ongoing and functions as a continuing unit. And the association-in-fact enterprise will continue to function unlawfully into the future unless constrained by this court.

135. CROOKED CREEK alleges that it is being continuously and systematically injured in its business and property each and every month by the criminal enterprise in violation of RICO. In short, ENSLEY,LILES, and their associates, having infiltrated and hijacked DANYA APARTMENTS, are methodically looting the business with the intent of wresting it away from plaintiff altogether. In plain English, the RICO enterprise is stealing the money the Section 8 business earns, and the RICO enterprise is doing all within its power to unlawfully take-over the business lock, stock, and barrel.

136. CROOKED CREEK alleges that at all relevant times to this action the acts of racketeering committed by ENSLEY, LILES and their associates, and which have injured plaintiff in its business and property, has been economically motivated. In other words, the enterprise's racketeering acts have been and continue to be motivated by a venal desire for financial gain notwithstanding the substantial monetary injury such criminal conduct has visited on and continues to visit on plaintiff.

137. CROOKED CREEK alleges that at all times relevant hereto its injuries to its business or property stems from the infiltration and theft of the funds derived from the RICO enterprise's unlawful domination and operation of DANYA

APARTMENTS. Moreover, plaintiff alleges that it is *continuing* to be injured by the enterprise by being unlawfully deprived of the use and benefit of the earnings from the operation of its Section 8 housing-project to which it has been entitled and is entitled as owner.[35]

138.   At all times relevant to this action, DANYA APARTMENTS has been hijacked, and *is being systematically looted*. And by *extortionate* means the enterprise is preventing CROOKED CREEK from taking possession of its Section 8 business in violation of RICO. To explicate, plaintiff alleges that at all relevant times to this action, ENSLEY, LILES, and their associates, while systematically looting DANYA APARTMENTS, have had as their ultimate goal wresting ownership of the Section 8 business away from plaintiff. Put another way, the enterprise is attempting to dishonestly appropriate plaintiff's housing-project.

139.   CROOKED CREEK avers not only that it has been substantially injured in its business or property by defendants' exploitation and appropriation of its business or property in violation of RICO, but also by supplemental state torts inflicted upon it by the members of the enterprise and the enterprise.

140.   At all relevant times to this action, that which is referred to in this complaint as criminally derived property is any property constituting of or derived from, proceeds obtained from a criminal offense within the meaning of 18 U.S.C. § 1957 (f) (2).

## B. THE ENGRAFTING OF THE "MORTGAGE" AND "MANAGEMENT AGREEMENT"

141.   CROOKED CREEK alleges that the coupling together or engrafting of the "Management Agreement" and the "mortgage" is at the heart of the enterprise's fraudulent scheme. Indeed, it is the integral component of the scheme. Not merely

---

[35] *Santiago v. Lykes Bros. S.S. Co., Inc.*, 986 F.2d 423 (C.A.11 (Ala), 1993). A continuing tort does not cease until the date of the last injury or when the tortious acts cease

unusual, doing such is truly unprecedented. And it is a circumstance from which a reasonable presumption spontaneously arises that the hijacking of DANYA APARTMENTS by the criminal enterprise was premeditated, and therefore wanton. To be sure, it is the conjoining of the two instruments which inferentially establishes that ENSELY, LILES, and their associates, while plotting to loot DANYA APARTMENTS, were all-the-while sub-plotting to take-over DANYA APARTMENTS lock, stock, and barrel.

142. CROOKED CREEK alleges that the underlying motivation for conjoining the "Management Agreement" and the "mortgage," was that the enterprise could continue to dominate and exploit the Section 8 housing-project in perpetuity. That is to say, for so long as the enterprise could retain control of the Section 8 housing-project, ENSLEY would continue to receive a manager's fee, and LILES would continue to draw a salary as on-site manager. In addition, PATRICIA ENSLEY would continue to receive a return on her capital investment, and CHARLES EDMONDSON would continue to receive a retainer. Implementation of the scheme has required only that ENSLEY indefinitely delay paying off DANYA APARTMENTS' purported "mortgage " to ES CAPITAL since under the terms of the purported "Management Agreement" the "mortgage" would continue in effect until such time as the mortgage to ES CAPITAL was paid in full. In other words...*never*.

## C. THE OPEN ENDED "MORTGAGE AGREEMENT"

143. CROOKED CREEK further avers emphatically that the purported "Management Agreement," the linchpin of the illicit scheme, is fraudulently open-ended. What that means is it has no term limits, no end-time. The point is this: by simply delaying paying off the "mortgage" the RICO enterprise can extend its exploitation of the Section 8 business indefinitely or until such time as plaintiff surrenders the business and property to DANYA GROUP altogether.

144. CROOKED CREEK alleges that unless this court intervenes, ENSLEY and LILES
will continue paying themselves a "management fee" *ad infinitum*. Meanwhile,
plaintiff will have been *denied access* to and control over the conduct of the affairs
of its Section 8 business and property, and will have been prevented from the
enjoyment of its property rights, all of which is a violation of RICO.[36]

145. CROOKED CREEK alleges that because ENSLEY has breached the purported
agreement it has no knowledge about the day-to-day operations of the business, the
physical condition of the property, the income the property generates, the expenses it
incurs, the cost and extent of repairs, the number of occupants or vacancies, the rent-
rate per unit, pending lawsuits, the federal and state income tax liabilities, the right
to depreciation for tax purposes, whether federal reporting requirements are being
timely submitted, whether state regulations are being complied with, or any other
such government-supported business-related matter. Indeed, ENSLEY, LILES, and
their associates have callously and steadfastly refused to furnish plaintiff any
business-related information whatsoever in violation of the express terms of the
purported agreement. The fact of the matter is that evidence of compliance with, or
even an effort to comply with a single term of the purported Agreement is entirely
absent.

146. CROOKED CREEK avers that because ENSLEY, LILES and their associates have
refused and failed to furnish it with monthly financial reports, they have, for this
reason alone, *materially breached* the "Management Agreement", justifying
termination, which has been done repeatedly, albeit without results.

### D. CANCELLATION OF THE PURPORTED MANAGEMENT AGREEMENT

---

[36] To establish open ended continuity, the "plaintiff need not show that the predicate acts extended over a substantial
period of time but must show that there was a threat of continuing criminal activity beyond the period during which
the predicate acts were performed." *H.J., Inc.* 492 U.S. at 242-43).

147. CROOKED CREEK alleges that when one party puts an end to a contract because of the breach of the other party, the contract has ended by "cancellation." Restatement (Second) of Contracts § 283.[37] When one party ends the contract because of a material breach of the agreement by the other party, the contract has ended by cancellation.[38] Under Alabama law a contract may be cancelled for cause. And a material breach of the terms of a contract is cause for cancellation by an aggrieved party. [39]

148. CROOKED CREEK alleges that under Alabama caselaw and Eleventh Circuit caselaw a breach of contract occurs, and the plaintiff's right of action is complete upon a party's failure to do a particular thing which he has agreed to do.[40] Put differently, where a party has agreed under the terms of the contract to do a *particular thing,* there is a breach and the right of action is complete upon his failure to do the particular thing he agreed to do.[41] A breach consists of the failure without legal excuse to perform any promise forming the whole or part of the contract.[42]

149. Indeed, the Eleventh Circuit has held that a material breach does not automatically and *ipso facto* end a contract; *it merely gives the injured party the right to end the agreement.* Indeed, the injured party can choose between canceling the contract and continuing.[43] In addition, where there is a breach of contract, which goes to the whole consideration of the contract, the injured party has a right to rescind.[44] Plaintiff further avers appellate courts hold that the label used to describe the

---

[37] U.S. v. Scruggs, 356 F.3d 539 (4th Cir. 2004)(quoting 23 Williston § 63:31, at 553 (noting that a "contract is frequently spoken of as 'rescinded' . . . when in truth, one party to the contract has merely exercised the right to refuse to perform because of the wrongful conduct of the other party").

