IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CROOKED CREEK PROPERTIES, INC.,    )
                                   )
            Plaintiff,             )
                                   )
      v.                           )    CASE NO. 2:08-CV-1002-WKW[WO]
                                   )
RICHARD ENSLEY, *et al.*,          )
                                   )
            Defendants.            )

## MEMORANDUM OPINION

Before the court are two motions to dismiss, one filed by Defendants Richard Ensley,

Patricia Ensley, Anita Liles and ES Capital, LLC (Doc. # 31), and the other filed by

Defendant Charles W. Edmondson (Doc. # 22).  Defendants' arguments in support of the

motions are overlapping.  Plaintiff Crooked Creek Properties, Inc., opposes the motions, and

there has been no shortage of briefs filed in support of the parties' respective positions.[1]

(Docs. # 29, 32, 34, 35, 36, 38, 39, 40, 42.[2])  The motions to dismiss are predicated on

multiple theories.  In a prior Order (Doc. # 74), the court granted Defendants' motions to

dismiss (Docs. # 22, 31).  This Memorandum Opinion sets forth the court's reasoning for its

ruling.

---

[1] The individual Defendants – Richard Ensley, Patricia Ensley, Anita Liles and Charles W.
Edmondson – are referred to by last name.  References to "Defendants" are to all movants, and Richard
Ensley and Patricia Ensley are referred to as the "Ensleys."  The corporate parties – ES Capital, LLC,
and Crooked Creek Properties, Inc. – are identified as "ES Capital" and "Crooked Creek."

[2] For ease of reference, the parties' briefs are referred to by their assigned docket number.

## I.  JURISDICTION AND VENUE

Jurisdiction is exercised pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.  The parties do not contest personal jurisdiction or venue, and the court finds allegations sufficient to support both.

## II.  STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8:  "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 1950 (brackets added; citation omitted).  "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  Hence, while the complaint need not set out "detailed factual allegations," *Twombly*, 550 U.S. at 555, it must provide sufficient factual amplification "to raise a right to relief above the speculative level," *id.*; *see also James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1274 (11th Cir. 2008) (holding that

2

*Twombly* formally retired "the often-criticized 'no set of facts' language previously used to describe the motion to dismiss standard." (citation omitted)).

### III.  FACTS

This action has its genesis in protracted legal proceedings litigated in the circuit courts of Montgomery and Autauga counties.  Those proceedings have involved the Supreme Court of Alabama on five occasions and the Alabama Court of Civil Appeals on two other occasions.  The state court proceedings began in 1995 and concluded in 2007 with a decision of the Supreme Court of Alabama.[3]  *See Walden v. Hutchinson*, 987 So. 2d 1109 (Ala. 2007).[4]  At the core of these controversies was a dispute about the ownership of Danya Park Garden Apartments ("Danya Apartments") located in Prattville, Alabama, and the common stock of a corporation that, at least at one point, owned 100 percent of the fee simple title to Danya Apartments.

In the present litigation, Defendants argue that *res judicata* and/or collateral estoppel foreclose Crooked Creek from reigniting the ownership dispute.  Crooked Creek disputes Defendants' characterization of its claims and the applicability of *res judicata* and collateral estoppel.  To understand the arguments, it is helpful initially to outline some of the facts of the Montgomery County Suit and the Autauga County Suit.

---

[3] All references to the Autauga County Suit and the Montgomery County Suit are to these proceedings.

[4] The procedural history of Ms. Walden's long-running dispute in both the Autauga County and Montgomery County courts is succinctly set out in the Supreme Court of Alabama's opinion.

**A.**   **The Montgomery County Suit**

The key players in the Montgomery County Suit were Hugh V. Smith, Jr. ("Smith") and Willadean Walden ("Walden").  (Am. Compl. ¶ 2 (Doc. # 10).)  As will be discussed later, Crooked Creek is the successor-in-interest to Ms. Walden's ownership interest in Danya Apartments.

In 1995, Mr. Smith sued Ms. Walden in Montgomery County, and Ms. Walden counterclaimed.  Ultimately, Ms. Walden obtained a favorable judgment against Mr. Smith for $187,166 in the Montgomery County Suit.  (Am. Compl. ¶¶ 4, 5); *Walden*, 987 So. 2d at 1111.  Later, the judgment being unsatisfied, Ms. Walden commenced further proceedings in the Montgomery County Suit to collect the judgment from Mr. Smith.  On August 11, 2000, to enforce the judgment, the Montgomery County Circuit Court entered a judgment vesting Ms. Walden with ownership of all of the common stock in Mr. Smith's corporation (Hugh V. Smith Enterprises, Inc.), the sole asset of which was Danya Apartments.  (Am. Compl. ¶ 4; Montgomery County Suit, Order, dated Aug. 11, 2000 (Doc. # 31-2, at 120).) On June 5, 2002, however, the Montgomery County Circuit Court vacated the portion of its August 11, 2000 judgment that awarded Ms. Walden ownership of the common stock of Hugh V. Smith Enterprises, Inc., and instead awarded Ms. Walden a lien on the common stock of the corporation that owned Danya Apartments sufficient to satisfy her judgment against Mr. Smith.  (Am. Compl. ¶ 4); *see also Walden*, 987 So. 2d at 1112 ("'The portion of the order of August [11], 2000, which awards the ownership of the stock of [Hugh V.

4

Smith Enterprises, Inc.] to [Ms. Walden] is vacated in favor of the award of a lien on the stock of [Hugh V. Smith Enterprises, Inc.] . . . ."  (quoting Montgomery County Suit, June 5, 2002 Order) (second and fourth alterations added; emphasis omitted)).  That judgment was affirmed by the Alabama Court of Civil Appeals in March 2003, *see Walden v. Smith*, 883 So. 2d 743 (Ala. Civ. App. 2003) (table), and in April 2004, the Supreme Court of Alabama denied Ms. Walden's certiorari petition, *see Ex parte Walden*, 916 So. 2d 632 (Ala. 2004) (table).  *See also Walden*, 987 So. 2d at 1113 (reciting procedural history).

Mr. Smith also was indebted to others, including Mr. Ensley, who is a defendant in this action.  (Am. Compl. ¶ 5.)  During the pendency of the appeal in the Montgomery County Suit, Mr. Ensley, his wife, and a third individual formed ES Capital for the purpose of conducting a one-time mortgage transaction.  *See Walden*, 987 So. 2d at 1113; (Am. Compl. ¶ 5.)  ES Capital loaned Hugh V. Smith Enterprises, Inc., $580,000, the proceeds of which were disbursed, in part, to pay off an existing mortgage on Danya Apartments and to pay Mr. Ensley for management services.  (Ex. K to Compl. (Doc. # 1)); *see also Walden*, 987 So. 2d at 1113-14.  Ms. Walden was not the recipient of any of the funds.  In return for the loan, ES Capital received a promissory note and a first mortgage on Danya Apartments, and the mortgage was recorded on August 4, 2003.  *See Walden*, 987 So. 2d at 1114.  An agreement for the management of the rentals and income from Danya Apartments also was executed in conjunction with the mortgage ("management agreement").  (Am. Compl. ¶¶ 7-8.)  Under the terms of the management agreement, the rental payments from Danya

Apartments were to be used to satisfy the mortgage debt.  (Ms. Walden Aff. ¶ 4 (Ex. J to Compl.); Management Agreement (Ex. M to Compl.).)

In October 2004, Ms. Walden's judgment against Mr. Smith remained unsatisfied, and she again sought relief in the Montgomery County Suit.  *See Walden*, 987 So. 2d at 1114. Ultimately, the parties to the Montgomery County Suit consented to the entry of a judgment vacating the June 5, 2002 judgment and reinstating the August 11, 2000 judgment.[5]  (Am. Compl. ¶ 6.)   As a result of the consent judgment entered on November 4, 2004, the Montgomery County Circuit Court declared that Ms. Walden was "the owner of the common stock in Hugh V. Smith Enterprises, Inc.," which owned Danya Apartments, and that Ms. Walden was, "therefore, the owner of the fee simple title to [Danya Apartments], Prattville, Alabama."  (Montgomery County Suit, Order, dated Nov. 4, 2004 (Ex. H to Compl.).)[6]

## B.   The Autauga County Suit

In November 2004, Ms. Walden and Danya Park Garden Apartments, Inc., "formerly known as Hugh V. Smith Enterprises, Inc.," filed a civil action in the Autauga County Circuit Court, naming as defendants, among others, the Ensleys and ES Capital.[7]  (Autauga County

---

[5] As noted in *Walden*, ES Capital and the Ensleys were not parties in the Montgomery County Suit and, thus, did not agree or consent to the judgment.  *See* 987 So. 2d at 1115.

[6] Other than the "therefore" in the quoted portion of the November 4, 2004 consent judgment, the court has been unable to locate, in this vast record, any other indication that Ms. Walden personally and individually owned in fee simple the real estate upon which Danya Apartments rest.

[7] Prior to Ms. Walden filing this action, Mr. Smith died, and the executrix of his estate was named as a defendant in the Autauga County Suit.  (Autauga County Suit, Compl. ¶¶ 8, 12.) Additionally, other individuals who had allegedly infringed upon Ms. Walden's ownership interest in Danya Apartments, but who are not parties in the case before this court, were named in the Autauga

Suit, Compl. (Doc. # 31-2).[8]) In the Autauga County Suit, Ms. Walden alleged that she "own[ed] all of the common stock in [Danya Park Garden Apartments, Inc.]," which in turn owned Danya Apartments.[9] (Autauga County Suit, Compl. ¶¶ 2, 9.)

Ms. Walden sought to quiet title in her to Danya Apartments and to "cancel the management agreement." (Autauga County Suit, Compl. (Counts I, IX).) Additionally, she brought the following claims, among others: (1) a claim against the Ensleys for conspiracy to "defraud" Ms. Walden out of her property (*i.e.*, Danya Apartments) "by unlawful and fraudulent means," which included forming ES Capital to "us[e] [Danya Apartments] as security for the mortgage loan" (Autauga County Suit, Compl. 21, 24 (Count III)); (2) a claim that the defendants unlawfully trespassed upon Ms. Walden's property, *i.e.*, Danya Apartments (Autauga County Suit, Compl. 24 (Count IV)); (3) a claim that the defendants took "large sums of money from [Danya Apartments'] bank account" and "convert[ed] it to their own use" (Autauga County Suit, Compl. 26 (Count V)); (4) a claim that the defendants in their management of Danya Apartments "wrongly and without the permission" of Ms.

---

County Suit. Ms. Walden alleged, for instance, that, during the pendency of the Montgomery County Suit and prior to his death, Mr. Smith wrongfully executed a quit claim dead to Danya Apartments to an individual named George Hutchison ("Hutchison") "to hinder, delay or prevent her from collecting the judgment." (Autauga County Suit, Compl. ¶ 20.) In the Autauga County Suit, Ms. Walden alleged that her judgment "which vested ownership of the common stock in Hugh V. Smith Enterprises, Inc. in her . . . preceded the recordation of [Mr.] Hutchison's quit claim deed and that the quit claim deed was "void." (Autauga County Suit, Compl. ¶¶ 22, 24.) Because the facts surrounding these third party interests are not material to resolution of the present motion to dismiss, further discussion is not needed.