[38] Bischoff v. Cook, 185 P.3d 902, 118 Haw. 154 (haw. App. 2008) citing United States v. Scruggs, 356 F.3dd 539, 545 (4th Cir. 2004)referencing UCC § 2-106(3)-(4); 12 Corbin § 11311 at 140-46.

[39] Western Union Telegraph Co. v. Tersheshee, 230 Ala. 239, 160 So. 233 (1935).

[40] Seybold v. Magnolia Land Co., 376 So.2d 1083 (Ala. 1979).

[41] Id.

[42] 17 Am.Jur.2d Contracts s 441 at 897. "Where a [party] has agreed under the contract to do a particular thing, there is a breach and the right of action is complete upon his failure to do the particular thing he agreed to do."

[43] Dunkin' Donuts of America, Inc. v. Minerva, Inc. 956 F.2d 1566 (C.A. 11 (Fla., 1992).

[44] *Western Union Telegraph Co. v. Tersheshee,* 160 So. 233, 230 Ala. 239, (Ala. 1935).

ending of a contract (i.e. rescind, cancel, terminate) is not conclusive; rather the content determines the legal effect of bringing the contract to an end.[45]

150. CROOKED CREEK alleges that at all times relevant to this action that ENSLEY'S purported Management Agreement was cancelled for material breach of the terms of the purported Management Agreement as is shown hereinafter.[46]

- failure to render monthly statements in accordance with paragraph 2.2.
- failure to obtain a fidelity bond in accordance with paragraph 2.3.
- failure to pay property taxes in accordance with paragraph (x).
- failure to provide owner with a monthly report in accordance with paragraph (xii).
- failure to maintain books and records in accordance with paragraph (xiii).
- nonpayment of taxes in accordance with paragraph (xv).
- failure to deliver monthly funds to owner in accordance with paragraph (xvii).
- failure to provide owner with annual operating budget in accordance with paragraph (xviii).
- failure to maintain bank accounts in accordance with paragraph 2.6.
- embezzlement of funds.
- payment of personal obligations, including legal fees, from DANYA APARTMENTS account.

---

[45] 7 Corbin § 28.26, at 108; see also 23 Williston § 63:31 at 553 (noting that a "contract is frequently spoken of as 'rescinded' . . . when in truth, one party to the contract has merely exercised the right to refuse to perform because of the wrongful conduct of the other party") as exposited by the court in U.S. Scruggs, 356 F.3rd 539 (4th Cir. 2004).

[46] Plaintiff's predecessor-in-interest alleged in the Autauga case that it cancelled the purported Management Agreement for material breach, but that precise issue was never decided by the state courts. Indeed, that issue was split-off by the state courts.

151.  Plaintiff alleges that because ENSLEY's purported Management Agreement has been cancelled, terminated, or rescinded for material breach of the terms of the "Management Agreement," he is precluded as a matter of law from asserting that he has a contractual right to manage DANYA APARTMENTS.[47]

152.  CROOKED CREEK alleges that ENSLEY was served notice of the cancellation of the "Management Agreement" and notice of his termination as "manager" once in 2005, and twice in 2006, and each of the notices was filed with the Clerk of the Autauga Circuit Court. In addition, after it had acquired the Section 8 housing-project, plaintiff notified ENSLEY (for the record) that it too had canceled the purported Management Agreement for cause, and that he was terminated as "manager." ENSLEY does not respond to the notices.

153.  CROOKED CREEK alleges that ENSLEY has breached the purported agreement by, among other things, failing to submit monthly financial statements, by failing to submit periodic reports about the day-to-day or month-to-month operations of the apartment business, and by misappropriation of plaintiff's property. Moreover, ENSLEY has failed to remit any earnings resulting from his operation of the Section 8 business. To be sure, not once has ENSLEY communicated, either orally or in writing, either directly or indirectly, with plaintiff about the affairs of the Section 8 business. Nor has he remitted any monies to it, ever....not even a penny.

154.  Even more astonishing, because ENSLEY has refused to provide any financial information to plaintiff's predecessor-in-interest or to plaintiff; neither plaintiff's predecessor-in-interest nor plaintiff has been able to file complete federal and state income tax returns for the last three years.

155.  CROOKED CREEK avers that ENSLEY's failure to furnish monthly financial reports, his failure to provide tax information, his failure to inform of the progress of

---

[47] See attachments.

pending litigation, his failure to report damage to the property from hurricanes and inclement weather, his failure to report the need for repairs, his failure to provide expenditures for major cost-items such as appliances, and his failure to report information about late-payments and evictions, not to mention a variety of other omissions, are all material breaches of the terms of the purported agreement justifying rescission, termination, or cancellation. And such misconduct as set forth hereinabove will continue unabated unless constrained by this court.

156. Indeed, CROOKED CREEK avers that ENSLEY has been audaciously dismissive of the notices of termination while brazenly continuing to intercept and misappropriate both the low-income families' rent payments, and the U.S. Government subsidy checks, which he and his associates fraudulently endorse and deposit into the DANYA GROUP checking account in a federally insured bank. To be sure, ENSLEY, unconstrained by his dismissal as manager, has hijacked and is looting the Section 8 business, and through extortion is preventing CROOKED CREEK from accessing its property, or obtaining control over its financial resources derived therefrom, in violation of RICO.

157. CROOKED CREEK alleges that ENSLEY is unhindered by plaintiff's termination notices just as he has been unconstrained by MRS. WALDEN's previous notices of termination. Undaunted, he persists in criminally trespassing on plaintiff's property, adamantly refusing to relinquish possession or control of the Section 8 business. Put another way, having infiltrated the business, ENSLEY, LILES, and their associates dominate and loot DANYA APARTMENTS with impunity. Their conduct in this regard is in a word . . . piratical.

158. By ignoring his ouster as "manager," ENSLEY has employed what has been commonly termed self-help. But self-help is unlawful in this circumstance under Alabama law. Nevertheless, ENSLEY disregards CROOKED CREEK's legitimate demands to discontinue further involvement in the conduct of the affairs of the

Section 8 business, and ignores CROOKED CREEK's demands to stop trespassing on its property.

159.    CROOKED CREEK alleges that under Alabama law a person may not purposefully remain ignorant of either the facts or the law in order to escape the consequences of the law. The law of *conscious avoidance* is a principle of law which means that a person may not purposely remain ignorant of either the facts or the law.[48] In accordance with this principle of law, neither RICHARD ENSLEY, nor PATRICIA ENSLEY, nor ANITA LILES, nor CHARLES EDMONDSON, nor ES CAPITAL nor any other associate has been or is morally or legally justified in disregarding the several notices of termination of the purported Management Agreement. Nor are any of them been morally or legally justified in continuing to come onto plaintiff's property after warning, as will be more particularly set forth hereinafter. Nor have any of them been legally justified in taking or accepting any of the money earned from the operation of the Section 8 business. Any one of them who has been the willing recipient of any of these benefits ought not to be allowed to escape the consequences of the law based upon a professed claim of ignorance of the law.

## XII.  GENERAL RICO ALLEGATIONS

### A. INFILTRATION AND EXPLOITATION OF DANYA APARTMENTS

160.    CROOKED CREEK avers that Congress's intention in 18 U.S.C.A. §1962 (c) was *to target a particular variety of criminal activity*, "the exploitation and appropriation of legitimate businesses by corrupt individuals."[49]

161.    CROOKED CREEK avers that the Racketeering Influenced and Corrupt Organization's Act (RICO) is aimed at individuals and entities that infiltrate and dominate legitimate businesses or properties.

---

[48] U.S. v. Shultz (2d Cir. 2003). (The law of conscious avoidance)
[49] *Yellow Bus Lines*, 883 F.3d at 139.

162. DANYA APARTMENTS, a government subsidized HUD Section 8 housing-project for low-income families, is a legitimate business which has been infiltrated, and is being dominated and controlled by persons and entities who are systematically looting the business and causing it financial and economic injury in violation of RICO.