[8] Defendants have submitted certified copies of pertinent pleadings and orders from the Autauga County Suit. (*See* Doc. # 31-2.)

[9] Ms. Walden was represented by her son Gatewood Walden, Esq., in the Autauga County Suit. Mr. Walden also represents Crooked Creek in the present litigation.

Walden converted substantial sums of money belonging to her (Autauga County Suit, Compl. 27 (Count VII)); (5) a claim against the Ensleys for theft of property, alleging that they exerted unauthorized control over Ms. Walden's property by collecting the rent from Danya Apartments tenants and retaining the rent for themselves (Autauga County Suit, Am. Compl. (Count IX)); and (6) a claim for ejectment in which Ms. Walden contended that she was "the owner of the common stock in Danya Park Garden Apartments, Inc., formerly Hugh V. Smith Enterprises, Inc., and its asset, [Danya Apartments],"[10] and that the Ensleys and ES Capital had withheld and detained the apartments from her and were continuing to convert to their own use rental income that belonged to her (Autauga County Suit, 2d Am. Compl. (Count IX)).[11]

The Autauga County Circuit Court rejected Ms. Walden's claims and entered summary judgment in favor of the Ensleys and ES Capital.  It found that the June 5, 2002 judgment entered in the Montgomery County Suit, "which served to vacate the award of stock to [Ms.] Walden in that case and thus permit the mortgage on [Danya Apartments], was a final judgment and was ultimately affirmed through the appeal process." (Autauga County Suit, Summ. J. Op. 4 (Doc. # 31-2).)  The Autauga County Circuit Court further found

> that the Montgomery Court's order of June 5, 2002, became the law of the case such that the Montgomery Court lost its jurisdiction to override that decision, when in November 2004, it ordered the reinstatement of its prior order of

---

[10] This appears to be an admission by Ms. Walden that the fee simple title to the real estate rested in the corporation.  The same admission appears in the pleadings in this case.

[11] The counts in the complaint and amendments are misnumbered.

> August 2000 thereby again awarding the common stock to [Ms.] Walden but
> this time in derogation of the rights of certain Defendants in this cause who
> now had an interest in the property, none of whom were parties to the
> Montgomery litigation.

(Autauga County Suit, Summ. J. Op. 5, dated Dec. 2006 (Doc. # 31-2).)  The Autauga

County Circuit Court also upheld the validity of the ES Capital mortgage on Danya

Apartments and the management agreement.  It ordered

> [t]hat the mortgage in favor of ES Capital, LLC is hereby adjudicated as a
> good and valid mortgage on [Danya Apartments] as more particularly
> described herein above.  The mortgage is adjudicated as a superior lien to the
> claims of the Plaintiffs and to claims of Defendant George Hutchison and/or
> his assigns.  The Court further finds that the management agreement executed
> contemporaneously with the mortgage is otherwise valid and is due to be
> enforced according to its terms.

(Autauga County Suit, Summ. J. Op. 6.)  Summary judgment was entered in favor of the

Ensleys and ES Capital "as to all claims[.]"  (Autauga County Suit, Summ. J. Op. 6 (¶ 3).)

On post-judgment cross-motions, the Autauga County Circuit Court denied Ms.

Walden's motion to vacate, but granted ES Capital's motion requesting an order directing

Ms. Walden not to interfere with the management of Danya Apartments during the pendency

of any appeal.  The Autauga County Circuit Court ruled:

> Plaintiff, her attorney and/or representatives shall not attempt to intercept any
> further rents from said tenants nor attempt to change the locks on the offices
> of said apartments or in any way interfere with the operation of said
> apartments by Defendant ES Capital, LLC such that said Defendant shall be
> entitled to all income received from the apartments which shall be applied

> toward the payment of its mortgage, the operating cost of said apartments and otherwise pursuant to the management agreement and the other loan documents executed contemporaneously with said mortgage.

(Autauga County Suit, Order ¶ 3, dated Jan. 2007 (Doc. # 31-2).)

The summary judgment entered in favor of the Ensleys and ES Capital in the Autauga County Suit was affirmed on appeal by the Supreme Court of Alabama in November 2007. *See Walden*, 987 So. 2d at 1122. The supreme court addressed Ms. Walden's quiet-title claim as pertained to the Ensleys and ES Capital.[12] *See id.* at 1116. Ms. Walden argued that the doctrine of *lis pendens* operated to cut off entirely their interests in Danya Apartments. *See id.* at 1120. She contended that the Montgomery County Circuit Court's November 4, 2004 consent judgment – entered more than seven months after the supreme court affirmed and denied certiorari review in that case – made her the "lawful owner" of Danya Apartments and invalidated ES Capital's mortgage. *See id.* at 1120. The supreme court assumed without deciding that the November 2004 consent judgment entered in the Montgomery County Suit was valid, but nonetheless held that Ms. Walden could not prevail: "[Ms.] Walden does not explain how the doctrine of *lis pendens* operates to invalidate a mortgage taken before the end of an appellate process that is finally resolved in favor of the mortgagee." *Id.* at 1121. It explained:

> Although ES [Capital] received its mortgage on June 29, 2003, after a final judgment in [the Montgomery County Suit], and while that judgment was under appellate review, that litigation was concluded by the judgment of this

---

[12] As noted by the Supreme Court of Alabama, this was the only claim Ms. Walden briefed. *See Walden*, 987 So. 2d at 1116.

10

Court on April 16, 2004, in a manner favorable to ES [Capital]. In other words, ES [Capital] took its mortgage, subject to the risk that the judgment of June 5, 2002, which gave Walden only a lien on the apartments, would be reversed on appeal. That did not happen, of course. Instead, the judgment was affirmed.

*Id.* Holding that Ms. Walden presented no basis for reversing the summary judgment entered in favor of the Ensleys and ES Capital, the supreme court affirmed that part of the judgment of the lower court in the Autauga County Suit. *See id.* at 1122.

The end result of the rulings in the Autauga County Suit, as affirmed by the Supreme Court of Alabama, was as follows: (1) The mortgage of ES Capital constitutes a valid lien on Danya Apartments; (2) ES Capital's mortgage is a superior lien to the claims of Ms. Walden; and (3) the management agreement by which ES Capital operates Danya Apartments and collects rent is valid and enforceable, and ES Capital is entitled to collect these rent payments without interference from Ms. Walden.

## C.    **The Present Lawsuit**

The decision by the Supreme Court of Alabama in the Autauga County Suit is the precursor to this lawsuit, which is brought by Crooked Creek, a Nevada corporation.[13] As alleged, Crooked Creek is the assignee of and successor-in-interest to all of Ms. Walden's

---

[13] As originally filed, the Complaint in this action was 203 pages in length and contained 637 numbered paragraphs, 170 footnotes and 14 exhibits. (Compl.) The court *sua sponte* dismissed the Complaint, with leave granted to Crooked Creek to file an amended complaint in compliance with Rule 8 of the Federal Rules of Civil Procedure. (Order (Doc. # 5).) The 70-page Amended Complaint was filed on January 13, 2009. The Amended Complaint is the operative complaint.

11

stock in the corporation that owns Danya Apartments.[14]  (Am. Compl. ¶ 11; *see also* Compl. ¶¶ 123, 228, 314; Compl., Ex. D (face page), describing Ms. Walden as Crooked Creek's "predecessor in interest.")

Defendants are Mr. Ensley, Mrs. Ensley, ES Capital, Ms. Liles and Mr. Edmondson. Although "Venture Services d/b/a Danya Apartments Management Group" ("Danya Group") is listed as a Defendant in the caption, the Amended Complaint describes Danya Group as an association-in-fact enterprise in the context of the RICO claims.  (Am. Compl. ¶¶ 27, 28.) In the Amended Complaint, Danya Group is not a legal entity against whom monetary or injunctive relief is sought, and Crooked Creek has not asserted otherwise in its briefs.

The Amended Complaint alleges that Mr. Ensley, Mrs. Ensley, Ms. Liles, Mr. Edmondson and ES Capital "comprise the participants of Danya Group" (Am. Compl. ¶ 19), with Mr. Ensley as the manager, Mrs. Ensley as the "financier and consultant," Ms. Liles as the on-site manager, Mr. Edmondson as an "accomplice" and legal advisor to Danya Group, and ES Capital as the vehicle through which funds are "laundered" (Am. Compl. ¶ 20). More particularly, Mr. Edmondson is alleged to have advised the Ensleys to pay funds from the collection of rent from Danya Apartments to ES Capital "in the guise of mortgage payments thereby creating the appearance of conducting a legitimate business transaction," when in fact, the rental payments belonged to Crooked Creek, the purported owner of all the stock in the corporation that owns Danya Apartments.  (Am. Compl. ¶ 98.)  The primary

---

[14] The Amended Complaint describes Danya Apartments as "a HUD Section 8 housing project for low-income families that receives federal subsidy funds."  (Am. Compl. ¶ 2.)

injuries allegedly caused by the Ensleys are that they continue to retain payments collected from the rental business of Danya Apartments. (Am. Compl. ¶ 121.) The Ensleys also are accused of depositing the rental funds into a Danya Group bank account, from which Mr. Edmondson has been paid for his legal services. (Am. Compl. ¶ 121.) It further is alleged that Mr. Edmondson has received these payments, notwithstanding his knowledge that the monies have been misappropriated from Crooked Creek. (Am. Compl. ¶ 121.) Ms. Liles's duties in connection with Danya Apartments are described as "leasing the apartment units, evicting low-income families who fail to pay rent, keeping records, hiring and overseeing repairmen . . . and . . . grounds keepers, and collecting tenants' monthly rent checks." (Am. Compl. ¶ 30.) As alleged by Crooked Creek, the "agreed-upon goal" of the Ensleys, Ms. Liles and Mr. Edmondson is to "loot[] [Crooked Creek's] rental-property business," and their "long range goal" is to "completely tak[e]-over [Crooked Creek's] business, lock-stock-and-barrel." (Am. Compl. ¶ 125; *see also* Am. Compl. ¶ 132.)

Furthermore, Crooked Creek alleges that the management agreement is "the linchpin of the illicit scheme." (Am. Compl. ¶ 23.) Through use of the management agreement, Defendants are accused of "systematically looting the business" (Am. Compl. ¶ 22), of taking control of Danya Apartments in order "to misappropriate the rental income" (Am. Compl. ¶ 28), and of paying "the criminally derived proceeds . . . to themselves notwithstanding that such payments are unapproved and unwarranted so-called management fees and . . . professional fees" (Am. Compl. ¶ 39). In addition to being deprived of the rental fees from

13

the apartments, Crooked Creek alleges that it has expended "substantial sums" to stop the "trespassing" and "theft of the rental property earnings."  (Am. Compl. ¶ 46.)

The Ensleys and ES Capital, as explained above, also were defendants in the Autauga County Suit.  Mr. Edmondson is identified as an attorney who represented the Ensleys and ES Capital in the Autauga County Suit.  (*See, e.g.*, Am. Compl. ¶¶ 121, 136, 139.)  Ms. Liles was not a party in the Autauga County Suit.