163. Thus, CROOKED CREEK alleges that DANYA APARTMENTS is the *prototypical victim* Congress intended to protect by the passage of RICO. And the type of criminal activity ENSLEY, LILES and their associates have engaged in at all times relevant to this action is the *precise type of criminal activity* Congress targeted in RICO.

**B. RICO PERSONS**

164. CROOKED CREEK alleges that natural persons are RICO "persons" within the meaning of 18 U.S.C. § 1961 (3). Furthermore, the term "person" includes any individual or entity capable of holding a legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961 (3).

165. CROOKED CREEK also alleges that a corporation or limited liability company is a "person" within the meaning of 18 U.S.C. § 1961 (3) because the term "person" includes any entity capable of holding a legal or beneficial interest in property.

166. CROOKED CREEK alleges that a corporation or limited liability company acts unlawfully if it receives income derived directly or indirectly from a pattern of racketeering in which the "person" has participated as a principal within the meaning of 18 U.S.C. § 2, and if the "person" uses the income in the operation of an enterprise affecting commerce within the meaning of 18 U.S.C.A. § 1961 (a).

167. CROOKED CREEK further avers that RICHARD ENSLEY, PATRICIA ENSLEY, ANITA LILES, CHARLES EDMONDSON, and ES CAPITAL, LLC

are "persons' within the meaning of 18 U.S.C. § 1961 (3) and, therefore, are proper-party defendants in this RICO action.

168. ES CAPITAL, LLC, although an entity, is a "person" within the meaning of 18 U.S.C. § 1961 (3), and, therefore is a proper party defendant in counts 18 U.S.C. § 1961 (a-d).

## C. THE ASSOCIATION-IN-FACT ENTERPRISE

169. CROOKED CREEK alleges that a RICO defendant may be both a person and a participant in a RICO association-in-fact enterprise.[50] In this action, the defendants who have been identified herein by name are both RICO "persons" and they participate in the association-in-fact enterprise.

170. CROOKED CREEK alleges that VENTURE SERVICES d/b/a DANYA APARTMENTS MANAGEMENT GROUP ("DANYA GROUP") is an association-in-fact enterprise within the meaning of 18 U.S.C.A. § 1961 (1) and as explicated in *U.S.v. Hewes*, 729 F.2d 1302, 15 Fed. R. Evid. Serv. (LCP) 1075 (11th Cir. 1984).[51] And DANYA GROUP, a corrupt organization, is distinct from the "persons" who comprise the enterprise.

171. CROOKED CREEK believes and therefore avers that in this action the association-in-fact enterprise is comprised of the following "persons" within the meaning of 18 U.S.C.A. § 1961 (3) and 1962 (c): RICHARD ENSLEY, PATRICIA ENSLEY, ANITA LILES, CHARLES EDMONDSON, and ES CAPITAL, LLC.

172. CROOKED CREEK further avers that DANYA GROUP is an informal, ongoing corrupt organization whose associates function as a continuing unit. In other words, CROOKED CREEK avers that DANYA GROUP is a RICO "enterprise" that has

---

[50] *St. Paul Mercury Ins. v. Williamson*, 224 F.3d 425 (5th Cir. 2000).
[51] 11th Cir. requires only that a group of persons associate, formally or informally, with the purpose of conducting illegal activity. *U.S. v. Hewes*, 729 F.2d 1302 (1984).

distinct characteristics, functions as a continuing unit, has an ascertainable structure; and has associates who have a common or shared purpose within the meaning of 18 U.S.C.A. § 1962, and as explicated in *U.S. v. Napolitano,* 564 F. Supp. 951 (S.D.N.Y. 1982).

173.   To be sure, CROOKED CREEK alleges that the shared purpose of the association-in-fact enterprise is to gain and maintain control of plaintiff's Section 8 business and to facilitate the misappropriation of the business's assets.

174.   CROOKED CREEK avers that ENSLEY is the ringleader of the association-in-fact enterprise, and purports to be the "manager" of the Section 8 housing-project even though any right or authority he might have had (which plaintiff denies him ever lawfully having) was long ago terminated for breach of the material terms of the purported "Management Agreement." Plaintiff avers that in his role as "manager" of the Section 8 housing-project, ENSLEY maintains a business checking account at a federally insured bank located in Prattville, Alabama, into which he deposits forged or falsely endorsed low-income families' rent checks, and forged or falsely endorsed U.S. Government subsidy checks made payable by the federal government through HUD to the owner and intended only for the owner of the Section 8 business, which ENSLEY is not.

175.   CROOKED CREEK alleges upon information and belief that PATRICIA ENSLEY consults with, counsels, induces, and conspires with RICHARD ENSLEY regarding the conduct of the affairs of the Section 8 business. And she also is connected with the affairs of the business through her financing of and participation in ES CAPITAL, which purportedly holds a "mortgage" on the Section 8 property. Upon information and belief, PATRICIA ENSLEY personally capitalized ES CAPITAL with her own financial resources.

54

176. Upon information and belief, CROOKED CREEK avers that ANITA LILES purports to be the "on-site manager" of the Section 8 housing-project, and as "on-site manager" her duties include, but are not limited to, leasing the apartment units, evicting low-income families who fail to pay their rent, keeping records, hiring and overseeing repairmen, and maintenance men, hiring and overseeing grounds keepers, and collecting low-income families' monthly rent checks. However, at ENSLEY's direction she willfully, knowingly, and intentionally forges or affixes unauthorized endorsements on the tenant's checks and deposits them or causes them to be deposited into the DANYA GROUP's business checking account. She also obtains possession of the monthly U.S. Government subsidy checks, and, at ENSLEY's direction and in accordance with his instructions, willfully, knowingly, and intentionally forges or affixes unauthorized endorsements on the U.S. Government subsidy checks, and deposits them or causes them to be deposited into the DANYA GROUP's business checking account for collection at an out-of-state bank or other out-of-state financial institution in violation of 18 U.S.C.A. § 1341.

177. CROOKED CREEK avers that LILES willingly and intentionally forges endorsements on the tenants' rent checks, and on the U.S. Government subsidy checks knowing, or having reason to believe, or recklessly and with conscious disregard for knowing the plain truth, that such conduct is unlawful, illegal, and financially damaging to plaintiff in its business or property in violation of RICO.

178. CROOKED CREEK, upon information and belief, avers and alleges that CHARLES EDMONDSON unlawfully counsels, encourages, and corruptly advises (aids and abets and conspires with) RICHARD ENSLEY, ANITA LILES, and PATRICIA ENSLEY regarding the conduct of the affairs of the association-in-fact enterprise within the meaning of 18 U.S.C.A. § 1962 (a-d), and in violation of state criminal statutes. And in so doing he wrongly and illicitly enables them to continue their domination and exploitation of the Section 8 business. More

55

specifically, EDMONDSON knows, or should know, or is recklessly indifferent to knowing, about the various indictable federal crimes and state offenses that RICHARD ENSLEY, PATRICIA ENSLEY, ANITA LILES, as well as himself, have committed and are continuing to commit, which said unlawful conduct is proximately causing injury to plaintiff in its business or property, and will continue unless constrained by this court.

179. Furthermore, CROOKED CREEK alleges that EDMONDSON himself has willfully, knowingly, and repeatedly committed the indictable offense of receiving stolen government funds in violation of 18 U.S.C. § 2315; and (6) theft of government property in violation of 18 USCS § 666 (a) (1) (A), and in violation of state criminal statutes.

180. CROOKED CREEK further avers that EDMONDSON'S primary role in the criminal enterprise is that of enabler and facilitator. By aiding and abetting RICHARD ENSLEY, PATRICIA ENSLEY, ANITA LILES, and ES CAPITAL, he enables them to continue dominating the Section 8 business and enables them to continue committing predicate RICO violations and other federal and state crimes and civil wrongs, which causes injury to plaintiff in its business or property within the meaning of 18 U.S.C.A. § 1962 (a-d).

181. CROOKED CREEK also avers that EDMONDSON aids, abets, and conspires with RICHARD ENSLEY, PATRICIA ENSLEY, ANITA LILES, and ES CAPITAL in defrauding plaintiff by, among other things, wrongly placing legal roadblocks up in order for them to continue dominating and looting DANYA APARTMENTS.