The Amended Complaint contains causes of action under both federal and state law. The first four claims are brought pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*.  The fifth through the tenth claims are causes of action purportedly brought under various federal criminal statutes, including 18 U.S.C. §§ 1957 (money laundering), 1951(a) (extortion), 666(a) (theft or bribery concerning programs receiving federal funds), and 2314 (transportation of stolen money).  (Am. Compl. ¶¶ 142-72.)  There also are numerous state law claims, including claims of civil liability for alleged violations of criminal statutes.  (Am. Compl. 60-66.)

## IV.  DISCUSSION

### A.    Claims for Alleged Violations of Federal and State Criminal Statutes

In the Amended Complaint, Crooked Creek brings several claims alleging that Defendants have committed criminal acts prescribed by various federal and state statutes. (Am. Compl. ¶¶ 142-72; Am. Compl. 60-66.)  Defendants assert that these claims are due to be dismissed for failure to state a claim because there is no private civil cause of action for

violations of these alleged criminal offenses.  (Doc. # 32, at 19-20; Doc. # 22, at 8-9.)  In its

briefs, Crooked Creek has not challenged this argument, and for good reason.

### 1.    *Federal Criminal Statutes*

The Eleventh Circuit has explained that an implied private right of action under a

federal statute should only be found where there is "'clear evidence of Congress's intent to

create a cause of action.'" *McDonald v. S. Farm Bureau Life Ins. Co.*, 291 F.3d 718, 723

(11th Cir. 2002) (quoting *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1345

(11th Cir. 1997)).  None of the federal criminal statutes relied upon by Crooked Creek

contains any hint that Congress intended to permit a private right of action.  Additionally, no

authority has been cited that would permit a private action.  To the contrary, as set out in the

accompanying footnote, courts uniformly have concluded that no private cause of action

exists under any of the statutes relied upon by Crooked Creek.[15]  On the basis of these

authorities and independent review, Counts Five through Ten alleging violations of federal

criminal statutes are due to be dismissed for failure to state a claim.

---

[15] *See Wisdom v. First Midwest Bank, of Poplar Bluff*, 167 F.3d 402, 409 (8th Cir. 1999) ("[N]either the statutory language of 18 U.S.C. § 1951 nor its legislative history reflect[s] an intent by Congress to create a private right of action." (collecting cases)); *De Pacheco v. Martinez*, 515 F. Supp. 2d 773, 787 (S.D. Tex. 2007) ("[F]ederal courts have not recognized a private right of action for breach of § 1956, the money laundering statute." (collecting cases)); *Whitmire v. U.S. Veterans Admin.*, 661 F. Supp. 720, 723 (W.D. Wash. 1986) (dismissing the plaintiff's claim alleging a violation of 18 U.S.C. § 666 and observing that the plaintiff "presented no authority or analysis which would indicate that this statute creates a private cause of action upon which he can base a suit"); *Cooper v. North Jersey Trust Co. of Ridgewood, N.J.*, 226 F. Supp. 972, 980 (S.D.N.Y. 1964) ("[N]o civil right is created by 18 U.S.C. [§] 2314."); *Piorkowski v. Parziale*, No. 3:02cv963, 2003 WL 21037353, at *8 (D. Conn. May 7, 2003) (dismissing a plethora of claims alleging violations of federal criminal statutes, including 18 U.S.C. § 666, because none of the statutes "provide[s], explicitly or implicitly, a civil cause of action and the plaintiff has cited no authority otherwise").

## 2. *State Criminal Statutes*

Crooked Creek also alleges numerous violations of state felony statutes, asserting that the claims are proper pursuant to § 6-5-370 of the Alabama Code. (Am. Compl. 60-66.) Defendants argue that Crooked Creek's reliance on § 6-5-370 as permitting private causes of action for criminal state law violations is misplaced. The court agrees.

Section 6-5-370 of the Alabama Code provides that "[f]or any injury, either to person or property, amounting to a felony, a civil action may be commenced by the party injured without prosecution of the offender." Ala. Code § 6-5-370 (1975). In *Lewis v. Fraunfelder*, 796 So. 2d 1067 (Ala. 2000), the plaintiff asserted that § 6-5-370 permitted her to bring a claim for mail fraud and credit card fraud, felony crimes. *See id.* at 1068 n.1 & 1069-70. The Supreme Court of Alabama disagreed, explaining that the plaintiff had failed to state a claim for which relief could be granted:

> Section 6-5-370 abrogates the common-law rule of "suspension," the rule that "a civil action for injury to person or property, amounting to a felony, could not be maintained without prosecution of the offender." Section 6-5-370 does not create a cause of action; rather, it merely allows a plaintiff to commence a civil action even if the plaintiff does not pursue criminal prosecution of the defendant.

*Id.* at 1070 (internal citations omitted); *see also Preskitt v. Lyons*, 865 So. 2d 424, 429 (Ala. 2003) ("§ 6-5-370 only eliminates an obstacle for plaintiffs with a valid cause of action; it does not *create* a civil cause of action for any injury that amounts to a felony.").

Based upon the holding in *Lewis*, the court finds that § 6-5-370 does not present a vehicle through which Crooked Creek can bring claims alleging that Defendants violated

16

state criminal statutes.  Accordingly, the court finds that Defendants' motions to dismiss Crooked Creek's claims predicated on violations of state criminal statutes are due to be granted.

**B.**   ***Res Judicata***

Defendants also argue that the doctrine of *res judicata* precludes Crooked Creek from litigating the matters decided adversely to its predecessor-in-interest Ms. Walden in the Autauga County Suit.  The facts to which all claims in this action, regardless of defendant, are wed involve the validity of only two instruments:  the mortgage and the management agreement.  Crooked Creek repeatedly and without shame asserts the invalidity of both of these instruments despite the prior holding of the courts of Alabama that, once and for all, for better or for worse, and no doubt rendering Crooked Creek and Ms. Walden sicker and poorer, the two instruments are valid.  Thus, the marriage here proposed by Crooked Creek would appear to be annulled by either *res judicata*, collateral estoppel, or both.  There is a hitch, however.

Pursuant to 28 U.S.C. § 1738, a federal court is required to give a state court judgment the same full faith and credit as that judgment would receive under the law of the state in which the judgment was rendered.  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005); *see also Green v. Jefferson County Comm'n*, 563 F.3d 1243, 1252 (11th Cir. 2009) ("When we are considering whether to give *res judicata* effect to a state court judgment, we 'must apply the *res judicata* principles of the law of the state whose decision

17

is set up as a bar to further litigation.'" (quoting *Kizzire v. Baptist Health Sys., Inc.*, 441 F.3d 1306, 1308-09 (11th Cir. 2006)); *cf. Taylor v. Sturgell*, 128 S. Ct. 2161, 2171 (2008) ("The preclusive effect of a federal-court judgment is determined by federal common law."). Because the preclusive effect of a state court judgment is at issue, the court looks to Alabama law on *res judicata*.  What would facially appear to be the most logical and obvious rule anywhere in the law – that where a court of competent jurisdiction, in a valid, litigated judgment, extinguishes an issue, that issue may not be relitigated in a subsequent lawsuit by the party against whom the issue was decided as to the whole world – is not so obvious in Alabama and a minority of jurisdictions.

"The elements of *res judicata*, or claim preclusion, are (1) a prior judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) with substantial identity of the parties, and (4) with the same cause of action presented in both suits."  *Dairyland Ins. Co. v. Jackson*, 566 So. 2d 723, 725 (Ala. 1990); *see also Whisman v. Ala. Power Co.*, 512 So. 2d 78, 81 (Ala. 1987) (observing that *res judicata* is "frequently referred to as a claim preclusion").  "If those four elements are present, then any claim that was, or that could have been, adjudicated in the prior action is barred from further litigation."  *Chapman Nursing Home, Inc. v. McDonald*, 985 So. 2d 914, 919 (Ala. 2007).  In *Hughes v. Martin*, 533 So. 2d 188 (Ala. 1988), the Supreme Court of Alabama discussed the policy underlying the doctrine of *res judicata*:

> Res judicata is a broad, judicially developed doctrine, which rests upon the
> ground that public policy, and the interest of the litigants alike, mandate that

18

there be an end to litigation; that those who have contested an issue shall be bound by the ruling of the court; and that issues once tried shall be considered forever settled between those same parties and their privies.  The principle of res judicata fosters reliance on judicial action, and tends to eliminate vexation and expense to the parties, wasted use of judicial machinery and the possibility of inconsistent results.

*Id.* at 190; *cf. Jones v. Blanton*, 644 So. 2d 882, 885 (Ala. 1994) ("The doctrine of collateral estoppel, like the related doctrine of res judicata, serves to promote the efficient allocation of our limited judicial resources, by preventing the unnecessary and pointless relitigation of issues previously adjudicated." (internal footnote omitted)).

Defendants argue that all four elements of *res judicata* are satisfied.  Crooked Creek counters those assertions.[16]  The court turns to the arguments on each of the elements of *res*

---

[16] Crooked Creek's two threshold arguments lack merit.  First, controlling precedent forecloses Crooked Creek's unsupported contention that the affirmative defense of *res judicata* cannot be raised in a motion to dismiss.  (Doc. # 36, at 2, 9; *see also* Doc. # 29, at 12 ("[A] motion to dismiss is not the proper vehicle to raise the defense of *res judicata*.").)  The law is well established that *res judicata* may be raised in a Rule 12(b)(6) motion to dismiss when the allegations on the face of the complaint "show that an affirmative defense bars recovery on the claim."  *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1022 (11th Cir. 2001).  Indeed, there is authority that a court can raise the issue of *res judicata sua sponte*.  *See Am. Furniture Co. v. Int'l Accommodations Supply*, 721 F.2d 478, 482 (5th Cir. Unit A March 1981).

Second, Crooked Creek argues that the pleadings and judgments from the Autauga County Suit and the Montgomery County Suit cannot be considered on a motion to dismiss.  (Doc. # 36, at 2.)  However, a court can consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Public records comprise a category of documents subject to judicial notice.  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999); *see also In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 102 F.3d 1524, 1537 (9th Cir. 1996) ("[A]mple authority exists which recognizes that matters of public record, including court records in related or underlying cases which have a direct relation to the matters at issue, may be looked to when ruling on a 12(b)(6) motion to dismiss.").  Moreover, "where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal[.]"  *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (*per curiam*).  And "the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment."  *Id.*

Here, Crooked Creek attached to its original complaint certain orders from the Montgomery County Suit and the Autauga County Suit, as well as other documents integral to its claims, such as the

*judicata*. Because Alabama is in the minority of jurisdictions as to the requirement of substantial identity of the parties when *res judicata* is raised defensively, as here, more discussion is needed as to this element.