182. CROOKED CREEK believes and therefore alleges that ES CAPITAL, LLC is a "person" who participates in the conduct of the affairs of the association-in-fact enterprise by receiving funds stolen from plaintiff, and channeling those funds to RICHARD ENSLEY, PATRICIA ENSLEY, and others. ES CAPITAL is

essentially the vehicle through which the illicit funds are unlawfully laundered in violation of RICO.

### 1. STANDING

183. CROOKED CREEK alleges that it has standing as a matter of law to bring this case. In determining constitutional standing, courts look to three components: (1) that the plaintiff has been "injured in fact," (2) that the injury is "fairly traceable" to the defendants' actions, and (3) that the injury will likely be redressed by a "favorable decision" of the court. In essence, standing is whether the litigant is entitled to have the court decide the <u>merits</u> of the dispute or of the particular issues. In other words, standing determines whether the plaintiff has a right to judicial relief. Clearly, in this case plaintiff has been substantially injured in fact, plaintiff's injuries are indeed fairly traceable to a RICO criminal enterprise, and the financial injuries will likely be addressed by a favorable decision because the underlying racketeering acts are so self-evident, so pervasive, and so numerous that to believe otherwise is unthinkable.

184. That said however, CROOKED CREEK believes and therefore avers that the United States Supreme Court has <u>rejected</u> any standing requirement beyond the requirement that the RICO plaintiff suffer a compensable injury. The RICO plaintiff has standing only if, and can recover only to the extent that, an injury has been suffered in the RICO plaintiff's business or property by conduct constituting a RICO violation within the meaning of 18 U.S.C.A. § 1964 (c). No more than this is required according to the United States Supreme Court.[52] No less than this will be shown herein.

185. CROOKED CREEK avers that it has suffered a compensable RICO injury in that a criminal enterprise through a pattern of racketeering activity has infiltrated,

---

[52] *Sedima, S.P.R.L. v. Imrex Co., Inc ,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346, 53 USLW 5034, Fed. Sec. L. Rep. P. 92,086, 1985-2 Trade Cases P 66,666, RICO Bus.Disp. Guide 6100 (U.S.N.Y., Jul 01, 1985)( No. 84-648).

exploited, and hijacked plaintiff's Section 8 business, criminally trespassed on its property which is being subsidized by U.S. Government funds, misappropriated federal funds, and through *extortionate* conduct prevented plaintiff from gaining access to its property and/or its financial resources. As a proximate result of the criminal enterprise's aforesaid illegal and unlawful conduct, hereinafter described in greater detail, plaintiff has been defrauded and its monetary losses exceed $100,000.

186.  More particularly, because of the criminal enterprise's extortionate conduct and behavior CROOKED CREEK avers that it has been prevented from putting its Section 8 business and property on the market for sale, and/or from conveying the property to a willing buyer at a fair market price.

## 2.  PROXIMATE CAUSE

187.  Regarding proximate causation, CROOKED CREEK believes and therefore avers that the statutory language "by reason thereof" is simply a RICO proximate cause requirement, and that the criminal conduct of which plaintiff complains is in violation of 18 U.S.C.A. § 1962. And said criminal conduct has, directly or indirectly, injured plaintiff in its business or property within the meaning of said statute.

188.  CROOKED CREEK believes and therefore avers that within the RICO context "a wrongful act is a 'proximate cause' if it is 'a substantial factor in the sequence of responsible causation."[53] Plaintiff alleges that the proximate cause of the economic injuries it has suffered to its Section 8 business and property has, at all relevant times to this action, been and continues to be caused by ENSLEY, LILES and their associates' criminal activities resulting from their infiltration and exploitation of its Section 8 business.

---

[53] *Maiz v. Virani,* (11th Cir. 2001); Brandenburg v. Seidel, 859 F.2d 1179, 1189 (4th Cir. 1988) (stating that the inquiry in determining the existence of proximate cause is "whether the conduct has been so significant and important a cause that the defendant should be held responsible").

189.  CROOKED CREEK avers that the criminal enterprise's RICO violations have been a substantial factor in the sequence of responsible causation regarding the injuries it has suffered in its business or property, and that defendants' criminal conduct has been so significant and important a cause of its injuries to its business or property that they should be held civilly responsible.

### D. RICO ENTERPRISE

190.  Regarding the term "enterprise," CROOKED CREEK avers that within the context of RICO the term "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity" within the meaning of 18 U.S.C.A. § 1961 (4). [54] CROOKED CREEK avers that DANYA GROUP is a RICO "enterprise" within the meaning of 18 U.S.C.A. § 1961 (4).

191.  CROOKED CREEK avers that the "enterprise" in this action are the "actors" and that the "pattern of racketeering activities" are the "unlawful acts" as such concept is explicated in *United States v. Turkette*, 452 U.S. 576, 101, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981).

192.  As alleged with particularity herein, CROOKED CREEK believes and therefore alleges that ENSLEY, LILES , and their associates and each of them are associated with the RICO enterprise, and have conducted or have participated in the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962 (a) (b) (c) and (d).

193.  CROOKED CREEK avers that a corporation may be named as the "enterprise" under 18 U.S.C. 1961 (4).

---

[54] *United States v. Hewes,* 729 F.2d 1302, 1311 (11th Cir. 1984).( 11th requires that a group of persons associate, formerly or informally, with the purpose of conducting illegal activity).

194.  CROOKED CREEK alleges that "enterprise" also includes an <u>informal</u> criminal
      network engaged in racketeering activity. [55] Moreover, an "enterprise" is a group of
      individuals who associates together to profit from crime through an "enterprise," the
      group being an ongoing organization, possessing a well-defined structure, with
      continuity of membership and purpose, extensive records, and fixed salaries and
      hours of operations under the leadership of a single individual.[56]

195.  CROOKED CREEK avers that DANYA GROUP, a group of persons associated-
      in-fact within the meaning of 18 U.S.C. § 1961 (4), is profiting from the systematic
      looting of a business or property owned by plaintiff. Moreover, the group has a
      well-defined structure and operates under the leadership of RICHARD ENSLEY as
      "manager," ANITA LILES as "on-site manager," PATRICIA ENSLEY as advisor,
      counselor, and financier of the scheme, and CHARLES EDMONDSON as
      consigliere, coconspirator, and enabler who through legal tactics and maneuvers,
      assisted by a compromised state judiciary, prevents plaintiff from acquiring control
      over the conduct of its own business and property. In addition, ES CAPITAL, a
      limited liability company created by ENSLEY and SANDLIN for the sole purpose
      of taking a purported mortgage on DANYA APARTMENTS, now functions as a
      conduit through which the illegally obtained funds are laundered, and whereupon
      the proceeds are paid over to the members of the association. Plaintiff avers that
      the "enterprise" in the case *sub judice*, DANYA GROUP, has a common or shared
      unlawful purpose, functions as a continuing and on-going unit, and is corrupt
      within the meaning of 18 U.S.C. § 1961.

196.  Plaintiff believes and therefore alleges that the hallmark of an enterprise's
      organization consists rather in those kinds of interactions that become necessary

---

[55] *U.S. v. Zielie*, 734 F.2d 1447, 15 Fed. R. Evid. Serv. (LCP) 1928 (11th Cir. 1984).
[56] *Zielle, supra*, and also in *U.S. v. Hewes*, 729 F.2d 1302, 15 Fed. R. Evid. Serv. (LCP) 1075 (11th Cir. 1984).

when a group, to accomplish its goal, divides among its members the tasks that are necessary to achieve a common purpose, as has been alleged herein above with particularity. As has been shown, each of the members of the criminal enterprise has an assigned and identifiable task, and each member's task is essential to achieve the common goal of stealing as much money as possible for so long as possible from plaintiff's Section 8 business.