### 1.    A Final Judgment on the Merits

The Autauga County Suit was decided at the summary judgment stage, with the Ensleys and ES Capital prevailing on the basis of their motion.  The case law is cohesive that a decision granting summary judgment is a final judgment on the merits for *res judicata* purposes.  *See Williams v. Moore*, ___ So. 2d ___, No. 2070284, 2008 WL 4531799, at *5 (Ala. Civ. App. 2008) ("A summary judgment operates as an adjudication on the merits of a claim." (quoting *Bean v. Craig*, 557 So. 2d 1249, 1253 (Ala. 1990)); *see also* Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure, § 4444 (3d ed. 2002) (collecting cases).  Moreover, the Supreme Court of Alabama has explained that "[i]f the judgment is general, and not based on any technical defect or objection, and the parties had a full legal opportunity to be heard on their respective claims and contentions, it is on the merits, although there was no actual hearing or argument on the facts of the case."  *Bd. of Trustees of Univ. of Ala. v. Am. Res. Ins. Co.*, 5 So. 3d 521, 533 (Ala. 2008) (citations and internal quotation marks omitted).

---

management agreement.  (*See* Compl., Exs. G, H, L, M.)  Additionally, transactions occurring in the Montgomery County Suit and Autauga County Suit are referenced in the Amended Complaint.  Based upon the above authorities, pleadings and orders from both state court lawsuits can be considered on the motions to dismiss because they are matters of public record and are integral to Crooked Creek's claims for relief.

20

Here, in the Autauga County Suit, the circuit court granted summary judgment in favor of the Ensleys and ES Capital "as to all claims" brought by Ms. Walden.  (Autauga County Suit, Summ. J. Op. 6.)   The record also reflects that the motion was briefed "exhaustive[ly]" and that "oral argument" was entertained.  (Autauga County Suit, Summ. J. Order 1.)   The requirements of *Board of Trustees of University of Alabama* are satisfied on these facts.

Crooked Creek, however, argues that the Autauga County Circuit Court's finding that "the purported management agreement was valid was merely the expression of the court's opinion."  (Doc. # 36, at 10 n.6.)  "It was not a decision on the merits."  (Doc. # 36, at 10 n.6; *see also* Doc. # 36, at 16 (asserting that the Autauga County Circuit Court's finding that the management agreement was valid and enforceable was not supported by reasoning or "fully investigated" or "tried").)  Crooked Creek cites *Ingram v. Commissioner of Social Security Administration*, 496 F.3d 1253 (11th Cir. 2007) (*see* Doc. # 36, at 8), for its statement that "[j]udicial opinions do not make binding precedents; judicial decisions do."  *Ingram*, 496 F.3d at 1265 (internal citation and quotation marks omitted).  That observation was made for the purpose of distinguishing between *dicta* and the holding of the case, *see id.*, but was not made within the context of applying Alabama's elements of *res judicata*.[17]   Nonetheless, Crooked Creek's *dicta* argument is not persuasive.  Where a matter is argued before the

---

[17] *Ingram* was not a *res judicata* decision.

court, and the court's opinion passes on the issue, the language is not *dicta*.  *See Gillespie v. U.S. Steel Corp.*, 321 F.2d 518, 529-30 (6th Cir. 1963).

Here, it is *Ms. Walden* who commenced the litigation in the Autauga County Suit and who expressly raised the issue of the management agreement's validity.  Namely, in Count IX of her state court complaint, Ms. Walden alleged that the management agreement was void "because it was not made in good faith, and because she [Ms. Walden] did not consent to, approve of, or acquiesce in said agreement."  (Autauga County Suit, Compl. ¶ 44.)  As relief, Ms. Walden requested the Autauga County Circuit Court to declare that the management agreement was "void."  (Autauga County Suit, Compl. 28.)  And in ruling on the parties' cross-motions for summary judgment, the Autauga County Circuit Court ruled on the issue, finding that "the management agreement . . . [was] valid and [was] due to be enforced according to its terms."  (Autauga County Suit, Order 6.)  The issue of the management agreement's validity was argued before the Autauga County Circuit Court, and a court ruling was issued.  *See Gillespie*, 321 F.2d at 529-30.  Ms. Walden cannot now contend that the Autauga County Circuit Court's conclusion is *dicta*.  The first *res judicata* element is satisfied on this record.

### 2.    *A Court of Competent Jurisdiction*

Defendants assert that the Autauga County Suit "certainly" was  "rendered by a court of competent jurisdiction."  (Doc. # 32, at 11.)  They contend that the Autauga County Circuit Court had subject matter jurisdiction over the *res* because "[t]he real property that

was the subject of the action (Danya Apartments) was in Autauga County."  (Doc. # 38, at 5.)
Crooked Creek, however, argues that the Autauga County Circuit Court's judgment is "void"
on three grounds and, thus is not entitled to *res judicata* effect.  (Doc. # 36, at 3, 11.)

First, Crooked Creek contends that the defendants in the Autauga County Suit
"lacked standing to challenge" the judgment entered in the Montgomery County Suit.  (Doc.
# 36, at 12.)  It argues that the absence of standing is "synonymous" with the absence of
subject matter jurisdiction.  (Doc. # 36, at 13.)  Second, Crooked Creek asserts that the
Autauga County Circuit Court lacked "subject matter jurisdiction" to address whether the
November 2004 consent judgment entered in the Montgomery County Suit was valid.[18]
(Doc. # 29 ¶ 6.)  Third, Crooked Creek contends that the grant of the defendants' summary
judgment motion amounted to a due process violation by depriving it of a jury trial "on an
important factual issue" concerning the validity of the management agreement.  (Doc. # 36,
at 11; *see also* Doc. # 40, at 5.)

---

[18] Crooked Creek is referring to the Autauga County Circuit Court's Order granting summary
judgment in favor of the Ensleys and ES Capital.  The Autauga County Circuit Court found that the
Montgomery County Circuit Court did not have "jurisdiction" in November 2004, which was after the
appeal process had concluded in that suit, to overrule its June 5, 2002 Order, which awarded Ms. Walden
only a lien on the common stock of the corporation that owned Danya Apartments sufficient to satisfy
her judgment against Mr. Smith, and to reinstate its August 2000 Order.  (Autauga County Suit, Summ. J.
Op. 5.)  As explained, the Montgomery County Circuit Court's August 2000 Order "again award[ed] the
common stock to [Ms.] Walden," but did so in contravention of the "law of the case," and in derogation
of non-parties, the Ensleys and ES Capital, who had obtained a mortgage on Danya Apartments after the
June 5, 2002 Order.  (Autauga County Suit, Summ. J. Op. 5.)  Finding that ES Capital's mortgage on
Danya Apartments was "valid," the Autauga County Circuit Court adjudged the mortgage as "superior"
to Ms. Walden's claim.  (Autauga County Suit, Summ. J. Op. 6.)

In *Neal v. Neal*, 856 So. 2d 766 (Ala. 2002), the Supreme Court of Alabama explained that, for *res judicata* purposes, a court's jurisdiction is not competent if its judgment is "void for want of personal jurisdiction, subject-matter jurisdiction, or due process of law."[19] *Id.* at 779; *see also Lloyd Noland Found., Inc. v. HealthSouth Corp.*, 979 So. 2d 784, 795 (Ala. 2007) ("[F]or purposes of res judicata, the prior judgment must be rendered by a court of competent jurisdiction.  A court of competent jurisdiction is a court with jurisdiction over the subject matter."); *Zickler v. Shultz*, 603 So. 2d 916, 920 (Ala. 1992) ("Under Alabama law, to be *res judicata*, a judgment must be rendered by a court with subject matter jurisdiction."). *Neal* further explained that "*due process of law* means notice, a hearing according to that notice, and a judgment entered in accordance with such notice and hearing."  856 So. 2d at 782 (internal quotation marks omitted).  Hence, a prior judgment is void for want of due process where "on some critical motion or for some critical proceeding within that

---

[19] There is a trend among federal courts to apply *res judicata*, notwithstanding that the prior federal-court judgment was rendered in the absence of subject matter jurisdiction.  *See Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 377 (1940) (holding that a federal district court's erroneous exercise of subject matter jurisdiction was not subject to collateral attack and was entitled to *res judicata* effect); *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 604 n.3 (5th Cir. 1999) ("'Today, it is safe to conclude that most federal court judgments are res judicata notwithstanding a lack of subject matter jurisdiction.'" (quoting 18A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4428 (2d ed. 2002))); *Nemaizer v. Baker*, 793 F.2d 58, 65 (2d Cir. 1986) ("[I]f the parties could have challenged the court's power to hear a case, then *res judicata* principles serve to bar them from later challenging it collaterally.").

No case has been cited to indicate that this is the trend in Alabama, and the Alabama decisions cited above are not in accord with that trend.  *See also Int'l Longshoremen's Ass'n v. Davis*, 470 So. 2d 1215, 1217 (Ala. 1985), *aff'd*, 476 U.S. 380 (1986) (A judgment entered without subject-matter jurisdiction is void and may be set aside at any time, either on direct or collateral attack); *cf.* 18A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4428 (2d ed. 2002) ("State judgments may prove more vulnerable than federal judgments to defeat in subsequent federal litigation.  So long as the lack of subject-matter jurisdiction is simply a matter of state law, it is clear that a federal court should accord the res judicata effects dictated by state law.").

litigation," the litigant was "deprived of the 'notice, a hearing according to that notice, and a judgment entered in accordance with such notice and hearing[.]'" *Id.*

However, a void judgment must be distinguished from an erroneous judgment. Discussing *res judicata*, *Neal* held that a court's "misinterpretations and misapplications of law" are insufficient to demonstrate a violation of due process of law. 856 So. 2d at 782. "The simple fact that a court has erroneously applied the law does not render its judgment void." *Id.* at 781 (internal quotation marks omitted); *see also Ex parte R.S.C.*, 853 So. 2d 228, 235 (Ala. Civ. App. 2002) ("[A] judgment is not void simply because it is erroneous[.]").

Crooked Creek's argument that the Autauga County Suit's judgment is void for lack of standing – and thus not barred by *res judicata* – is not easily followed. This is because Crooked Creek's argument is made in the abstract. No attempt has been made to connect general propositions of law to concrete facts. Standing generally is regarded as a jurisdictional prerequisite to *bringing* a lawsuit. *See Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008). Here, no argument is made by Crooked Creek that Ms. Walden lacked standing to bring her prior action in the Autauga County Circuit Court. Rather, Crooked Creek's contention is that, in *defending* against Ms. Walden's claims, the *defendants* in the Autauga County Suit did not have standing to assert any argument that had the effect of contradicting the November 2004 consent judgment entered in the Montgomery County Suit. Crooked Creek, however, has not cited any authority that supports its position. It cites only *R.S.C.* for the general principle that a judgment is void

25

if there was no subject matter jurisdiction.  (Doc. # 36, at 18.)  But, Crooked Creek has failed

to demonstrate *R.S.C.*'s applicability to this case.  *R.S.C.* is distinguishable on a number of

bases.  For one thing, it involved a plaintiff's, not a defendant's, standing.  *See* 853 So. 2d

at 236.  For another, the factual issue is not comparable to this case; the issue in *R.S.C.* was

whether an aunt, who had physical custody of the father's children, had standing to file a

contempt petition against the father for his failure to pay child support.  *See id.*  Crooked

Creek's cursory and unsupported argument does not support a conclusion that the Autauga

County Circuit Court's judgment is not competent because it is void for lack of standing.