197. CROOKED CREEK believes and therefore avers that the *short* term common or shared purpose of those "persons" that comprise the association-in-fact enterprise, i.e. DANYA GROUP, is illicit economic gain despite the fact that their economic gain is economically injurious to plaintiff's Section 8 business in violation of RICO. The criminal enterprise's illicit economic gain is derived from forging U.S Government subsidy checks, and misappropriating low-income families rent checks, which they deposit into an Alabama bank for collection from an out-of-state bank or other out-of-state financial institution.

198. CROOKED CREEK believes and therefore avers that the *long* term common or shared purpose of those "persons" that comprise the association-in-fact enterprise, i.e. DANYA GROUP, is the wresting away or hijacking of the Section 8 business from plaintiff by the use of force and the threat of continuing force. Plaintiff alleges that under Alabama law a trespass to real property is *an intentional or wanton direct application of force by a defendant or under his authority.*[57]

199. CROOKED CREEK alleges that DANYA GROUP is continuously trespassing on its Section 8 property, and this *use of force* to compel plaintiff to acquiesce to the

---

[57] *Strozier v. Marchich*, 380 So.2d 804 (Ala. 1980);"Force . . . . is implied in every trespass *quare clausum fregit*. If a man, without right, goes upon another's land, however quietly and peaceably, the law will imply force, and trespass is the remedy, not case. . . ." *Eidson v. Johns-Ridout's Chapels, Inc.*, 508 So.2d 697 (Ala. 1987).

misappropriation of its monies is a violation of the federal extortion statute within the meaning of 18 U.S.C. § 1951 (a) (the Hobbs Act).

200.   Parenthetically speaking, CROOKED CREEK alleges an interstate commerce nexus as required by18 U.S.C. § 1951 (a) exists in this case in that ENSLEY, LILES, and their associates have adversely affected interstate commerce by the wrongful use of *force* as herein described. That is to say, that by willfully, knowingly, and wantonly trespassing on plaintiff's Section 8 property, and by forging endorsements on U.S. government subsidy checks, ENSLEY, LILES and their associates have prevented plaintiff's California shareholders from sharing in the earnings of the Section 8 business, and they will continue to prevent plaintiff from sharing in the aforesaid earning into the future. Had plaintiff's shareholders, some of whom are residents of the State of California, shared in the earnings of the Section 8 business, they would have bought personal or real property or services in the state of their residence. Or they would have deposited those earnings into a California bank or other financial institution. In any case, plaintiff's California shareholders have been unlawfully and forcibly prevented from engaging in interstate commerce by the extortionate tactics of ENSLEY, LILES and their associates.

201.   CROOKED CREEK believes and therefore alleges that the magnitude of the effect on interstate commerce is immaterial and that a *de minis* or even a *potential impact* on interstate commerce is sufficient to confer jurisdiction on this court under the Hobbs Act. CROOKED CREEK alleges that in this action ENSLEY'S, LILES' and their associates' extortionate conduct substantially obstructed, delayed, or affected interstate commerce as has been alleged.[58] Moreover, the potential impact of defendants' extortionate conduct on interstate commerce, while it will undoubtedly be substantial, is in reality incalculable.

---

[58] *U.S. v. Tuchow,* 768 F.2d 855, 870 (7th Cir. 1985); *U.S. v. Mattson,* 671 F.2d 1020,1024 (7th Cir. 1982); *U.S. v. Lee,* 256 F.3d 1229 (11th Cir.,2001)

202. CROOKED CREEK avers that the boss of the criminal enterprise, RICHARD
ENSLEY, is a "person" within the meaning of 18 U.S.C. § 1961. Upon information
and belief, CROOKED CREEK alleges that ENSLEY, hires and fires, and makes
all proprietary decisions regarding the conduct of the affairs of the Section 8
business. Indeed, ENSLEY so overwhelmingly dominates and exploits the Section
8 business that plaintiff is totally, 100%, excluded from *any* involvement or
participation whatsoever in the conduct of the affairs of the business. Nor is
plaintiff's shareholders allowed to share in the earnings the Section 8 business.

203. Upon information and belief, CROOKED CREEK avers that PATRICIA ENSLEY
is RICHARD ENSLEY'S financial backer, confidant, counselor, and co-
conspirator. And she is as responsible for ENSLEY's federal and state criminal
acts as if she had directly committed those acts herself, within the meaning of 18
U.S.C. (Supp. V) § 2 (a).[59]

204. ANITA LILES, the Section 8 "on-site manger," upon information and belief,
conspires with ENSLEY, fraudulently endorses the low-income families' rent
checks and the U.S. Government subsidy checks, and deposits them or causes them
to be deposited into a federally insured bank for forwarding and collection to an
out-of-state bank or other financial institution.

205. CROOKED CREEK alleges that CHARLES EDMONDSON conspires with,
encourages, and counsels with ENSLEY about the ongoing operations and conduct
of the criminal enterprise, and for these services the consigliore receives a portion
of the criminally derived funds, i.e. "any property constituting or derived from,
proceeds obtained from a criminal offense " within the meaning of 18 U.S.C. §
1957(f) (2). Put differently, for his services in aiding and abetting ENSLEY's

---

[59] *Nye & Nissen v. United States*, 336 U.S. 613, 69 S.CT. 766, 93 L.Ed. 919.

looting and exploitation of the Section 8 business, EDMONDSON knowingly, intentionally, and willingly receives stolen, misappropriated, or converted private and public funds all-the-while aware or recklessly indifferent to the fact that such private and public funds have been fraudulently converted or out-right stolen.

206. CROOKED CREEK alleges with specificity that EDMONDSON knows, should know, or has reason to believe, as a matter of law, that ENSLEY and his associates lack lawful authority to enter upon, or to come onto CROOKED CREEK's federally subsidized property (having been "trespassed" therefrom). And he knows, has reason to know, or is willfully ignorant of the fact, that ENSLEY has no lawful authority to take possession of, and exercise dominion and control over, the low-income families' rent checks and the U.S. Government subsidy checks. Furthermore, he knows, has reason to know, or is recklessly indifferent to the fact that ENSLEY and LILES are continuously forging endorsements on the misappropriated checks, depositing them into DANYA GROUP's business checking account in a federally insured bank out of which he is paid and from which he receives a portion of the criminally derived funds. Therefore, as a matter of law, he is as responsible for ENSLEY's criminal and racketeering acts as if he had directly committed those acts himself, within the meaning of 18 U.S.C. (Supp. V) § 2 (a).

### E. THE PATTERN OF RACKETEERING ACTIVITIES

207. CROOKED CREEK further alleges that under federal RICO, "racketeering activity" is defined by 18 U.S.C. § 1961 (1), and is interpreted by the United States Supreme Court to consist of no more and no less than the commission of a single predicate RICO act.[60]

---

[60] *U.S. v. Gonzalez*, 21 F.3d 1045 (11th Cir.1994).

208. CROOKED CREEK alleges upon information and belief that the "*pattern*" element of the statute was designed to limit its application to planned, ongoing, continuing crime as opposed to sporadic, unrelated, isolated criminal episodes.

209. That at all relevant times to this action, CROOKED CREEK alleges that the large number and variety of racketeering acts committed by defendants and referred to herein constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961 (5). The scores of racketeering acts constitute a pattern of racketeering activity because they are related to each other by virtue of common participants, a common victim, a common method of commission, and the common purpose and common result of cheating, stealing, misappropriating, and converting funds which are generated by the operation of a legitimate business, i.e. plaintiff's Section 8 housing-project business.

210. CROOKED CREEK alleges that ENSLEY's fraudulent scheme has been on-going for over three years, and will continue unabated unless constrained by this court. Thus, the scheme can be properly termed as open-ended.