Crooked Creek's argument that the Autauga County Circuit Court did not have subject

matter jurisdiction to declare that the Montgomery County Circuit Court lacked jurisdiction

to enter its November 2004 consent judgment is shortsighted.  Crooked Creek has not

submitted any authority that supports this line of attack on the jurisdiction of the Autauga

County Circuit Court.  Again, the case law it cites supports only general propositions of law.

(Doc. # 29 ¶ 6.)  Moreover, Crooked Creek did not advance this argument in the Autauga

County Suit or on appeal in the Supreme Court of Alabama.

"Subject-matter jurisdiction concerns a court's power to adjudicate a case, not the

merits of the court's decision in the case."  *Ex parte Butler*, 972 So. 2d 821, 825 (Ala. 2007).

In Alabama, "'[a] trial court derives its jurisdiction from the Alabama Constitution and the

Alabama Code.'"  *Id.* (quoting *Ex parte Seymour*, 946 So. 2d 536, 538 (Ala. 2006)).  The

Autauga County Circuit Court is a court of general jurisdiction.  *See* Ala. Const. art. VI,

§ 139.  The matters over which it can exercise original and equitable jurisdiction are set out by statute.  *See* Ala. Code §§ 12-11-30, 12-11-31.  Whether a court has subject matter jurisdiction to hear a particular case is to be assessed based upon the allegations in the complaint.  *See Chestang v. Tensaw Land & Timber Co.*, 134 So. 2d 159, 165 (Ala. 1960).

Here, the crux of Ms. Walden's complaint in the Autauga County Suit was a claim to quiet title in Danya Apartments, brought pursuant to § 6-5-541 *et seq.*, of the Alabama Code, and the primary relief Ms. Walden sought was a "judgment or decree declaring that she ha[d] the entire undivided fee simple interest in and to [Danya Apartments] with no restrictions thereon."  (Autauga County Suit, Compl. 19.)  No argument has been made in this or any other court, and for good reason, that the Autauga County Circuit Court lacked subject matter jurisdiction to decide the priorities of the parties as to Danya Apartments.  An action to quiet title gives the circuit court jurisdiction "to determine and settle [title] as between the [plaintiff] and the defendants."  *Stokes v. Cottrell*, No. 2060887, ___ So. 2d ___, 2008 WL 682475, at *5 (Ala. Civ. App. 2008) (citation and internal quotation marks omitted).  And, "[w]hen a plaintiff brings a quiet-title action, the defendant is required to defend the state of his or her title to the property and, even in the absence of a cross-claim, is entitled to have title quieted in him or her if he or she can establish superior title to the property."  *Id.* at *10 (citing *Myers v. Moorer*, 134 So. 2d 168 (Ala. 1961)).

The Autauga County Circuit Court, acting within the realm of that jurisdiction, established the priorities of the litigants' claims to Danya Apartments.  (Autauga County Suit,

Summ. J. Op. 1-7.)  Crooked Creek has not cited any authority that the Autauga County Circuit Court's findings adjudicating the priorities of the parties as to Danya Apartments – even assuming *arguendo* that those findings were wrong – affected the court's *subject matter jurisdiction*.  Rather, the court finds that Crooked Creek's argument boils down to an assertion that the Autauga County Circuit Court misapplied the law when it concluded that ES Capital's mortgage was superior to Ms. Walden's legal interest in Danya Apartments.  As set out above, however, under Alabama law, erroneous applications of the law do not bear on the court's subject matter jurisdiction and do not preclude the application of *res judicata*.  *See Neal*, 856 So. 2d at 782.

Finally, Crooked Creek's argument that the grant of summary judgment in favor of the defendants in the Autauga County Suit was inconsistent with due process is not persuasive. There is no allegation or argument from Crooked Creek that its predecessor-in-interest, Ms. Walden, did not receive notice or an opportunity to be heard on the defendants' summary judgment motion filed in the Autauga County Suit.  To the contrary, the proceedings in the Autauga County Circuit Court reflect that Ms. Walden was represented by counsel, filed her own summary judgment motion, and responded to the defendants' summary judgment motion. Moreover, the Autauga County Circuit Court's order granting summary judgment in the defendants' favor reflects that a hearing was held on the cross-motions for summary judgment, and that the court heard "extensive oral argument by counsel for the respective parties" and was "provided with exhaustive briefs."  (Autauga County Suit, Summ. J. Op. 1.)

28

The court recognizes the strength of Crooked Creek's belief that the Autauga County Suit was wrongly decided.  (*See, e.g.*, Waldens' Affs.  (Exs. J & K to Compl.).)  Crooked Creek's arguments that the Autauga County Circuit Court incorrectly applied the summary judgment standard and erroneously found that no jury issue existed as to the management agreement's validity, however, simply do not call into question the jurisdictional competency of the state court.  These arguments focus on legal errors in the judgment, not on violations of due process.  The foregoing principles of law make clear that the *res judicata* consequences of a final judgment on the merits are not altered by the fact that the judgment may have been wrong.  Crooked Creek has failed to make any showing that the Autauga County Circuit Court did not accord Ms. Walden due process.

Crooked Creek's predecessor in interest engaged the state court's jurisdiction, invited certain defendants into the case, set the agenda of issues to be decided, and appealed her loss to the Supreme Court of Alabama.  As a result, Crooked Creek is barred from claiming that those proceedings, framed entirely by its predecessor, are void.  Crooked Creek cannot have it both ways.  In sum, the second element of *res judicata* is satisfied.

### 3.    *Substantial Identity of the Parties*

Citing *Dairyland Insurance Co. v. Jackson*, 566 So. 2d 723 (Ala. 1990), Defendants argue that the third element of the *res judicata* test is satisfied based solely upon a demonstration of privity between Crooked Creek and Ms. Walden.  In *Dairyland*, the Supreme Court of Alabama said that

> the "party identity criterion of *res judicata* does not require complete identity,
> but only that the party against whom *res judicata* is asserted was either a party
> or in privity with a party to the prior action or that the non-party's interests were
> adequately represented by a party in the prior suit, and the relationship between
> the party and non-party is not so attenuated as to violate due process."

566 So. 2d at 725-26 (quoting *Whisman*, 512 So. 2d at 82).

However, a subsequent decision of the Supreme Court of Alabama illustrates that *Dairyland* cannot be stretched this far, *see Thomas v. Lynn*, 620 So. 2d 615, 617 (Ala. 1993), and in fact places Alabama squarely in the minority of jurisdictions. In *Thomas*, referring to *Dairyland*'s statement that the "'party identity criterion' . . . require[s] . . . only that the party against whom *res judicata* is asserted was either a party or in privity with a party to the prior action," the Supreme Court of Alabama observed that the defendants "would have this Court apply that abstract language literally and hold that, because the plaintiffs are the same in both actions, the 'party identity criterion' has been met . . . ." *Thomas*, 620 So. 2d at 617 (quoting *Dairyland*, 566 So. 2d at 725). *Thomas* explained that, in the cases upon which *Dairyland* relied, there was no question but that the party who was raising the *res judicata* defense also was a party to the prior action. *See id.* at 617 & n.1. The *Thomas* court held that to interpret *Dairyland*'s statement literally would be "totally inconsistent with the classical statement" of the element of the *res judicata* doctrine requiring a "substantial identity of the parties." *Id.* at 617. *Thomas*, thus, declined to interpret *Dairyland*'s holding as requiring a substantial identity of parties only as to the parties against whom the defense is asserted.

30

In the context of *res judicata*, "[s]ubstantial identity requires that the parties be identical, sometimes referred to as the mutuality of estoppel requirement." *Greene v. Jefferson County Comm'n*, 13 So. 3d 901, 912 (Ala. 2008) (citation and internal quotation marks omitted); *see also Fisher v. Space of Pensacola, Inc.*, 461 So. 2d 790, 792 (Ala. 1984) (declining to abandon *res judicata*'s "mutuality requirement[]"). There is, however, an exception where a nonparty is in privity with a party in the prior action. *See Greene*, 13 So. 3d at 912. "Judgments can bind persons not party (or privy) to the litigation in question where the nonparties' interests were represented adequately by a party in the original suit." *Whisman*, 512 So. 2d at 82 (quoting *Century 21 Preferred Props., Inc. v. Ala. Real Estate Comm'n,* 401 So. 2d 764, 770 (Ala. 1981)).

It has been recognized that Alabama "follows an expansive definition of privity, which includes not only a successive interest to the same property right, but also 'an identity of interest in the subject matter of litigation.'" *Wood v. Kesler*, 323 F.3d 872, 877-80 & n.10 (11th Cir. 2003); *see also Greene*, 13 So. 3d at 912 (A party is in privity with a party to a prior action when there is "an identity of interest in the subject matter of litigation."). In *Hughes v. Martin*, 533 So. 2d 188 (Ala. 1988), the court summarized the law on *res judicata*'s privity requirement in Alabama:

> "The term 'privity' has not been uniformly defined with respect to res judicata. The following three definitions have appeared in Alabama cases: (1) the relationship of one who is privy in blood, estate, or law; (2) the mutual or successive relationship to the same rights of property; and (3) an identity of interest in the subject matter of litigation. Largely defining privity by example, the Alabama cases seem to resolve the question on an ad hoc basis in which the

circumstances determine whether a person should be bound by or entitled to the benefits of a judgment.  The decision usually turns on whether the relationship between the parties was close enough and whether adequate notice of the action was received by the alleged privy; this test has been bolstered by the recent tendency of the Alabama courts to analyze privity as an identity of interests."

*Id.* at 191 (quoting *Issue Preclusion in Alabama*, 32 Ala. L. Rev. 500, 520-21 (1981)).

Moreover, "if a party has 'a sufficient "laboring oar" in the conduct' of the litigation, then the principle of res judicata can be actuated."  *Century 21 Preferred Props.*, 401 So. 2d at 770 (quoting *Montana v. United States*, 440 U.S. 147, 155 (1979)); *accord Gonzalez, LLC v. DiVincenti*, 844 So. 2d 1196, 1203 (Ala. 2002).  In *Montana*, the Court explained that a sufficient "[l]aboring oar" exists where the non-party "assume[s] control over litigation . . . ." 440 U.S. at 154.  The Alabama Court of Civil Appeals applied the "laboring oar" concept in *Brown v. Brown*, 680 So. 2d 321 (Ala. Civ. App. 1996).  The issue in *Brown* involved the *res judicata* effect of a prior federal court judgment awarding the deceased's (Stirling Brown's) second wife, and not his first wife, the proceeds of his life insurance policy.  *See id.* at 322. *Res judicata* was raised defensively in *Brown* against the first wife as a bar to relitigating her counterclaim seeking the proceeds from Stirling Brown's life insurance policy.  *See id.* at 323. The parties in the prior federal court action were the first wife and the second wife, individually.  *See id.* at 322-23.  In *Brown*, the first wife also was a party, and, while the second wife was a party, she was named in her capacity as executrix of Stirling Brown's estate, not individually.  *See id.* at 323.  Although neither Stirling Brown nor his estate was a party in the prior federal lawsuit, the Alabama Court of Civil Appeals explained that Stirling

32

Brown's "*conduct* . . . was very much at issue" in the federal lawsuit, and that both wives had ample adversarial motive to vigorously argue that Stirling Brown's conduct should be interpreted in their favor. *Id.* at 324. The *Brown* court, thus, held that Stirling Brown's estate had a "sufficient 'laboring oar' in the conduct of the federal litigation." *Id.*

Under Alabama law, the employer-employee relationship also can provide the necessary privity to satisfy *res judicata* with respect to matters within the scope of that relationship. In *Thompson v. SouthTrust Bank*, 961 So. 2d 876 (Ala. Civ. App. 2007), the Alabama Court of Civil Appeals held that the privity requirement of *res judicata* "bar[s] a plaintiff from prosecuting a lawsuit against an employee when the same plaintiff already has suffered an adverse judgment on the merits in an action against the employer for the acts of the employee, provided that the prior judgment for the employer was not based on grounds personal to the employer." *Id.* at 885. The court examined at length analogous cases from other jurisdictions that had similarly held. One case was *Emery v. Fowler*, 39 Me. 326 (1855).