211. Moreover, CROOKED CREEK alleges that there was and there continues to be a definitive, unambiguous nexus between the scores of predicate RICO acts committed by ENSLEY, LILES, and their associates, and the criminal enterprise. That is to say, at all relevant times to this action, the commission of a variety of indictable RICO offenses by ENSLEY, LILES, and their associates has been done in furtherance of the operation of the RICO enterprise. Moreover, the criminal enterprise has used DANYA APARTMENTS' land, offices, telephones, facsimiles, computers, office supplies, machines, and its employees in furtherance of their fraudulent scheme of looting and of hijacking DANYA APARTMENTS, all of which meets the "through" requirement connecting the predicate RICO acts committed by RICHARD ENSLEY, PATRICIA ENSLEY, ANITA LILES, and CHARLES EDMONDSON to the subject RICO enterprise.

65

212.  CROOKED CREEK, upon information and belief, alleges that the pattern of
racketeering activity engaged in by ENSLEY, LILES and their associates have
involved at least four separate but related schemes, carried out during the preceding
three years. These four schemes have included: firstly, a scheme to funnel
criminally derived funds to ES CAPITAL ostensibly as mortgage payments, but
which in actuality, it is believed, are reimbursements to PATRICIA ENSLEY who
provided the capital to organize and establish ES CAPITAL so that ES CAPITAL
would have what appeared to be a bona fide first mortgage lien on the Section 8
housing-project; secondly, a scheme to provide RICHARD ENSLEY --- by means
of a purported open-ended Management Agreement tied to the ES CAPITAL
mortgage --- with periodic income for "managing" the Section 8 housing-project
although he has no HUD managerial training, knowledge, or experience, and few
managerial responsibilities; thirdly, a scheme to provide ENSLEY with an annual
income for preparing the housing-project's tax returns; and fourthly, a scheme to
hijack the Section 8 housing-project by submitting no information, no reports, and
no other business related information to the plaintiff thereby establishing the
groundwork for a hostile take-over of the business and its property.

213.  CROOKED CREEK avers that the racketeering activity the association-in-fact
enterprise engages in and conducts is the systematic *looting* of the Section 8
business, which is accomplished by those individuals who participate in the
enterprise forging endorsements on low-income families' checks, and forging
endorsements on U.S. Government subsidy checks, by placing them in the United
States mail to be delivered by the United States Postal Service for collection
through an out-of-state bank, or other out-of-state financial institution, and
thereafter by paying the criminally derived proceeds, or a portion of the criminally
derived proceeds therefrom, to themselves notwithstanding that such payments are

unapproved and unwarranted *management fees* and unapproved and unwarranted *legal fees*.

214. CROOKED CREEK alleges that the federal criminal acts ENSLEY, LILES and their associates are continuously engaging in involve the same victim, i.e. the plaintiff, the criminal acts have the same methods of commission, involve the same participants, are committed at irregular intervals, have been committed continuously over a long period of time, benefit the same persons repeatedly, adversely affect interstate commerce on an ongoing basis, and are related in other ways.

### 1. SEPERATENESS AND CONTINUITY

215. CROOKED CREEK further believes and therefore avers that there is separateness between the "enterprise" and the "pattern;" that the "enterprise," and at all relevant times to this litigation the "association-in-fact-enterprise" operates and dominates the Section 8 business with the primary agreed-upon goal of stripping the earnings from the business, and with a secondary agreed upon goal of an organized crime method of taking-over the business in its entirety at some future point in time, i.e. with force.

216. All the while, the association-in-fact enterprise, DANYA GROUP, conducts the affairs of the enterprise through a pattern of racketeering activity. CROOKED CREEK believes and therefore avers that the pattern of racketeering activity which is ongoing and threatens to continue indefinitely is, *inter alia*, bank fraud, mail and wire fraud, interstate transportation of stolen property, extortion, theft of federal property, and conspiracy to violate RICO.

217. CROOKED CREEK believes and therefore avers that the "enterprise" is an ongoing organization, which functions as a continuing unit. And the "enterprise" has an independent significance apart from the "pattern of racketeering." That is to

say, plaintiff believes and therefore avers that the "enterprise" engages in activities separate and distinct from the predicate acts heretofore alleged and therefore come within the purview of RICO. And DANYA GROUP is an ongoing organization whose associates function as a continuing unit.

218. CROOKED CREEK believes and therefore avers that acts of bank fraud, mail fraud and wire fraud, theft of U.S. Government funds, receiving stolen U.S. Government funds, extortion, and conspiracy to violate RICO, alleged hereinafter with particularity, constitute a pattern of racketeering activity due to their relationship and similarity to one another and their *continuity* where, as in this case, the racketeering activity has continued over a period of more than 3 years.[61]

219. CROOKED CREEK alleges that at all relevant times in this action the element of *continuity* exists so as to establish a "pattern" of racketeering activity. "Continuity is a temporal concept involving long-term criminal conduct. The various racketeering acts alleged herein have occurred over a 36 or more month period of time. Thus, plaintiff alleges that this fact establishes the *continuity* requirement of a pattern of racketeering activities.

### 2. RELATEDNESS

220. CROOKED CREEK believes and therefore avers that "relatedness" between the acts of racketeering is present. That is to say, that while plaintiff alleges a number and variety of separate racketeering acts, these acts are related because they all have the purpose and effect of depriving plaintiff of its financial interest in its business or property, and the additional purpose and effect of enriching the members of the association-in-fact-enterprise by the conversion, theft, or misappropriation of federal funds intended to belong to plaintiff.

---

[61] *D'Orange v. Feely* (1995, SD NY) 894 F.Supp. 159, RICO Bus Disp Guide (CCH) ¶ 8893.

221. CROOKED CREEK believes and therefore alleges that the racketeering activity engaged in by ENSLEY, LILES and their associates is *open-ended* activity, and that there is a pattern of prohibited activity rather than just disconnected criminal acts. Indeed, plaintiff alleges, upon information and belief, that each and every month for the three years ENSLEY and LILES have received and taken possession of the monthly federal subsidy checks along with the low-income families rent checks (believed to be 30 to 40 checks each month) which they have falsely endorsed, and unlawfully deposited, it is believed, into a business checking account in a federally insured bank under the name VENTURE SERVICES d/b/a DANYA APARTMENTS MANAGEMENT GROUP.

222. Upon information and belief, CROOKED CREEK alleges that ENSLEY and/or LILES have forged as many as 396 checks during the proceeding 36 months, which belonged not to them but to the plaintiff.

223. CROOKED CREEK believes and therefore avers and alleges that ENSLEY and LILES, and possibly others, have during the preceding three years knowingly, willfully, intentionally, and systematically engaged in repeated predicate RICO acts of forgery of U.S. Government subsidy checks, which are delivered periodically by the United States Postal Service to an out-of-state bank or other financial institution for collection, but which are intended to be delivered to and to be the property of the owner of the housing-project, and which are not the property of ENSLEY, LILES or their associates.

224. CROOKED CREEK alleges that under the Housing Act of 1937, the low-income families that occupy DANYA APARTMENTS pay a portion of their monthly rent to the owner of the housing-project, and the U.S. Government pays a portion of the rent to the owner of the housing-project on behalf of the low-income families. Plaintiff alleges that it has not authorized or empowered ENSLEY, LILES or any others to affix an endorsement on either the low-income families' rental checks, or

69

the U.S. Government subsidy checks. To the contrary, plaintiff alleges that it and it alone is lawfully authorized to affix an endorsement on the low-income families' rental checks, and the U.S. Government subsidy checks. Hence, any and all other endorsements are false endorsements, and while CROOKED CREEK has specifically directed ENSLEY and LILES to discontinue further involvement in the conduct of the affairs of the Section 8 business, including endorsing and depositing rent checks and subsidy checks to their bank account, those demands have been disregarded.