In *Emery*, the judgment entered against the defendant for trespass was reversed on appeal as barred by a prior action. The defendant "had acted at the direction of his father," who in the prior lawsuit had been found not liable for the same conduct underlying the claim against the defendant. *Thompson*, 961 So. 2d at 886 (discussing *Emery*). In *Thompson*, the court quoted from *Emery*:

> "This case requires that a single point only should be considered; whether one who acts as the servant of another, in doing an act alleged to have been a trespass, is to be considered as so connected with his principal, who commanded the act to be done, that what will operate as a bar to the further

> prosecution of the principal, will operate as such for his servant . . . .  In such
> case the principal and servant would be one in interest and would be known to
> the plaintiff to be so.  To permit a person to commence an action against the
> principal and to prove the acts alleged to be trespasses, to have been committed
> by his servant acting by his order, and to fail upon the merits to recover, and
> subsequently to commence an action against that servant and to prove and rely
> upon the same acts as a trespass, is to allow him to have two trials for the same
> cause of action, to be proved by the same testimony.  In such cases the technical
> rule, that a judgment can only be admitted between the parties to the record or
> their privies, expands so far as to admit it, when the same question has been
> decided and judgment rendered between parties responsible for the acts of
> others."

*Thompson*, 961 So. 2d at 886 (quoting *Emery*, 39 Me. at 329-32).  The *Thompson* court also

observed that its holding was "in accord" with the federal common law of *res judicata*:

> "Where a plaintiff has sued parties in serial litigation over the same transaction;
> where plaintiff chose the original forum and had the opportunity to raise all its
> claims relating to the disputed transaction in the first action; where there was
> a 'special relationship' between the defendants in each action, if not complete
> identity of parties; and where although the prior action was concluded, the
> plaintiff's later suit continued to seek essentially similar relief – the courts have
> denied the plaintiff a second bite at the apple."

*Id.* at 887 (quoting *Lubrizol Corp. v. Exxon Corp.*, 871 F.2d 1279, 1288 (5th Cir. 1989)).

Applying the foregoing principles of law, the court examines whether the parties in this

lawsuit are identical to or in privity with the parties in the Autauga County Suit.  This

application is defensive in nature, *i.e.*, the bar is raised against the plaintiff.

### a.  Crooked Creek

Crooked Creek correctly points out that it "was not a party" in the prior action.  (Doc.

# 40, at 1 n.1.)  Defendants assert, however, that, although not a party to the Autauga County

Suit, Crooked Creek is in privity with Ms. Walden, the plaintiff in the Autauga County Suit,

because it is the successor-in-interest to Ms. Walden's interest in Danya Apartments.  (Doc.
# 32, at 11.)  The court agrees with Defendants.

In *Williams*, an action to quiet title, one of the defendants brought a counterclaim
asserting her alleged ownership of the disputed property in the purported landowners' action
to quiet title.  *See* 2008 WL 4531799, at *3.  The Alabama Court of Civil Appeals held that
the counterclaim brought by the defendant, who was a party in a prior suit that determined
ownership of the property, was barred by *res judicata*, even though the landowners were not
parties to that suit.  2008 WL 4531799, at *6.  The landowners' predecessors in title were
defendants in the prior suit:  "[S]uccessors in title are in privity with their predecessors in
title" for purposes of res *judicata*.  *Id.*  The policy behind the *res judicata* principle of privity
in the context of successive property ownership is well established:

> The ground upon which, and upon which alone, a judgment against a prior
> owner is held conclusive against his successor in interest, is that the estoppel
> runs with the property, that the grantor can transfer no better right or title than
> he himself has, and that the grantee takes cum onere.

*Postal Tel. Cable Co. v. City of Newport, Ky.*, 247 U.S. 464, 474-75 (1918).  No basis has
been asserted, and none can be envisioned, for treating the assignment in interest of ownership
of personal property – the common stock in the corporation that owns Danya Apartments –
any differently than the transfer of the real property itself.  *See Taylor*, 128 S. Ct. at 2172
(explaining that, for preclusion purposes, "substantive legal relationships," including
"preceding and succeeding owners of property, bailee and bailor, and *assignee and assignor*,"
may justify a finding of privity (emphasis added)); *Salvage One Demolition Co. v. Wallace*,

35

408 So. 2d 89, 90 (Ala. 1981) (For purposes of *res judicata*, the assignee to the contract in the present action was in privity with its assignor in the prior action; the *res judicata* doctrine "'includes not only those who were actual parties but also all persons who are in privity with them, that is, having a mutual or successive relationship to the same rights . . . .'" (citation omitted)).

Here, Ms. Walden was the plaintiff in the Autauga County Suit.  In the Autauga County Suit, Ms. Walden alleged that she "own[ed] all of the common stock" in the corporation that owned Danya Apartments.  (Autauga County Suit, Compl. ¶¶ 2, 9.)  It is undisputed, and indeed alleged by Crooked Creek in this lawsuit, that Crooked Creek now retains Ms. Walden's stock:  "[Ms.] Walden . . . conveyed all of her stock in Danya Apartments to [Crooked Creek]."  (Am. Compl. ¶ 11; *see also* Am. Compl. ¶ 17 ("[Crooked Creek] alleges that it owns Danya Apartments.").)  Also, in the original complaint, Crooked Creek explicitly acknowledged its successor-in-interest status.  (Compl. ¶ 75.)   Because Crooked Creek – the plaintiff in this litigation – claims to be the successor-in-interest to the ownership interest in Danya Apartments claimed by Ms. Walden, who was the plaintiff in the Autauga County Suit, the court finds that the two parties are in privity.

### b.    The Ensleys and ES Capital

The Ensleys and ES Capital were defendants in the Autauga County Suit.  (Autauga County Suit, Compl. ¶¶ 4-6.)  They also are defendants in this action.  As to these parties, the third *res judicata* element is satisfied.

c.    **Ms. Liles**

It is undisputed that Ms. Walden did not sue Ms. Liles, the "on-site manager" of Danya Apartments (Am. Compl. ¶ 30), in the Autauga County Suit; thus, for *res judicata* to bar the present action against her, Ms. Liles must be in privity with at least one of the prevailing defendants in the Autauga County Suit.  Although the argument from the parties is bleak on this point, the court finds, for the reasons to follow, that Ms. Liles is entitled to the benefits of the Autauga County Suit judgment.

First, as to Ms. Liles's relationship with the Ensleys, the court is persuaded that the principles elaborated upon in *Thompson* apply in this case.  *See* 961 So. 2d at 876.  Crooked Creek's predecessor-in-interest (Ms. Walden) received an adverse judgment, affirmed by the Supreme Court of Alabama in November 2007, as to her claim that the Ensleys had encroached upon her purported ownership interest in Danya Apartments.  A year later, in December 2008, Crooked Creek in this action sued Ms. Liles based on the same set of factual circumstances – *i.e.*, that Ms. Liles has "caus[ed] injury to" Crooked Creek's purported ownership of Danya Apartments and has joined the Ensleys in their "long term common purpose" of "wresting away from [Crooked Creek] its property . . . ." (Autauga County Suit, Compl. ¶ 31.)  Crooked Creek has not explained how Ms. Liles, in her role as the on-site manager, would have different rights than the Ensleys in the management of Danya Apartments.  *Thompson* supports the conclusion that Ms. Liles's liability is coextensive with the Ensleys.  Whether Ms. Liles is deemed to be in a "special relationship" with the Ensleys

or is categorized as an employee or agent of Danya Group's principals (*i.e.*, the Ensleys), on the facts pleaded, Ms. Liles and the Ensleys are "one in interest" against whom the same relief is sought "over the same transaction," *Thompson*, 961 So. 2d at 886 & 887 (quoting *Emery*, 39 Me. at 326, & *Lubrizol*, 871 F.2d at 1288).  Moreover, the Autauga County Suit judgment was not "personal to" the Ensleys, *Thompson*, 961 So. 2d at 885, but rather was based upon a holding that ES Capital's mortgage on Danya Apartments and the management agreement were valid instruments.  In short, to allow Crooked Creek to relitigate the validity of the mortgage and management agreement as to Ms. Liles is to allow it to have a "'second bite at the apple.'"  *Thompson*, 961 So. 2d at 887 (quoting *Lubrizol*, 871 F.3d at 1288).

Second, an argument can be made that Ms. Liles is in privity with the Ensleys and ES Capital based upon her "identity of interest" with them "in the subject matter of litigation." *Hughes*, 533 So. 2d at 191.  As stated, in this lawsuit, it is alleged that Ms. Liles, in conjunction with the other Defendants, operates the rental business of Danya Apartments based upon a void mortgage and management agreement, and in contravention to Crooked Creek's purported ownership of all of the common stock of the corporation that owns Danya Apartments.  The legality of Ms. Liles's conduct in this action is directly contingent upon both the validity of ES Capital's mortgage on Danya Apartments and the management agreement. The validity of the Ensleys' and ES Capital's mortgage and the management agreement also was the focal point of the Autauga County Suit.  Namely, in the Autauga County Suit, Ms. Walden vigorously fought for a judgment against the Ensleys and ES Capital that she was the

38

owner of the stock in the corporation that owned Danya Apartments, with no restrictions on that ownership, for cancellation of the defendants' agreement governing the management of Danya Apartments, and for damages for alleged infringements by the defendants on her claimed ownership of Danya Apartments.  In response, in the Autauga County Suit, the Ensleys and ES Capital sought to defend and preserve a priority mortgage on Danya Apartments and the validity of the management agreement.  Based on these facts, the court finds that Ms. Liles, ES Capital and the Ensleys have parity of interest in the subject matter of the prior litigation.  By virtue of the Autauga County Circuit Court's judgment, which was affirmed, that there was a valid, first priority mortgage on Danya Apartments and a valid management agreement governing the operation of the rental business of Danya Apartments, the Ensleys and ES Capital have been exonerated from any wrongdoing in the collection and keeping of the rents from that rental business.  Based upon an identity of interest among the Ensleys, ES Capital and Ms. Liles, Ms. Liles is entitled to the same benefit the Ensleys and ES Capital received from the Autauga County Suit judgment.  The third element of *res judicata* is satisfied as to Ms. Liles.