## F. SCIENTER

225.  At all relevant times to this action, CROOKED CREEK believes and therefore alleges that ENSLEY, LILES, and each of their associates have knowingly engaged in or participated in racketeering conduct in violation of RICO, and that such criminal conduct has injured plaintiff in its business or property. Specifically, CROOKED CREEK alleges that RICHARD ENSLEY knew, should have known, or had reason to believe at the inception that the "Management Agreement" entered into by and between PARK PLACE CENTER, LTD and HUGH V. SMITH ENTERPRISES, INC. was invalid. ENSLEY knew, should have known, or had reason to believe the "Management Agreement "was invalid because, having been HUGH SMITH's accountant for almost a decade, he learned that SMITH never claimed on his federal and state income tax returns to be an officer, director or shareholder of HUGH V. SMITH ENTERPRISES, INC. Had SMITH been an officer, director or shareholder of HUGH V. SMITH ENTERPRISES, INC. he would have been required under state and federal law to report any income he received or was entitled to receive from the operation of the apartment business. SMITH did not do this, and ENSLEY knew he did not. Hence, ENSLEY had actual knowledge that SMITH had no official connection with HUGH V. SMITH ENTERPRISES, INC., and therefore had no authority to enter into any binding

Management Agreement with PARK PLACE CENTER to manage DANYA
APARTMENTS.

226. CROOKED CREEK further avers and alleges that ENSELY submitted affidavit
testimony in the Montgomery case stating in part that he had prepared SMITH's
federal and state income tax returns from 1990 through 1999, and that SMITH's
federal and state income tax returns reflected no connection whatsoever between
him and HUGH V. SMITH ENTERPRISES, INC. Put another way, according to
ENSLEY's affidavit testimony, SMITH never reported any income, or loss, or
depreciation attributable to an ownership interest in the Section 8 housing-project.
see attachment.

227. CROOKED CREEK further alleges that ENSLEY possessed a strong economic
motive for his deceitful conduct in procuring a *mala fide* mortgage on DANYA
APARTMENTS through ES CAPITAL. For unless he acquired a mortgage on
DANYA APARTMENTS through ES CAPITAL, he was faced with a certain loss
of the unsecured loans he had previously made to HUGH SMITH. Moreover,
ENSLEY was presented with a clear opportunity of avoiding the certain and
otherwise unavoidable loss. Fully aware that he was likely to lose DANYA
APARTMENTS in the Walden v. Smith litigation to plaintiff's predecessor-in-
interest, SMITH was predictably receptive to ENSLEY's offer (in actuality a bribe)
to pay him $35,000 in cash at the mortgage loan closing, notwithstanding that the
transaction was patently invalid, if not outright illegal, but certainly violative of the
Montgomery court's 2002 order.

228. Even so, CROOKED CREEK believes and therefore alleges, in the alternative, even
assuming that the "Management Agreement" was at some point valid, it has long
since been cancelled or rescinded for material breach. The material breach consists
in part in ENSLEY's jaw-dropping refusal to provide either plaintiff's predecessor-

in-interest or plaintiff with monthly financial reports, or any other financial information regarding the affairs of the Section 8 business. Furthermore, ENSLEY failed to report pending litigation filed against DANYA APARTMENTS. And, ENSLEY failed to pay out to plaintiff any of the earnings derived from the operation of the business. To the contrary, ENSLEY, LILES, and their associates have kept for themselves all of the money produced by the Section 8 business, and they have done all within their power to compell plaintiff's predecessor-in-interest and plaintiff to surrender the Section 8 business and property to them.

229. CROOKED CREEK avers that each month ENSLEY and LILES receive tenant's rent checks and federal government subsidy checks from the United States Treasury Department through HUD, which they wrongly endorse and deposit to DANYA GROUP's checking account. Those checks, uttered and published as true, but affixed with falsely made and forged endorsements, then enter into the interstate and intrastate banking systems, and are forwarded to an out-of-state bank, or out-of-state financial institution for collection, in violation of the mail fraud, wire fraud, and bank fraud statutes.

230. CROOKED CREEK believes and therefore alleges that it is not necessary for it to allege and prove that an agreement to use the mails or transport stolen property existed *from the inception of the scheme to defraud,* because if there was such an agreement, *at any time,* it is sufficient as explicated in *Pereira v. U.S.*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954)§1964(c)(2000 ed.). Plaintiff does believe and therefore alleges that at the inception of the scheme there was an agreement, either explicit or implicit, between RICHARD ENSLEY, ANITA LILES, PATRICIA ENSLEY, and CHARLES EDMONDSON to use the mails and the wire services in furtherance of their scheme to unlawfully enrich themselves even though by doing so they knew they would injure plaintiff in its business or property, and they also

agreed, either implicitly or explicitly, to transport stolen property in interstate commerce.

## G. RICO INJURIES

231. CROOKED CREEK alleges that as a proximate result of the racketeering acts of RICHARD ENSLEY, PATRICIA ENSLEY, ANITA LILES, CHARLES EDMONDSON, ES CAPITAL, LLC and DANYA GROUP it has been injured in its property and/or business. Moreover, CROOKED CREEK alleges that the economic and financial losses that it has sustained as a proximate result of defendants' multiple crimes and civil torts can only be determined by an auditing of the Section 8 business, but plaintiff believes and therefore alleges that the injuries it has suffered in its business or property exceed $500,000.

232. CROOKED CREEK alleges that it has to date also been caused to expend substantial sums in legal fees, court costs, transcription fees, copying costs, and postal fees in an attempt to remove ENSLEY, LILES and their associates from its Section 8 housing-project, to prevent them from returning to the property, and to put a stop to their plundering of the funds earned by the Section 8 business.

233. CROOKED CREEK believes and therefore alleges that it need only allege or prove injury to its business or property resulting from the underlying acts of racketeering in this RICO action, which plainly it has done or will do. [62]

234. However, CROOKED CREEK avers specifically that defendants have converted, stolen, or misappropriated more then $500,000 belonging to plaintiff, and ENSLEY, LILES, and the association-in-fact enterprise are by the use of *force* preventing it from using, improving, and enjoying its property rights in its Section 8 business in violation of the Hobbs Act.

---

[62] *Horoco v. American National Bank,* 747 Fed. R. 2d 384.

235.  CROOKED CREEK alleges that its claims are predicated in part on the criminal enterprise's use of the mails and wire services in furtherance of its illicit scheme to defraud by forging endorsements on low-income families' rent checks, and on U.S. Government subsidy checks, and by depositing the rent and subsidy checks for payment into their own Alabama business and personal accounts for collection from foreign banks or foreign financial institutions.

236.  CROOKED CREEK avers that it has suffered an injury to its business or property by reason of specific racketeering activities, i.e. bank fraud, mail fraud and wire fraud, interstate transportation of stolen property, conspiracy to violate RICO, aiding and abetting violations of RICO, theft of federal funds, theft from programs receiving federal funds, extortion, and receiving stolen federal and private funds.

237.  CROOKED CREEK believes and therefore alleges that its economic injuries are the direct and proximate results of defendants' unlawful, fraudulent, and extortionate conduct, its inability to conduct the operation of the business as it, as owner, deems best, its inability to obtain financial profits or earnings from its Section 8 business, its inability to refurbish and improve the apartment property and increase its value, and its inability to place the apartment property on the market for sale, if it were to desire to do so.

238.  CROOKED CREEK avers that it has suffered an injury to its business or property by reason of defendants' use of a RICO enterprise and a pattern of racketeering acts in violation of RICO as exposited in *Haroco v. American Nat.* 747 F. 2d 384 (1984).

### H. FORESEEABILITY OF DAMAGES

239.  CROOKED CREEK believes and therefore avers that no reliance showing is required to establish that a person or persons has violated 18 U.S.C. §1962 (c) by conducting an enterprise's affairs through a pattern of racketeering activity

predicated on mail fraud, wire fraud, or bank fraud. In other words, plaintiff avers that a person can be injured, as has plaintiff been injured, *by reason of* a pattern of mail fraud, wire fraud, or bank fraud even if he himself has not relied on any misrepresentation. In other words, first party reliance is not an element of a claim predicated on bank fraud, and/or mail and wire fraud. Nevertheless, plaintiff asserts that it has been caused pecuniary harm to its Section 8 business *by reason of* a pattern of mail fraud, wire fraud, and bank fraud because ENSLEY'S, LILES, and their associates' numerous RICO violations led directly to its business injuries, and expenditure of large sums of legal fees, court costs, transcription costs, etc. in the prosecution of this action against these defendants, and thus it avers that it has established proximate causation for its RICO claims.