### d.    Mr. Edmondson

Crooked Creek argues, without citation to authority, that because Mr. Edmondson was not a party to the Autauga County Suit, "res judicata cannot apply."  (Doc. # 40, at 8.)  It is true that Mr. Edmondson was not a party in that prior litigation.  He, however, was employed to represent two of the defendants – the Ensleys and ES Capital – in the Autauga County Suit.

The issue is whether under Alabama law he is in privity with the Ensleys and ES Capital by virtue of the fact that he was their counsel of record in the prior action.

Initially, as the attorney for the Ensleys and ES Capital in the Autauga County Suit, there is no dispute that Mr. Edmondson had "adequate notice" of that suit. *Hughes*, 533 So. 2d at 191. Additionally, in the Autauga County Suit, Mr. Edmondson was able to "control," to a measurable extent, how the defense of that litigation proceeded. *Taylor*, 128 S. Ct. at 2173. The Autauga County Suit record reflects that he defended the claims lodged against the Ensleys and ES Capital through briefs and at oral argument. (Autauga County Suit, Summ. J. Op. 1.) During this state court litigation, Mr. Edmondson actively advocated for the Ensleys and ES Capital's interests in preserving ES Capital's mortgage on Danya Apartments and the management agreement, and in defending against claims that the Ensleys were wrongfully diverting from Ms. Walden the rental income from the apartments. These matters again are at the heart of the claims that Mr. Edmondson is defending against in the present litigation as the Ensleys and ES Capital's co-defendant. The court finds that the control Mr. Edmondson exerted in the prior action *vis-a-vis* his role as the attorney and agent for the Ensleys and ES Capital gave him a sufficient voice in that litigation to contradict Ms. Walden's claims of ownership to Danya Apartments so as to satisfy the privity element of *res*

*judicata*.  Stated differently, Mr. Edmondson had an ample laboring oar himself in the conduct

of the Autauga County Suit proceedings.[20]

### e. Summary

Because all of the parties in this action were either parties or in privity with parties in

the prior litigation, the court finds that there is a "substantial identity of parties."  Accordingly,

the third *res judicata* element is satisfied as to all parties.

### 4. Same Cause of Action

Defendants argue that *res judicata*'s same-cause-of-action requirement is met.  In

*Chapman Nursing Home*, the Supreme Court of Alabama addressed this element of the *res*

*judicata* test:

> Discussing the same-cause-of-action element of res judicata, this Court has
> noted that "the principal test for comparing causes of action [for the application
> of res judicata] is whether the *primary right and duty or wrong* are the same in
> each action."  This Court further stated:  "Res judicata applies not only to the
> *exact legal theories* advanced in the prior case, but to *all legal theories and*
> *claims* arising out of the same nucleus of operative facts."  As a result, two
> causes of action are the same for res judicata purposes "when the same
> evidence is applicable in both actions."

---

[20] *Thompson* recognized that privity has been found to encompass "'special relationship[s]'" among defendants in the present and former actions.  *Thompson*, 961 So. 2d at 877 (quoting *Lubrizol*, 871 F.2d at 1288).  The phrase "special relationship" was not expanded upon in either *Thompson* or *Lubrizol*, and both cases involved an employer-employee relationship, not an attorney-client relationship.  *See Thompson*, 961 So. 2d at 877; *Lubrizol*, 871 F.2d at 1288.  Moreover, no published decision from an Alabama court has been cited by the parties or found by the court discussing the attorney-client relationship in the context of *res judicata*'s privity requirement.  However, as an alternative rationale supporting Mr. Edmondson's motion to dismiss, *see infra*, and because the relationship of attorney-client is one of the highest agencies known to the law, *see, e.g., In re Hayes*, 183 F.3d 162, 168 (2d Cir. 1999) ("[T]he attorney-client relationship entails one of the highest fiduciary duties imposed by law."), Mr. Edmondson's legal representation of the Ensleys in the Autauga County Suit is found on this record to be a qualifying "special relationship."

985 So. 2d at 921 (internal citations and quotation marks omitted; emphasis in original); *accord Greene*, 13 So. 3d at 913; *accord Chiepalich v. Coale*, No. 1061725, ___ So. 3d ___, 2009 WL 3335891, at *2 (Ala. 2009) (*per curiam*).  However, an exception exists to *Chapman Nursing Home*'s general precepts if "'[t]he plaintiff was unable to rely on a certain theory . . . or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action . . . .'"  *Lloyd Noland Found., Inc.*, 979 So. 2d at 795 (citation omitted).

Defendants contend that in this litigation and in the Autauga County Suit, the same wrong is asserted and the same proof is required because both lawsuits "center[] upon the validity and enforceability of the [m]ortgage and [m]anagement [a]greement through which ES Capital and the Ensleys retain the rental proceeds from the apartments."  (Doc. # 32, at 12.)  Furthermore, while recognizing that the federal-law causes of action in this litigation were not asserted in the Autauga County Suit, Defendants contend that *res judicata* bars those claims as well because the factual underpinnings mirror those of the Autauga County Suit and because the circuit court's subject matter jurisdiction was not an impediment to bringing those causes of action.  (Doc. # 32, at 12-13 & n.3.)

Having considered the arguments in light of the applicable law set out above, the court finds that the primary right asserted by Ms. Walden in the Autauga County Suit was her right to an unencumbered ownership interest in Danya Apartments.  (*See, e.g.*, Autauga County

42

Suit, Compl. 19.)  The primary wrong, in turn, centered on the defendants' interference with that ownership.  That interference included, among other things, ES Capital's mortgage on Danya Apartments and the agreement entered into by certain of the defendants for the management of Danya Apartments.  Ms. Walden having lost her fight in the Autauga County Suit, Crooked Creek, as the successor-in-interest to Ms. Walden's claim against Danya Apartments, continues in this lawsuit the quest for ownership of the stock in the corporation that owns Danya Apartments.  Crooked Creek vigorously argues that the management agreement is "the linchpin of the illicit scheme" devised by the current Defendants (Am. Compl. ¶ 23), and that ES Capital's mortgage on Danya Apartments is void (Am. Compl. ¶¶ 217-18).  Moreover, Crooked Creek also asks this court to "quiet" its "title" to Danya Apartments (Am. Compl. 70; *see also* Am. Compl. ¶ 212), and seeks from Defendants the return of proceeds from the rental business of Danya Apartments (Am. Compl. ¶ 172).  All of the injuries and damages claimed pertain to Defendants' alleged conduct that purportedly contravenes Crooked Creek's asserted ownership of the common stock in the corporation that owns Danya Apartments.  Based upon a comparison of the Autauga County Suit and this litigation, it is apparent that the primary rights sought to be vindicated and the primary wrongs allegedly perpetrated against Crooked Creek are the same in this litigation as they were in the Autauga County Suit.

Additionally, as stated, although not all of the causes of action are the same in the present action and the Autauga County Suit, *res judicata*'s same-cause-of-action element will

be satisfied if the claims in the former and present actions arise out of the same nucleus of operative facts. Some of the causes of action are identical. For example, the present lawsuit replicates the claims in the Autauga County Suit for quiet title and to declare the mortgage void. (*See* Am. Compl. ¶¶ 212-18.) These overlapping claims – in the present and the former litigation – focus on arguments that Ms. Walden and now Crooked Creek owns all of the common stock in the corporation whose only asset is Danya Apartments, that the management agreement is void, and that the defendants' alleged control over Danya Apartments' rental management is unauthorized. The federal-law causes of action, *i.e.*, the RICO counts, elaborate upon what Crooked Creek contends is a calculated scheme by Defendants to injure its ownership and business interests in Danya Apartments. (*See, e.g.,* Am. Compl. ¶¶ 45-75.) The scheme involves diversion of the income from the rental of Danya Apartments through use of the mail, banks, computers and phones. (Am. Compl. ¶ 60.)

All in all, the court concludes that the conduct that forms the basis of this action and the former action arises out of the same nucleus of operative facts. In its simplest terms, the subject matter – ownership control of Danya Apartments and the validity of the mortgage – is the same in both suits.[21]

---

[21] Crooked Creek says that the "evidence necessary to establish the validity of ES Capital's mortgage varies materially from the evidence necessary to establish the elements" of other of its causes of action brought in this lawsuit. (Doc. # 36, at 10.) The argument, however, is cursory and without support. Based upon the foregoing factual comparison of the two lawsuits, the court has been unable to envision any substantial evidentiary deviations.

Furthermore, the court agrees with Defendants that Crooked Creek's predecessor-in-interest could have brought the RICO claims in the Autauga County Suit.  It is well established that state courts have concurrent jurisdiction with federal courts over civil RICO actions.  *See Tafflin v. Levitt*, 493 U.S. 455, 458 (1990).  Hence, the Eleventh Circuit, as well as other courts, has applied claim preclusion principles in barring a second suit advancing RICO claims that were not asserted in the prior proceedings.  *See Israel Disc. Bank Ltd. v. Entin*, 951 F.2d 311, 315 (11th Cir. 1992) (applying *res judicata* to bar RICO claims and noting that, "[i]n determining whether the causes of action are the same, a court must compare the substance of the actions, not their form" (internal quotation marks omitted)); *Regions Bank v. J.R. Oil Co.*, 387 F.3d 721, 732 (8th Cir. 2004) (holding that *res judicata* barred the plaintiff from asserting a RICO claim that it failed to raise in the prior bankruptcy proceeding).  Accordingly, there were no "limitations on the subject matter jurisdiction" of the Autauga County Circuit Court to entertain the RICO claims.  *Lloyd Noland Found.*, 979 So. 2d at 795.  Because the current RICO claims merely present a different legal avenue through which Crooked Creek is attempting to challenge the validity of the mortgage on Danya Apartments and the management agreement, Crooked Creek cannot avoid the *res judicata* effect of the Autauga County Suit judgment by re-labeling its claims as falling under the proscriptions of RICO.

Crooked Creek, however, argues that in the Autauga County Suit, the state court "split[]" Ms. Walden's causes of action, thereby precluding the application of *res judicata*. (Doc. # 36, at 10.)  The court disagrees.

If in the first lawsuit, a plaintiff voluntarily omits claims that could have been decided based upon the factual transaction alleged, *res judicata* will bar a plaintiff's successive lawsuit that relies upon the previously-omitted claims.  This omission by a plaintiff has been referred to as splitting a cause of action.  *See Ex parte Sears, Roebuck & Co.*, 895 So. 2d 265, 270 (Ala. 2004).  As discussed above, this is what has occurred with the RICO claims brought by Crooked Creek in this lawsuit.  However, "[w]here the court does the splitting and dilatoriness on the part of the plaintiff is not a consideration," *res judicata* does not preclude the plaintiff from filing a later action based upon the claims not addressed in the first action.  *Id.*; *see also id.* at 270-71 (citing *Nilsen v. City of Moss Point*, 701 F.2d 556, 563 (5th Cir. 1983), for the principle that the rule "precluding litigants from splitting causes has no function where the court itself, rather than the litigant, does the splitting and does it by reason of no default on the part of the litigant, who timely advanced all his claims in the initial proceeding").