240.   Regarding reliance, however, CROOKED CREEK believes and therefore alleges and avers that at all times relevant to this action that the criminal enterprise's drawee bank has relied on and continues to rely on the falsely endorsed U.S. Government subsidy checks as having been properly and lawfully endorsed, as has also the drawer bank. Thus, plaintiff believes and therefore alleges that there has been reliance by an Alabama federally insured bank, and by the U.S. Department of the Treasury on the predicate acts of fraudulent endorsements. And, of course, the falsely endorsed U.S. Treasury subsidy checks have been and continue to be deposited into the U.S. Mail, and have entered into and continue to enter into the interstate banking system for collection, or the public funds have been and continue to be wire transferred from the U.S. Treasury Department in Washington, D.C. to defendants' Alabama bank thus inflicting economic injury on plaintiff in its business or property. Thus, plaintiff believes and therefore alleges that the element of causation within the meaning of 11 U.S.C. § 523 (a) (2) (A) is satisfied in this complaint.

## XIII. PREDICATE RICO OFFENCES

### A. BANK FRAUD

241. At all relevant times to this action, CROOKED CREEK believes and therefore alleges that ENSLEY, LILES, and their associates in the criminal enterprise *sub judice* have committed scores of predicate acts of bank fraud, which predicate RICO acts has economically injured plaintiff in its business and/or property

242. CROOKED CREEK alleges that bank fraud is a predicate RICO racketeering activity within the meaning of 18 U.S.C. § 1961 (A).

243. CROOKED CREEK further alleges that a plaintiff asserting a RICO claim predicated on bank fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on defendants' alleged misrepresentations.[63] *Bank fraud is a statutory offense*, not a common-law offense, and, thus, does not require proof of first-party reliance.

244. CROOKED CREEK further avers that 18 U.S.C. § 1344 (2) states in relevant part that anyone who knowingly executes, or attempts to execute, a scheme or artifice to defraud a financial institution, or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the *custody* or control of a financial institution, by means of false or fraudulent pretenses, representations, or promises, *including forged endorsements,* shall be fined or imprisoned, or both. Put differently, Title 18 U.S.C. § 1344 makes it a felony to knowingly execute a scheme to defraud a federally insured financial institution, or to *obtain money from* a federal financial institution by means of false or fraudulent pretenses or representations as ENSLEY, LILES, and their associates have done and are continuing to do.

---

[63] *Bridge v. Phoenix Bond*, 553 U.S. _____(2008)

245. CROOKED CREEK believes and therefore alleges that forging endorsements on U.S. Government subsidy checks or obtaining moneys, funds, credits, assets, securities, or other property owned by, or under the *custody* or control of a financial institution, by means of false or fraudulent pretenses, representations, or promises, as ENSLEY and LILES have each done on multiple occasions within the Middle District of Alabama during the preceding three years are indictable offenses under 18 U.S.C. § 1344.

246. CROOKED CREEK believes and therefore acknowledges that 18 U.S.C. § 1344 (a) (1), requires proof: (1) that. a scheme existed in order to obtain money in the custody of a federally insured financial institution, (2) that defendant participated in the scheme by false pretenses, which were material, (3) that the defendant acted knowingly, and (4) that at all times relevant to the action these elements were present. [64]

247. CROOKED CREEK believes and therefore alleges that the intent element of bank fraud is intent to deceive the bank in order to obtain from it money or other property.[65] Thus, it is believed that bank fraud may involve a scheme to take a bank's own funds, or it may involve a scheme to take funds merely in a bank's *custody*.[66]

248. CROOKED CREEK believes and therefore alleges that the pattern of racketeering activity engaged in by ENSLEY, LILES, and their associates has involved and continues to involve fraudulent acts and false pretenses in support of the scheme to loot DANYA APARTMENTS constituting bank fraud under 18 U.S.C. § 1344.

---

[64] *US v. Goldsmith*, 109 F.3d 714 (C.A. 11 (Fla.), 1997
[65] *Thomas* 315 F.3d at 197 "the sine qua non of a bank fraud violation, no matter what subdivision of the statute it is pled under, is the intent to defraud the bank
[66] *U.S. v. Leahy*, 445 F.3d 634 (3rd Cir. 2006)

249. CROOKED CREEK alleges that the complex, criminal scheme repeatedly referred to herein by plaintiff is the illicit infiltration, exploitation, and hijacking of a Section 8 business known as DANYA APARTMENTS, with the intent of wresting control and ownership of the business away from plaintiff permanently.

250. CROOKED CREEK alleges that forging endorsements on U.S. Government subsidy checks while pretending to be lawfully entitled to endorse and deposit said subsidy checks into the DANYA GROUP business checking account in a federally insured bank in Alabama is an indictable offense, and is a predicate RICO violation.

251. CROOKED CREEK believes and therefore alleges that ENSLEY acted knowingly, intentionally, and willfully because he knew, should have known, or had reason to believe that he had no lawful right to serve as manager of DANYA APARTMENTS. He had no lawful right to serve as manager of DANYA because the "Management Agreement" was either void *ab initio*, or it had been justifiably cancelled, rescinded, or terminated for material breach. In addition, ENSLEY wittingly and falsely endorsed the U.S. Government subsidy checks by affixing unauthorized endorsements thereon, when he knew, should have known, or was recklessly indifferent to knowing that he had no lawful right to serve as manager of DANYA APARTMENTS, and he had no lawful right to endorse the U.S. Government subsidy checks by affixing unauthorized endorsements thereon because the U.S. Government subsidy checks were made payable to the owner of DANYA APARTMENTS, or the owner's authorized agent, which he knew he was not.

252. CROOKED CREEK believes and therefore alleges that so long as the defendants who participated in the criminal enterprise had an intent to defraud the bank, which it is alleged that they did, and the bank suffered loss or risk of loss as a result of the deceptive conduct, 18 U.S.C. § 1344 is implicated even if a third party such as

78

plaintiff is also injured as a result of the fraudulent conduct; as has been explicated in *US v Leahy*, 82 F.3d 624 (5th Cir.) 1996.

## B. THE INTERSTATE TRANSPORTATION OF STOLEN SECURITIES

253.   CROOKED CREEK believes and therefore alleges that a violation of 18 USC 1961 (A), the federal statute that is prohibitive of the interstate transportation of stolen *securities*, is a predicate RICO activity. Stated expansively, CROOKED CREEK avers that the interstate transportation of stolen or converted securities taken by fraud is a predicate RICO racketeering offense.[67] Title 18 U.S.C. § 2311 states that, as used in §§ 2311-2318, the term securities includes *any* check. Thus, a low-income renter's personal check is a security as is the U.S. Government's subsidy check also a security.

254.   CROOKED CREEK alleges that interstate transportation of securities acquired by fraud is an indictable RICO offense under 18 U.S.C. § 2314.[68]

255.   CROOKED CREEK believes and therefore alleges that the necessity of sending a deposited check (any check) through interstate banking channels for collection establishes the interstate transportation element of 18 U.S.C. § 2314.[69] CROOKED CREEK believes and therefore alleges that in a civil RICO action for transporting in interstate commerce falsely made and counterfeited securities, in violation of 18 U.S.C.A. § 2314, *each check cashed or deposited constitutes a separate offense* unless the checks all pass through interstate commerce together, which in this civil action they did not.[70] Therefore, because ENSLEY, LILES, and their associates receive and/or take possession of a substantial number of low-income families'

---

[67] *U.S. v. Herring,* 602 F.2d 1220 (C.A.5 (Ga.), 1979:

[68]   Title 18 U.S.C. § 2314 provides in pertinent part: "Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited . . . . "

[69]   *U.S. Brown*, 605 F. 2d 389 (C.A. 8 (Iowas), 1979) citing United states v. Gray, 531 F.2d 933, 934-35)8th Cir.) cert denied 429 U.S. 841, 97 S.Ct. 117, 50 L.Ed. 110 (1976)

[70]   *U.S. Gotches,* 547 F.2d 80.