Here, the Autauga County Circuit Court did not split any causes of action.  To the contrary, as stated above, it granted summary judgment in favor of the Ensleys and ES Capital "as to all claims" brought by Ms. Walden.  (Autauga County Suit, Summ. J. Op. 6.) Additionally, on appeal from the Autauga County Circuit Court's judgment, while the Supreme Court of Alabama restricted its review, it did so solely because "[t]he only issue

46

briefed by Walden [was] the quiet-title claim." *Walden*, 987 So. 2d at 1116.  Because Ms. Walden in effect abandoned her claims for appellate review, she cannot successfully argue that the Supreme Court of Alabama "d[id] the splitting." *Sears, Roebuck & Co.*, 895 So. 2d at 270.

Having considered carefully the arguments of the parties, the court find that the fourth element of *res judicata* is satisfied.  Because all four elements have been met, the doctrine of *res judicata* forecloses Crooked Creek's claims in this litigation.

## C.   Collateral Estoppel

Defendants also rely on the doctrine of collateral estoppel.  *See Chapman Nursing Home,* 985 So. 2d at 919 ("Res judicata and collateral estoppel are two closely related, judicially created doctrines that preclude the relitigation of matters that have been previously adjudicated or, in the case of res judicata, that could have been adjudicated in a prior action."); *see also Lee L. Saad Constr. Co. v. DPF Architects, P.C.*, 851 So. 2d 507, 516 (Ala. 2002) ("'The doctrine of res judicata, while actually embodying two basic concepts, usually refers to what commentators label "claim preclusion," while collateral estoppel . . . refers to "issue preclusion," which is a subset of the broader res judicata doctrine.'" (citations omitted)).  *But see Ex parte Ford Motor Credit Co.*, 772 So. 2d 437, 440 n.1 (Ala. 2000) ("There is some dispute in Alabama cases whether 'issue preclusion' and 'claim preclusion' are separate doctrines or are both subsets of the doctrine of res judicata.").  Because the doctrine of *res*

*judicata* precludes this lawsuit, it is unnecessary to address the parties' arguments on collateral estoppel, although Defendants' arguments are persuasive.[22]

**D.      Additional Findings as to Mr. Edmondson:  RICO Liability**

Crooked Creek alleges that Mr. Edmondson engaged in activities prohibited by the RICO statute, namely, (1) that he knew that the proceeds from a pattern of racketeering activity were being invested in an enterprise engaged in interstate commerce, *see* 18 U.S.C. § 1962(a); (2) that he conducted or participated directly or indirectly through a pattern of racketeering activity in the conduct of an enterprise engaged in interstate commerce, *see* § 1962(c); and (3) that he conspired with others to violate the foregoing prohibitions, *see* § 1962(d).  (Am. Compl. ¶¶ 89-100, 106-41.)

Mr. Edmondson argues that he cannot be held liable under RICO because the allegations in the operative complaint merely target his services as an attorney.  The court agrees.

---

[22] As discussed in a prior section of this opinion, under Alabama law, *res judicata* embodies a mutuality requirement.  See *Greene*, 13 So. 3d at 912.  Alabama's mutuality requirement also has not been relinquished under the doctrine of collateral estoppel.  *See, e.g., Hurt v. Pullman, Inc.*, 764 F.2d 1443, 1450 (11th Cir. 1985) ("[T]he Alabama Supreme Court has . . . declined to abandon its mutuality requirement" in the application of collateral estoppel.); *Redmond v. Bankester*, 757 So. 2d 1145, 1151 n.2 (Ala. 1999) (Collateral estoppel requires "'mutuality,' that is, both parties must have been bound by the previous judgment or else neither party may invoke the doctrine of collateral estoppel.'").  However, its function has been questioned and its scope eroded.  *See Little v. Pizza Wagon, Inc.*, 432 So. 2d 1269, 1274 (Ala. 1983) (Jones, J., concurring specially) ("[T]he time has come for us to recognize that adherence to strict mutuality, when collateral estoppel is asserted in a defensive manner, is contrary to the basic policy underlying the notion of preclusion. . . .  Estoppel, in this situation, promotes judicial economy and efficiency by reducing litigation and encouraging the use of our liberal joinder and pleading rules.").

In *Handeen v. Lemaire*, 112 F.3d 1339 (8th Cir. 1997), the Eighth Circuit explained that "a growing number of courts, including our own, have held that an attorney or other professional does not conduct an enterprise's affairs through run-of-the-mill provision of professional services." *Id.* at 1348 (collecting cases); *see also Reves v. Ernst & Young*, 507 U.S. 170, 174-75 & 186 (1993) (holding that an accounting firm, which allegedly provided the plaintiffs with erroneous information about the defendant's financial solvency, was not liable under RICO); *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994) (An attorney who "acted as no more than [an] attorney" could not be held liable under RICO.); *Univ. of Md. at Balt. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539-40 (3d Cir. 1993) (Mere performance of financial services, "even if they are later found to be deficient," does not open up an accounting firm "to liability under the federal racketeering statute."). While emphasizing that "[a]n attorney's license is not an invitation to engage in racketeering" activities proscribed by RICO, the Eighth Circuit observed, "[i]t is a good thing, we are sure, that we find it extremely difficult to fathom any scenario in which an attorney might expose himself to RICO liability by offering conventional advice to a client or performing ordinary legal tasks (that is, by acting like an attorney)." *Handeen*, 112 F.3d at 1349.

Here, it is alleged that Mr. Edmondson served as legal counsel to the other named Defendants, and that he failed in his duties to render lawful advice, thus facilitating the RICO enterprise. (*See* Am. Compl. ¶¶ 20, 98, 121.) In Crooked Creek's mostly conclusory words, Mr. Edmondson "corruptly counsel[ed]" and "corruptly advise[d]" the Ensleys and Ms. Liles

"by, among other things, wrongly placing legal roadblocks up in order for them to continue looting Danya Apartments."  (Am. Compl. ¶ 121; *see also* Am. Compl. ¶¶ 139, 144.)  It further is alleged that, in return for his corrupt advice, Mr. Edmondson was paid with funds collected from the rental business of Danya Apartments.  (Am. Compl. ¶¶ 121, 136-37.)  Crooked Creek avers that "had it not been for [Mr.] Edmondson's advice, counsel and help," the "criminal enterprise would have expired long ago."  (Am. Compl. ¶ 121.)  In his role as legal counsel, Mr. Edmondson allegedly joined the other Defendants in an "unlawful objective . . . to maintain autocratic control over [Crooked Creek's] rental-property business in order to have immediate, unfettered, unlimited, access to its financial resources, and, in the long run, to wrest the business and property away from a financially exhausted and dispirited owner."  (Am. Compl. ¶ 132.)

The court finds that these allegations place Mr. Edmondson squarely within the principles espoused in the foregoing cases.  His alleged corrupt role is confined to providing legal services to the other Defendants.  The fact that the advice purportedly was wrong or tainted does not give rise to liability under RICO.  Because the allegations challenge Mr. Edmondson's services as an attorney, they fail to present a basis for holding him liable under RICO.  Accordingly, the RICO claims against Mr. Edmondson are not only barred by *res judicata*, but also are due to be dismissed on this basis.

**E.**   **A Final Observation:  The *Rooker-Feldman* Doctrine**

It also bears mentioning that application of the *Rooker-Feldman* doctrine has been urged by Mr. Edmondson (Doc. # 34, at 5-7), but not by the other Defendants.  "The *Rooker-Feldman* doctrine prevents the lower federal courts from exercising jurisdiction over cases brought by 'state-court losers' challenging 'state-court judgments rendered before the district court proceedings commenced.'"  *Lance v. Dennis*, 546 U.S. 459, 460 (2006) (*per curiam*); *accord Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

Admittedly, this action seems to be an attempt to conceal, principally by way of RICO claims, a motive to reverse the ruling by the Autauga County Circuit Court.  Nonetheless, the *Rooker-Feldman* doctrine is an "extremely narrow exception[] to the federal courts' 'virtually unflagging' duty 'to adjudicate claims within their jurisdiction.'"  *Green*, 563 F.3d at 1245.  In *Lance*, emphasizing the doctrine's restricted use, the Court held that the *Rooker-Feldman* doctrine "does not bar actions by nonparties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment."  *Lance*, 546 U.S. at 466; *see also Exxon*, 544 U.S. at 283 (observing that lower courts have extended the *Rooker-Feldman* doctrine "far beyond the contours of the *Rooker* and *Feldman* cases, . . . superseding the ordinary application of preclusion law pursuant to 28 U.S.C. § 1738").

Crooked Creek was not a party to the Autauga County Suit.  While *Lance* left open whether "*any* circumstances, however limited" existed "in which *Rooker-Feldman* may be

applied against a party not named in an earlier state proceeding[,]" 546 U.S. at 466 n.2, Mr. Edmondson has not addressed whether such circumstances exist in this case.  Because this action is due to be dismissed on the ground of *res judicata* and because the argument for application of the *Rooker-Feldman* doctrine is perfunctory as to the same-party requirement, the court declines on this record to delve further into the applicability of the *Rooker-Feldman* doctrine.

## V.  CONCLUSION

Based upon a careful study of the history of collateral estoppel and *res judicata* in Alabama, it is unclear when one doctrine ends and the other begins, as the terminology used by the courts is not always consistent and frequently is interchanged.  It is clear, however, that the result in this opinion is entirely consistent with the policies enunciated by Alabama courts that parties should not be permitted to litigate the same matter in perpetuity: "[T]hose who have contested an issue shall be bound by the ruling of the court[,] and . . . issues once tried shall be considered forever settled between those same parties and their privies." *Hughes*, 533 So. 2d at 190.  "The principle of res judicata fosters reliance on judicial action, and tends to eliminate vexation and expense to the parties, wasted use of judicial machinery and the possibility of inconsistent results." *Id.*

Consistent with this principle and for the reasons set out herein, the court finds that under Alabama law, all four elements of *res judicata* have been satisfied.  The Autauga County Suit constitutes a prior judgment on the merits, rendered by a court of competent

jurisdiction, with the same subject matter as presented in this action, and with the same parties or their privies. *Res judicata*, thus, bars Crooked Creek from bringing the present action.

Additionally, because there is not a private right of action under the federal and state criminal statutes alleged, those claims cannot survive Rule 12(b)(6) scrutiny, and the RICO claims against Mr. Edmondson fare no better. Because the operative complaint's allegations against Mr. Edmondson merely attack his work as an attorney for Defendants, they are insufficient as a matter of law to sustain RICO liability. In sum, the foregoing sets out the bases for the court's prior Order (Doc. # 74) granting the motions to dismiss (Docs. # 22, 31) filed by Defendants Richard Ensley, Patricia Ensley, Anita Liles, ES Capital, LLC, and Charles W. Edmondson.

An appropriate judgment will be entered.

DONE this 28th day of October, 2009.

/s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE